IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| ALPINE SUMMIT FUNDING, LLC, | COMPLAINT |
| Plaintiff, | |
| | Case No. 24-cv-3327 |
| v. | |
| CRAIG PERRY, DARREN MOULDS, WILLIAM WICKER, TRAVIS REAGAN BROWN, and CHRYSTIE HOLMSTROM, | JURY TRIAL REQUESTED |
| Defendants. | |

Plaintiff Alpine Summit Funding, LLC ("**ASF**"), as and for its complaint against Defendants Craig Perry, Darren Moulds, William Wicker, Travis Reagan Brown, and Chrystie Holmstrom, states:

## STATEMENT OF THE CASE

1. This is an action for breach of fiduciary duty and tortious interference with contract against Defendants, each of whom is a former officer of ASF.

2. Defendants were also officers of an interrelated group of companies, including Alpine Summit Energy Partners, Inc. (**"ASEP"**), HB2 Origination, LLC (**"HB2"**), Ageron Energy II, LLC (**"Ageron Energy"**), Ironroc Energy Partners LLC (**"Ironroc"**), Ageron Ironroc Energy, LLC (**"Ageron"**), Alpine Summit Energy Investors, Inc. (**"ASEI"**), and Alpine Carbon, LLC (**"Carbon"**, and with **ASEP**, **HB2**, **Ageron Energy**, **Ironroc Energy**, **Ageron Ironroc**, and **ASEI**, the "**Debtors**"). On July 5, 2023 (the **"Petition Date"**), the Debtors commenced a Chapter 11 proceeding in the United States Bankruptcy Court for the Southern District of Texas, Case No.

1

23-90739 (MI).[1]

3. ASF was formed in 2022 as a special-purpose entity in connection with an asset-backed securitization facility, pursuant to which the Debtors raised over $100 million in capital (the "**ABS Facility**").

4. As discussed in more detail below, HB2 sold and assigned certain of its non-operated working interests in oil and gas wellbores to ASF (the "**ASF Wells**"). ASF, in turn, funded its purchase of the working interests in the ASF Wells by issuing ASF Notes, in the aggregate principal amount of $135 million, to certain investors pursuant to an Indenture. The ASF Notes were secured by substantially all of ASF's assets (as well as a pledge by ASF Holdings) and guaranteed by HB2. The ASF Note proceeds were paid to HB2 in exchange for its interests in the ASF Wells.

5. Under the relevant agreements, ASF was entitled to any and all proceeds of hydrocarbons attributable to the ASF Wells ("**ASF Funds**"). The ASF Funds, which were exclusively the property of ASF, were required to be segregated and held in a separate bank account (referred to herein and defined below as the DACA Account), and ASF was obligated to use the ASF Funds to pay the ASF Notes and other amounts owed under the Indenture.

6. Defendants owed ASF undivided duties of care, loyalty, and good faith as mandated by Delaware law. ASF trusted Defendants and reasonably expected them to conduct themselves in accordance with their fiduciary duties to ASF, especially given that Defendants (as officers of the various corporate entities involved) were on all sides of the transactions and operations. Defendants abused ASF's trust and confidence, making decisions for the benefit of themselves and the Debtors that were directly against ASF's interests.

---

[1] ASF's claims against the Debtors were resolved in the Chapter 11 proceedings.

7. Specifically, Defendants breached their fiduciary duty to ASF by withholding funds from the DACA Account – funds that belonged solely to ASF – that were supposed to be used to pay royalties, taxes, or other required payments to third parties, and instead using them for the benefit of HB2. As just one example, Defendants withheld approximately $1.4 million in ASF Funds from the DACA Account and claimed that the withheld funds were used to make certain royalty payments. Instead of using the withheld funds to pay royalties, Defendants used them to pay a $1.4 million premium owed for the Debtors' director and officer liability insurance policy. Defendants then withheld funds to pay the same royalties **a second time**, causing ASF to effectively pay for the royalties twice.

8. In addition, Defendants swept approximately $2.5 million in ASF Funds from the DACA Account just days before the Petition Date. Defendants knew that the funds belonged solely to ASF and that they were not entitled under the transaction documents to take these funds, but did so anyway, to their own (and the Debtors') benefit.

9. By using withheld ASF Funds for improper purposes and by sweeping the ASF Funds from the DACA Account, Defendants also tortiously interfered with ASF's rights under the DACA Agreement.

10. As a result of Defendants' actions, ASF has been injured in an amount to be proven at trial. A preliminary investigation indicates that ASF's damages exceed $10 million.

## PARTIES

11. Plaintiff Alpine Summit Funding, LLC is a limited liability company organized and existing under the laws of the State of Delaware. ASF was indirectly wholly owned by HB2, through the intermediate holding company Alpine Summit Funding Holdings, LLC ("**ASF Holdings**").

12. Defendant Craig Perry was the Chairman of the Board of Directors and Chief Executive Officer of the Debtors. Perry was also President and Chief Executive Officer of ASF until he was removed post-petition as discussed below. On information and belief, Perry is a citizen of Tennessee.

13. Defendant Darren Moulds was the Debtors' Chief Financial Officer and was the Chief Financial Officer of ASF until removed post-petition as discussed below. On information and belief, Moulds is a citizen of Texas.

14. Defendant William Wicker was the Debtors' Chief Investment Officer. Wicker was also ASF's Chief Investment Officer until he was removed post-petition as discussed below. On information and belief, Wicker is a citizen of Texas.

15. Defendant Travis Reagan Brown was the Debtors' Chief Administrative Officer. Brown was also ASF's Chief Administrative Officer until he was removed post-petition as discussed below. On information and belief, Brown is a citizen of Tennessee.

16. Defendant Chrystie Holmstrom was the Debtors' Chief Legal Officer and Corporate Secretary. Holmstrom was also ASF's Chief Legal Officer and Secretary until she was removed post-petition as discussed below. Holmstrom is currently a partner at Holland & Knight LLP. On information and belief, Holmstrom is a citizen of Tennessee.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between Plaintiff and the Defendants and because the amount in controversy exceeds $75,000.

18. This Court has personal jurisdiction over the Defendants because this action arises out of the Defendants' contacts with the State of Texas.

19. Venue in the Southern District of Texas is proper under 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events giving rise to the claims occurred in this district and because the defendants are subject to this Court's personal jurisdiction with respect to this action.

## FACTUAL ALLEGATIONS

### I. THE TRANSACTION

20. The Debtors formed ASF on or about April 7, 2022, in connection with the ASF Facility, and the parties entered into a number of related agreements, including the following (the "**Transaction Documents**"):

   a. Two Note Purchase Agreements (the "**NPAs**"), dated April 29, 2022 and September 12, 2022. The NPAs were executed by ASF (as the Issuer), ASEP (as parent), HB2 (as Manager), Ironroc (as the Operator under the April 29 NPA), Ageron (as the Operator under the September 29 NPA), and certain note purchasers (the "**ASF Noteholders**").

   b. Two Asset Purchase Agreements (the "**APAs**"), dated April 29, 2022 and September 12, 2022. The APAs were executed by HB2 (as seller) and ASF (as issuer/purchaser).

   c. An Indenture dated April 29, 2022, and an amended and restated Indenture dated (September 12, 2022 (the "**Indenture**"). The Indenture was executed by ASF (as issuer) and UMB Bank, N.A. (as indenture trustee) ("**UMB**" or the "**Indenture Trustee**").

   d. An Operating Agreement dated April 29, 2022, which was amended and restated by agreement dated September 12, 2022 (the "**JOA**"). The JOA was executed by Ageron and Ironroc (as Operators) and ASF (as non-operator working interest owner).

   e. A Management Services Agreement dated April 29, 2022, which was amended and restated by agreement dated September 12, 2022 (the "**MSA**"). The MSA was executed by HB2 (as Manager) and ASF.

   f. A Deposit Account Control Agreement dated April 29, 2022 (the "**DACA Agreement**"). The DACA Agreement was executed by HB2 (as customer), Bank7 (as depository bank), and UMB (as secured party, in its capacity as Indenture Trustee).

21. The Transaction Documents, including the JOA and MSA, explicitly recognize and

provide that the ASF Funds are exclusively ASF's property. The Transaction Documents required segregation of the ASF Funds at all times in the DACA Account, which was subject to the Indenture Trustee's perfected security interest and control pursuant to the DACA Agreement.

22. Pursuant to the NPAs and the Indenture, in April and September 2022, ASF issued and sold two tranches of notes, initially in the aggregate principal amount of $135 million, comprised of certain (a) $80,000,000 in Series 2022-1 Floating Rate Oil & Gas Asset-Backed Notes and (b) $55,000,000 in Series 2022-2 Floating Rate Oil & Gas Asset-Backed Notes (collectively, the "**ASF Notes**").

23. Pursuant to the APAs, HB2 unconditionally sold and assigned to ASF, inter alia, all of its interests in the ASF Wells, for a purchase price of over $119 million (the "**HB2 Assignments**"). ASF, in turn, paid the proceeds of the ASF Notes to HB2 in exchange for such interests. As a result of the HB2 Assignments, ASF owns and holds all equitable title to the non-operated working interests in the ASF Wells, and the proceeds thereof, including any and all ASF Funds.

24. Pursuant to the Indenture and certain related and ancillary agreements, ASF granted the Indenture Trustee a lien on substantially all of its assets to secure its obligations under the Indenture, including, inter alia, to pay the ASF Notes. ASF Holdings also pledged its equity interests in ASF to the Indenture Trustee. HB2 guaranteed ASF's obligations under the Indenture.

25. ASF was required to pay the ASF Notes from the proceeds attributable to the ASF Wells (i.e., the ASF Funds) under all of the relevant agreements. Under the JOA, Debtors Ironroc and Ageron were designated as the Operators of separate contract areas described therein, which collectively included all of the ASF Wells. The Operators were responsible for drilling and operating ASF's oil and natural gas wells on behalf of ASF, including with respect to the marketing

and sale of hydrocarbons produced from the wells, the segregation and maintenance of the sales proceeds, payment of authorized expenses, and remittance of the proceeds to ASF. Furthermore, pursuant to the MSA, the Operators could delegate (and did delegate) certain operational duties and services to HB2, in its capacity as Manager thereunder, subject to the meticulous terms and conditions of the JOA, including those terms and conditions governing the treatment of the ASF Funds.

26. Importantly, under the Indenture, JOA, MSA and other agreements, the parties were required to segregate the ASF Funds, which the agreements explicitly recognized belonged exclusively to ASF. Among other requirements, the Debtors had to establish, and thereafter deposit and separately maintain, the ASF Funds in the "HB2 Segregated Account" with Bank7—the Debtors' chosen depository institution. The Debtors designated the Bank7 account number ending *6432 as the HB2 Segregated Account (the **"DACA Account"**). Pursuant to the DACA Agreement, HB2 granted the Indenture Trustee a perfected security interest and exclusive control over the DACA Account and the funds contained therein, as security for ASF's obligations under the Indenture. The funds in the DACA Account were to be held solely for the benefit of ASF.

27. Article V(D)(4) of the JOA provides:

> <u>Custody of Funds</u>: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

(JOA, Art. V(D)(4))

28. As set forth above, the JOA explicitly provides that the ASF Funds belong solely to

ASF and shall remain ASF's property while in the Operators' custody until the funds are used for their intended purposes or otherwise delivered to ASF. While the above provision states that the Operator **was not** required to segregate non-Operator funds unless the parties otherwise specifically agreed, **here the parties did agree**, thereby mandating segregation of the ASF Funds.

29. Article XVI(I) of the JOA required the Operators to cause production purchasers to pay proceeds attributable to the ASF Wells directly into the DACA Account to mitigate any risk of commingling. Specifically, Article XVI(I)(2) of the JOA provides, in pertinent part:

> All proceeds from the sale of Issuer's proportionate share of Oil and Gas production attributable to the Wells shall be paid directly to the HB2 Segregated Account by the purchasers of such production, and Operator shall thereafter remit or cause Manager to remit to Issuer, Issuer's proportionate share of such proceeds within two (2) Business Days following such time as Operator or Manager has identified the portion of such proceeds as payable to Issuer (after calculation and netting of applicable Operating Expenses, Burdens and Asset Taxes), but in any event within sixty (60) days after receipt of such proceeds in the HB2 Segregated Account.

JOA, Art. XVI(I)(2).

30. After the Operators segregated the ASF Funds, the JOA authorized the Operators to use the ASF Funds to pay certain authorized expenses, i.e., "Operating Expenses, Burdens and Asset Taxes." The authorized expenses under the Transaction Documents included lease operating expenses, capital expenditure projects, royalties, production payments, and various taxes (including ad valorem, property, severance, production, sales, and use taxes).

31. The MSA also obligated HB2, as Manager, to cause all production proceeds attributable to the ASF Wells to be deposited directly to the DACA Account (i.e., the HB2 Segregated Account). From there, under the MSA, the Manager was required to make remittances to ASF by transferring the net proceeds to the "Collection Account," which was defined in the MSA by reference to the definition of that term in the Indenture. Under the Indenture, the Collection Account was a trust account at UMB. Furthermore, the MSA provided that if any ASF

Funds were received into an account of the Manager or any of its Affiliates (other than the HB2 Segregated Account), then the Manager was required to transfer and segregate such funds into the DACA Account or Collection Account, as applicable, within three (3) business days of learning of misplacement of the funds.

## II. DEFENDANTS WERE SIMULTANEOUSLY OFFICERS OF ASF AND THE DEBTORS

32. Defendants comprised the Debtors' core management team. Defendant Craig Perry was the Debtors' Chief Executive Officer and Chairman of the Board of Directors. Defendant Darren Moulds was the Debtors' Chief Financial Officer. Defendant William Wicker was the Debtors' Chief Investment Officer. Defendant Travis Reagan Brown was the Debtors' Chief Administrative Officer. And Defendant Chrystie Holmstrom was the Debtors' Chief Legal Officer and Corporate Secretary.

33. Defendants held the same or similar positions with ASF. Defendant Craig Perry was ASF's President and Chief Executive Officer. Defendant Darren Moulds was ASF's Chief Financial Officer. Defendant William Wicker was ASF's Chief Investment Officer. Defendant Travis Reagan Brown was ASF's Chief Administrative Officer. And Defendant Chrystie Holmstrom was ASF's Chief Legal Officer and Secretary.

34. Under applicable Delaware law, as ASF's officers, Defendants owed a "triad of duties" to ASF. These duties include a duty of care, duty of loyalty, and a duty to act in good faith. ASF reasonably trusted Defendants to act in accordance with these duties and to make decisions in good faith and in ASF's best interests. Instead, Defendants breached their duties to ASF by causing Debtors – which Defendants controlled as Debtors' officers and core management team – to misappropriate ASF Funds and use them for their own benefits.

### III. FORBEARANCE AGREEMENT

35. In early 2023, the Debtors experienced financial and operational challenges that caused them to be unable to meet their financial obligations, including their ability to make required payments under the Indenture.

36. On March 23, 2023, the ASF Noteholders entered into a Side Letter Agreement (together with certain related and ancillary agreements, the "**Forbearance Agreement**") with ASF and Debtors ASEP, HB2, Ironroc, and Ageron. The Forbearance Agreement was scheduled to terminate on July 1, 2023.

37. The Indenture Trustee did not pursue its remedies in connection with the Debtors' non-performance, including seizing the funds in the DACA Account. The Indenture Trustee agreed to suspend certain covenants in the Indenture until July 1, 2023, or upon breach of ASF or the Debtors of the covenants, representations or agreements in the Forbearance Agreement.

### IV. DEFENDANTS MISAPPROPRIATED THE ASF FUNDS

#### A. Defendants Caused the Debtors to Use ASF Funds for the Debtors' Benefit

38. As set forth above, the Operators and Manager were permitted to use ASF Funds in the DACA Account to pay for "Operating Expenses, Burdens and Asset Taxes," which included royalty payments.

39. On June 22, 2023, the Debtors withheld $1,475,557 from the ASF Funds, ostensibly to pay royalties for the April 2023 production period.

40. Pursuant to the Indenture, the Manager was required to provide a statement to the Indenture Trustee setting forth information regarding the ASF Notes, including, among other things, "confirmation of compliance with the terms of the Indenture and the other Basic Documents by the respective Alpine Parties." *See* Indenture § 8.08(a) (the "**ASF Noteholder Statements**").

41.     HB2, as Manager, provided an ASF Noteholder Statement to ASF dated June 22, 2023, which covered the April 2023 production period. This ASF Noteholder Statement was signed and certified by Defendant Brown as CAO. It stated that the Debtors had withheld the $1,475,557 from the ASF Funds for the payment of royalties for the April 2023 production period.

42.     The certification in the June 2023 ASF Noteholder Statement was false. The $1,475,557 withheld from the ASF Funds **was not used to pay royalties**; rather, Defendants used the funds to reimburse the Debtors for a $1.4 million premium payment owed for the Debtors' director and officer liability insurance policy. Defendants knew that the ASF Funds could not be used for such a purpose but allowed the funds to be used for an unauthorized purpose.

43.     Despite the June 2023 certification from Defendant Reagan Brown stating that the April 2023 royalty payments had been made, the Debtors did not pay the April royalties until August 8, 2023. On that date, the Debtors made a payment of $1,226,860 for the royalty payments for the April 2023 production period. On August 11, 2023, the Debtors deducted the $1,226,860 from the ASF Funds in the DACA Account. This was **in addition to** the $1,475,556 that Defendants had **already** withheld from the ASF Funds purportedly for the April 2023 royalty payments, but which they had wrongfully used for the benefit of the Debtors. In effect, Defendants caused ASF to pay for the April 2023 royalties twice.

**B. Defendants Caused the Debtors to Improperly Withhold Additional Funds from the DACA Account**

44.     During 2022 and 2023, the Debtors withheld approximately $6.1 million from the DACA Account for the purported purpose of paying taxes and operating expenses for the ASF Wells, including expenses for taxes, trucking, compression, and well services.

45.     Under the Transaction Documents, the Operators were permitted to withhold funds from the DACA Account to pay for taxes and operating expenses. But the Debtors did not use the

11

withheld funds to pay for approved expenses. Instead, over $6 million in accounts receivable remained unpaid, many of which have resulted in liens on ASF's assets.

46. In addition, the Debtors deducted approximately $2 million from the DACA Account for the purported purpose of making royalty payments to San Roman Minerals. Despite deducting these funds, the **royalty payments were never made** to San Roman Minerals.

### C. Sweep of $2.5 Million from DACA Account

47. On June 30, 2023 – the day before the Forbearance Agreement expired – Defendants transferred approximately $2.5 million in ASF Funds from the DACA Account.

48. The bank records for the DACA Account show that on June 23, 2023, there was a balance of $2,599,888.46. On July 1, 2023, there was only $100,000 remaining in the Account.

49. On information and belief, the ASF Funds in the DACA Account were transferred to HB2's bank account at Bank7.

50. At the time that Defendants wrongfully transferred the ASF Funds, Defendants knew that the Debtors' covenants to ASF would resume the following day. They also knew that the Debtors were planning to file bankruptcy immediately after the July 4 holiday weekend.

51. Defendants further knew that the ASF Funds in the DACA Account belonged solely to ASF. Defendants exploited their access to the DACA Account to steal ASF's money for the benefit of themselves and the Debtors.

52. Defendants used the $2.5 million in ASF Funds misappropriated from the DACA Account to pay fees and retainers for the Debtors' restructuring professionals. In filings in the bankruptcy proceedings, the Debtors admitted that they intentionally took the ASF Funds for their own purposes in contemplation of the bankruptcy filing and that it was an intentional and strategic decision to sweep the funds from the DACA Account.

## V. DEBTORS FILE FOR BANKRUPTCY

53. The Debtors commenced their Chapter 11 bankruptcy cases on July 5, 2023.

54. As of the Petition Date, Porter Hedges LLP simultaneously represented ASF and the Debtors. Porter Hedges withdrew as counsel for ASF on August 1, 2023. Defendants failed to secure replacement counsel for ASF.

55. ASF was without the protection of counsel until the ASF Noteholders effected a transfer of title from ASF's former owner, ASF Holdings. Only then were the ASF Noteholders able to remove and replace Defendants as officers of ASF and engage new counsel to untangle the Defendants' deceitful conduct.

### FIRST CAUSE OF ACTION
(Breach of Fiduciary Duty)

56. Plaintiff repeats and realleges the allegations in paragraphs 1 through 56 as if fully set forth herein.

57. At all relevant times alleged herein, Defendants were officers of ASF.

58. Pursuant to applicable Delaware law, an officer of a limited liability company owes the company undivided duties of care, loyalty, and good faith.

59. The Second Amended and Restated LLC Agreement provides that an Officer of the company is not liable to the company "for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such [Officer] in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such [Officer] by this Agreement." LLC Agreement § 14(b). It explicitly provides, however, that an Officer "shall be liable for any such loss, damage or claim incurred by reason of such [Officer's] gross negligence or willful misconduct." *Id.*

60. From at least March 9, 2023, ASF was insolvent and unable to meet its maturing

13

obligations as they became due within the ordinary course of business. In the Forbearance Agreement, ASF and the Debtors stipulated that ASF was unable to perform, for an uncertain duration, certain of its obligations, including likely being unable to have sufficient funds to make timely payment of amounts due to the ASF Noteholders.

61. Under these circumstances, under Delaware law, the Defendants' fiduciary obligations to ASF inure to the ultimate benefit of ASF's creditors.

62. Defendants breached their fiduciary duties of loyalty, care, and good faith to ASF by allowing, authorizing, and otherwise failing to prevent the Debtors from misappropriating millions of dollars belonging to ASF for their own and the Debtors' benefit. Specifically, Defendants allowed, authorized and/or failed to prevent Debtors from:

   a. withholding approximately $1.4 million in funds belonging to ASF based on false certifications that the funds were used to pay royalties, when the funds were actually used to pay a $1.4 million premium for directors and officers insurance for the benefit of HB2;

   b. withholding approximately $2 million in funds belonging to ASF purportedly to pay royalties to San Roman Minerals that were not paid to San Roman; and

   c. withholding approximately $6.1 million in funds belonging to ASF purportedly to pay taxes and operating expenses that were not actually paid to the proper recipients and which resulted in liens on ASF assets.

63. Defendants further breached their fiduciary duty to ASF by taking approximately $2.5 million in ASF funds that were held in the DACA Account for the benefit of ASF and using those funds for the benefit of HB2.

64. Upon information and belief, Defendants managed the affairs of both ASF and the

Debtors. As the core management team of both the Debtors and ASF, they had knowledge of and/or were involved in the day-to-day decision making with respect to both the Debtors' and ASF's operations.

65. Defendants' actions and inaction as described herein constituted willful misconduct and bad faith and were directly against the interests of ASF and its creditors. Defendants acted with gross negligence because the misappropriated ASF Funds and/or allowed such funds to be misappropriated with deliberate disregard for ASF's rights and their own obligations to ASF. Defendants knew that the ASF funds could not be used for invalid purposes or transferred from the DACA Account but did so anyway.

66. As a result of Defendants' multiple breaches of fiduciary duty, ASF was harmed in an amount to be proved at trial.

**SECOND CAUSE OF ACTION**
(Tortious Interference with Contract)

67. Plaintiff repeats and realleges the allegations in paragraphs 1 through 67 as if fully set forth herein.

68. The DACA Agreement was entered into on April 29, 2022, by and among HB2 as the "Customer," Bank7 as the "Depository Bank," and UMB Bank, N.A., the Indenture Trustee, as the "Secured Party."

69. The DACA Agreement refers both to the Indenture and to ASF as the Issuer of the Notes:

> Reference is hereby made to that certain Indenture dated as of the date hereof (as amended, restated, supplemented and otherwise modified from time to time, the "<u>Indenture</u>"), between Alpine Summit Funding LLC, a Delaware limited liability company (the "<u>Issuer</u>"), and UMB, as indenture trustee, paying agent and as securities intermediary.

70. The DACA Agreement provides that HB2 "has established and maintains account

15

number XXX6432 with [Bank7] (the "Specified Deposit Account"), and has agreed to enter into this Agreement in connection with the Indenture in order to grant to [the Indenture Trustee] a perfected security interest in the Specified Deposit Account [i.e., the DACA Account]."

71. In the DACA Agreement, HB2 granted the Indenture Trustee "as security for the payment of the Secured Obligations (as defined in the Indenture), a security interest in the Specified Deposit Account and the funds on deposit therein." DACA Agreement §(1)(a).

72. "Secured Obligations" is defined in the Indenture to mean "any and all amounts owing or to be owing by the Issuer," including amounts owed to any Noteholder under the Notes, including the payment of principal and interest, and all other amounts payable by the Issuer under the Notes.

73. In other words, the DACA Agreement granted the Indenture Trustee a security interest in the DACA Account as security for the payment of ASF's obligations under the Indenture – primarily, its obligation to use the ASF Funds to pay the ASF Notes. Although HB2 opened the DACA Account and was the "Customer" under the DACA Agreement, the DACA Agreement makes clear that the ASF Funds held in the DACA Account were to be used to pay ASF's obligations on the ASF Notes.

74. Defendants tortiously interfered with ASF's rights under the DACA Agreement by facilitating, allowing, authorizing, and/or otherwise failing to prevent HB2's theft of the money in the DACA Account, which belonged to ASF or was held for ASF's benefit. Specifically, Defendants facilitated, allowed, authorized and/or failed to prevent HB2 from:

    a. withholding approximately $1.4 million in funds belonging to ASF based on false certifications that the funds were used to pay royalties, when the funds were actually used to pay a $1.4 million premium for directors and officers insurance for

16

      the benefit of HB2;

   b. withholding approximately $2 million in funds belonging to ASF purportedly to pay royalties to San Roman Minerals that were not paid to San Roman; and

   c. withholding approximately $6.1 million in funds belonging to ASF purportedly to pay taxes and operating expenses that were not actually paid to the proper recipients and which resulted in liens on ASF assets.

75. Defendants' actions and inaction as described herein were willful, intentional, and done in bad faith, and were directly against the interests of ASF and its creditors. Defendants knew that the ASF funds could not be used for invalid purposes or transferred from the DACA Account but did so anyway.

76. Defendants' actions in facilitating, allowing, authorizing, and/or otherwise failing to prevent HB2's theft of the money in the DACA Account were the proximate cause of ASF's damages, as they caused and/or allowed the theft of ASF's funds by HB2.

77. As a result of Defendants' actions, ASF was damaged in the amount of ASF Funds that were improperly withheld and/or stolen from the DACA Account, the exact amount of which will be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, ASF seeks an Order:

a. Awarding damages, including punitive damages, and pre- and post-judgment interest;

b. Awarding costs and fees, including but not limited to reasonable attorneys' fees, to the extent appropriate; and

c. Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

ASF demands a trial by jury on all issues so triable.

Dated: September 6, 2024

*/s/ Denver G. Edwards*
**BRADFORD EDWARDS LLP**
Denver G. Edwards, Esq.
575 Fifth Avenue, 14th Floor
New York, New York 10017
T: (917) 671-9407
M: (646)455-9044
F: (607) 930-3596
Email: dedwards@bradfordedwards.com

*Attorneys for Plaintiff Alpine Summit Funding, LLC*