IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ALPINE SUMMIT FUNDING, LLC, § | |
| § | |
| *Plaintiff,* § | |
| § | Case No. 24-cv-3327 |
| v. § | |
| § | |
| CRAIG PERRY, DARREN MOULDS, § | |
| WILLIAM WICKER, TRAVIS REAGAN § | |
| BROWN, and CHRYSTIE HOLMSTROM, § | |
| | |
| *Defendant.* | |

## DEFENDANT CRAIG PERRY'S MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Craig Perry files this Motion to Dismiss Plaintiff Alpine Summit Funding, LLC ("ASF")'s Complaint. Perry also joins in the contemporaneously filed motions to dismiss by Defendants Darren Moulds, William Wicker, Travis Reagan Brown, and Chrystie Holmstrom.

### I. INTRODUCTION

Plaintiff ASF is a former subsidiary of Alpine Summit Energy Partners, Inc. ("Alpine"). *See* Dkt. 34 at 1. Alpine and its related subsidiaries declared bankruptcy in the summer of 2023. *See id.*; *see also In re Alpine Summit Energy Partners, Inc., et al.*, Case No. 23-90739 (Bankr. S.D. Tex.) ("Alpine Bankruptcy"). Prior to that bankruptcy filing, creditors of the Alpine debtor Alpine Debtors (the "Alpine Debtors") took over ownership of the ASF entity. *See* Dkt. 43 at ¶ 54.

ASF now sues several of its former officers, including Perry, for breach of fiduciary duties and conversion. *See* Dkt. 43 at ¶¶ 55-75. The crux ASF's claims are based on the allegation that these officers "improperly managed company funds for the benefit of the Alpine Debtors (of which

1

Defendants were also officers)." Dkt. 34 at 1. ASF's claims fail at the outset due to numerous separate and independent legal deficiencies.

*First*, as a threshold matter, ASF has not even alleged a specific act or omission that *Craig Perry personally did*. Indeed, the only specific mentions of Perry's name in the Complaint are to identify him as a defendant, a former officer of ASF and the other Alpine Debtors, and a Tennessee resident. *See* Dkt. 43 at ¶¶ 11, 31-32. The Fifth Circuit and this District have repeatedly barred such group pleading allegations as insufficient.

*Second*, ASF contractually waived its claims against Perry. Specifically, ASF entered into a Joint Operating Agreement ("JOA") and a Management Services Agreement ("MSA") with the other Alpine Debtors that form the basis of ASF's liability theory in this case. *See* Dkt. 43 at ¶ 19 (naming the JOA and MSA as the key contracts that underlie the ASF transactions at issue), ¶ 25 (pleading that the "under the … JOA, MSA and other agreements, the parties were required to segregate *the ASF Funds*, which the agreements explicitly recognized belonged exclusively to ASF.") (emphasis added), ¶¶ 37–51 (accusing the Alpine Debtors of allegedly misusing "*ASF Funds*") (emphasis added). However, both the JOA and MSA bar ASF from pursuing any recovery against former officers of the Alpine Debtors — which includes Perry. *See* Ex. 1 (JOA) at 20; Ex. 2 (MSA) at 27 (§33).

*Third*, ASF's breach of fiduciary duty claim suffers from two additional defects. ASF's LLC Agreement contains an exculpation clause in favor of a former officer like Perry. Plus, under governing Delaware law, Perry—as an officer of ASF's parent Alpine Debtors—cannot commit a breach of fiduciary duties to ASF, a wholly owned subsidiary, by acting in the interest of and for the benefit of ASF's parent companies.

*Finally*, ASF's conversion claim also fails. Perry did not wrongfully exercise dominion or

2

control over the property or have knowledge of the alleged conversion. This claim is also barred by the economic loss rule and suffers numerous additional deficiencies.

## II.  FACTUAL BACKGROUND

ASF is a Delaware LLC formed to raise funds for oil-and-gas activities of the Alpine Debtors.[1] Dkt. 43 at ¶ 3. Perry was the Chairman of the Board of Directors and Chief Executive Officer of the Alpine Debtors, and served as President and CEO of ASF during the time ASF was an Alpine subsidiary. *Id.* ¶¶ 11, 31–32. By way of summary, ASF acquired ownership interests in oil and gas wells the Alpine Debtors were developing and operating, which gave ASF the right to receive some of the revenue generated from Alpine's wells; ASF then used those assets as collateral to borrow money from creditors. *Id.* at ¶¶ 4-5.

Of importance to this Motion, there were two key agreements that underlie ASF's relationship with the other Alpine Debtors with respect to these wells, and the proceeds from those wells at issue in this case. First, ASF entered into a Joint Operating Agreement ("JOA") with two Alpine entities: Ageron Ironroc and Ironroc Energy, to acquire non-operator working interest in the wells. *Id.* ¶ 19(d). Second, ASF also entered into an Amended and Restated Management Services Agreement ("MSA") with another Alpine entity, HB2 Origination. *Id.* ¶ 19(e). These agreements governed the financial relationships between ASF, Ageron Ironroc, Ironroc Energy, and HB2. The JOA is attached as Exhibit 1 and the MSA as Exhibit 2.

After acquiring its interest in the Alpine wells, ASF issued asset-backed notes to creditors. Dkt. 43 at ¶ 21. The creditors who purchased those notes were to be repaid with the revenue that ASF would receive as a working interest owner from those Alpine wells. *Id.* ¶ 24. Under the JOA's

---

[1] Those entities are: Alpine; HB2 Origination, LLC ("HB2"); Ageron Energy II, LLC; Ironroc Energy Partners LLC ("Ironroc Energy"); Ageron Ironroc Energy, LLC ("Ageron Ironroc"); Alpine Summit Energy Investors, Inc.; and Alpine Carbon, LLC. Compl. (Dkt. 43) ¶ 2.

and MSA's terms, a bank account was created for such revenue to be deposited (the "DACA Account"). *Id.* ¶ 25.

The DACA Account had an associated "DACA Agreement" that was entered into between HB2 as customer, a depository bank named Bank7 and UMB Bank, N.A. ("UMB"), as the indenture trustee and secured party. *Id.* ¶ 19(f). The DACA Agreement is attached to this Motion as Exhibit 3. Importantly, ASF is ***not a party*** to the DACA Agreement. *See* Ex. 3 at 1.

### III.     PROCEDURAL HISTORY

ASF's noteholders took ownership of ASF and filed an adversary proceeding against the Alpine Debtors and Defendants, along with one additional former officer. *See* Complaint, *Alpine Summit Funding, LLC v. Alpine Summit Energy Partners, Inc.*, No. 23-ap-03213, (Bankr. S.D. Tex. Sept. 23, 2023) (Doc. 1). In that complaint, ASF alleged no standalone claims against Perry, instead asserting that all Alpine officers as a group were liable under a knowing participation theory for certain allegedly tortious conduct by the Alpine Debtor Defendants. *Id.* ¶¶ 209–10. These claims centered primarily on the removal of funds from the DACA Account. *Id.*

ASF dismissed its adversary-proceeding claims against Defendants after Defendants filed motions to dismiss, and after ASF failed to respond and repeatedly violated procedural rules and court orders. *See generally* Individual Defendants' Joint Supplement to Motions to Dismiss, *id.* (Doc. 92) (recounting these violations); Notice of Voluntary Dismissal, *id.* (Doc. 94). ASF settled with the Debtors, but not the Individual Defendants, shortly thereafter.[2]

Similar to the last version of its lawsuit, ASF's Complaint in this action contains only one

---

[2] Order (I) Authorizing and Approving the Settlement Amongst the Debtors, the ASF Entities, and Paleo Oil Company, LLC and (II) Granting Related Relief at 9, 34–55, *In re Alpine Summit Energy Partners, Inc.*, No. 23-90739 (Bankr. S.D. Tex. Feb. 5, 2024) (Doc. 1548) ("Settlement Order").

4

specific allegation about Perry: he served as the Alpine Debtors' CEO and Chairman of the Board of Directors, and ASF's President and CEO. Dkt. 43 at ¶ 11; *see id.* ¶¶ 31–32. The rest of the Complaint is similarly sparse, but the allegations boil down to the following:

- From 2022 to 2023, funds that allegedly should have been directed to ASF under the JOA and MSA were diverted to benefit another Alpine company (HB2) and purportedly used to pay taxes, operating expenses, and insurance premiums. *Id.* ¶ 61.
- In 2023, approximately $2.5 million in funds from the DACA Account were allegedly used "for the benefit of HB2," *id.* ¶ 63, and the officers of Alpine allegedly helped HB2 by "approving, authorizing, and facilitating the withholdings" and transfers of the funds. *Id.* ¶¶ 66, 70.

ASF asserts without further explanation that Defendants' alleged participation in HB2's purported violations of the JOA, MSA, and DACA Agreement "constituted willful misconduct and bad faith" or "gross negligence" because "Defendants knew that the ASF funds could not be used for invalid purposes or transferred from the DACA Account" under the JOA, MSA, and DACA Agreement. *Id.* ¶ 66. ASF asserts that Defendants had identical participation because they were "the core management team of both the Debtors and ASF," *id.* ¶ 64, and that this makes them all liable for breaches of fiduciary duty and conversion. *Id.* ¶¶ 56–67 (breach of fiduciary claim); *id.* ¶¶ 68–75 (conversion).

### IV.  LEGAL STANDARD

A complaint fails under Rule 12(b)(6) if its factual allegations do not "raise a right to relief above the speculative level." *Norris v. Hearst Tr.*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This "plausibility standard . . . asks for more

5

than a sheer possibility . . . ." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).[3]

Courts accept "all *well-pleaded* facts as true . . . ." *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021) (emphasis added) (quoting *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc)). But whether a fact is "well-pleaded" is not a given. "[T]he court does not 'presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and *naked assertions devoid of further factual enhancement*.'" *Armstrong v. Ashley*, 60 F.4th 262 (5th Cir. 2023) (citation omitted); *see also id.* at 273 (holding that allegations of bad faith, "as an allegation of subjective intent, need not be accepted as true"). This includes and the Fifth Circuit has explicitly rejected "group pleading," where allegations are leveled against all defendants "as a group without factual material suggesting that any particular defendant" engaged in the liability-creating conduct. *Id.* at 274.

**V.     ARGUMENT**

**A. ASF does not plead any specific act or omission by Perry and instead engages in legally insufficient group pleading.**

The Complaint says only ***one*** thing about Perry—that he served as CEO and Chairman of the Board of Directors for the Alpine Debtors, and President and CEO of ASF. Dkt. 43 at ¶¶ 11, 31–32. Otherwise, ASF only makes allegations against "Defendants" indiscriminately as an undifferentiated group with no specificity as to what each defendant, including Perry, actually did. *E.g.*, *id.* at ¶¶ 62, 74. The court may not credit such "naked assertions devoid of further factual

---

[3] When reviewing a motion to dismiss, courts may consider "documents either attached to or incorporated in the complaint." *Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 506 (S.D. Tex. 2017) (quoting *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996)). If a document is "integral to and explicitly relied on in the complaint," or if it is "partially quoted or referred to in the complaint," then the court can consider the full text of that document when attached to a defendant's motion to dismiss. *Id.* (quoting *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001)).

enhancement" as true against Perry because of the clear rule against group pleading. *Armstrong*, 60 F.4th at 269.

The Fifth Circuit has held that, under Federal Rule of Civil Procedure 8, a plaintiff may not engage in group pleading. *See id.* at 274 ("Armstrong's allegation also suffers from the distinct problem of group pleading: she simply faults the eight Law Enforcement Defendants as a group without factual material suggesting that any particular defendant suppressed evidence."). Courts in this District agree. *See Del Castillo v. PMI Holdings N. Am. Inc.*, No. 4:14-CV-3435, 2015 WL 3833447, at *6 (S.D. Tex. June 22, 2015) ("A complaint does not satisfy the requirements of *Iqbal* and *Twombly* by lumping together all defendants, while providing no factual basis to distinguish their conduct.").

Indeed, the Supreme Court has made clear that a "plaintiff must plead that each . . . defendant, though the [defendant's] own individual actions," is liable. *Iqbal*, 556 U.S. at 676; *see also id.* at 687 ("Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss."). Thus, a court must not "construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the [illegal conduct] is specifically pled." *Armstrong*, 60 F.4th at 275 (alteration in original) (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365 (5th Cir. 2004)).

In *Armstrong*, a plaintiff alleging suppression of claimed that the eight law-enforcement defendants with access to the evidence must have destroyed or failed to disclose the evidence, and named the particular defendant who "obtained and analyzed the relevant fingerprint evidence." *Id.* at 273–74. Still, the Fifth Circuit found that pleading insufficient for "group pleading" because the

7

plaintiff "simply faults the eight Law Enforcement Defendants as a group without factual material suggesting that any particular defendant suppressed evidence." *Id.* at 274.

In *Matter of Settoon Towing, L.L.C.*, the Fifth Circuit similarly held that when oyster leaseholders sued eighteen entities involved in oil and gas exploration for causing a salinity spike consistent with such oil and gas activity, the allegations were insufficient under Rule 12(b)(6) because the court was "able to infer only a 'mere possibility of misconduct' by each defendant.", No. 23-30578, 2024 WL 3520166, at *2 (5th Cir. July 24, 2024) (quoting *Iqbal*, 556 U.S. at 679); *id.* at *2 n.13 ("While not specifically relied upon by the district court, Plaintiffs' complaint is more akin to a 'group pleading' complaint, which this Court has rejected." (citation omitted)).

Here, ASF's Complaint is even more barren of details than the ones at issue in *Armstrong* and *Settoon Towing*. It provides **no detail whatsoever** about what Perry specifically did that ASF claims was tortious. ASF's allegations that all five Defendants, as a group, engaged in every supposedly tortious act cannot be credited as "plausible" because it is "merely consistent with" an entitlement to relief against Perry that is "equally suggestive" of Perry's not being involved in the alleged activity. *Armstrong*, 60 F.4th at 270; *see also Matter of Settoon Towing*, 2024 WL 3520166, at *2 ("[T]he cases Plaintiffs rely on are inapplicable here because they involved only **one** defendant (not eighteen); thus, the circumstantial evidence made the claim that **the** defendant was responsible for the misconduct alleged facially plausible.").

Finally, this is ASF's *fourth* (failed) attempt at pleading claims against Perry. *See* ASF's Obj. to Debtor Defs.' Emergency Mtn to Strike Am. Compl, *Alpine Summit Funding, LLC v. Alpine Summit Energy Partners, Inc.*, No. 23-ap-03213, (Bankr. S.D. Tex. Sept. 23, 2023) (Doc. 51) ¶¶ 19–21. In the Alpine Bankruptcy, ASF even obtained discovery "pertaining to accounting records for post-petition collections pertaining to sale from ASF's wells and royalties, and lease

8

operating expenses deducted from those proceeds." *Id.* ¶¶ 2–3; *see also id.* ¶ 14. The Court should reject any request by ASF for leave to amend to try *a fifth time* to allege Perry's specific conduct. *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254–55 (5th Cir. 2003) (affirmed denying leave to amend where plaintiffs failed repeatedly to correct deficiencies).

**B. ASF contractually disclaimed liability by a former officer of the Alpine companies such as Perry under the JOA and MSA.**

In the JOA, ASF agreed that "it has no rights of recovery" and "no recourse hereunder" against any former, current or future officer "of any Party" to the JOA "for any claim . . . based on, in respect of, or by reason of" the JOA, the transactions it contemplates, or the documents delivered contemporaneously with the JOA. Below is the JOA's "No Recourse" provision in full:

> Notwithstanding anything that may be expressed or implied in this agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any Party may be a partnership or limited liability company, **each Party, by its acceptance of the benefits of this agreement, covenants, agrees and acknowledges that** no Persons other than the Parties (and their respective successor and assigns, collectively, the "Recourse Parties") shall have any obligation hereunder and that **it has no rights of recovery hereunder against, and no recourse hereunder** or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith **against (i) any former, current or future director, officer, agent, Affiliate, manager, incorporator, controlling Person, fiduciary, representative or employee of any Party** (or any of the foregoing Persons' successors or permitted assignees), (ii) any former, current, or future general or limited partner, manager, stockholder or member of any Party (or any of the foregoing Persons' successors or permitted assignees) or any Affiliate thereof or (iii) any former, current or future director, officer, agent, employee, Affiliate, manager, incorporator, controlling Person, fiduciary, representative, general or limited partner, stockholder, manager or member of any of the foregoing, but in each case not including the Parties (each, but excluding for the avoidance of doubt, the Recourse Parties, a "Party Affiliate"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract or otherwise) by or on behalf of such Party against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Law, or otherwise; it being expressly agreed and acknowledged that **no personal liability whatsoever shall attach** to, be imposed on, or otherwise be incurred by any Party Affiliate, as such, **for any obligations of the applicable Party under this agreement or the transactions contemplated hereby, under any documents or**

9

> **instruments delivered contemporaneously herewith**, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or **for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation**.

Ex. 1 at 20 (emphasis added).

This waiver covers ASF's claims in this lawsuit. Perry is a former officer of ASF—a defined "Party" to the JOA. Ex. 1 at 18 (§29), 24. Such claims, as ASF admits, arise out of obligations under (and the transactions contemplated by) the JOA. *E.g.*, Dkt. 43 at ¶¶ 26–30 (outlining duties under the MSA and JOA that underly ASF's allegations). As such, ASF has "no rights of recovery . . . for any claim" against any of the Defendants. Ex. 1 at 20.

The MSA contains a similar "No Recourse" provision that bars ASF from suing its former officers such as Perry:

> <u>No Recourse</u>. Notwithstanding any provisions herein to the contrary, all of the obligations of the Issuer under this Agreement are nonrecourse obligations of the Issuer payable solely from the Collateral in accordance with the priorities set forth in Section 8.06 of the Indenture, and following realization of the Collateral and its reduction to zero, any claims of a Person against the Issuer under this Agreement shall be extinguished and shall not thereafter revive. It is understood that the foregoing provision shall not limit the right of any Person claiming hereunder to name the Issuer as a party defendant in any proceeding or in the exercise of any other remedy, so long as no judgment in the nature of a deficiency judgment shall be asked for or (if obtained) enforced against the Issuer. **In addition, none of the Manager Indemnified Parties other than the Manager shall have any liability to any of the Issuer Indemnified Parties hereunder**, and none of the Issuer Indemnified Parties other than the Issuer shall have any liability to any of the Manager Indemnified Parties hereunder.

Ex. 2 (MSA) at 27 (§33) (emphasis added). [4]

Again, the result is the same: no "directors, officers agents, representatives, and

---

[4] The MSA defines the "Issuer" as ASF and the "Manager" as HB2 Origination, LLC. Ex. 2 (MSA) at 1. It then defines "Manager Indemnified Parties" as "the Manager and each of the Manager's Group Members." Ex. 2 (MSA) at 11 (§14(a)). It further defines "Issuer Indemnified Parties" to include "the Issuer" (which is ASF). Ex. 2 (MSA) at 11 (§14(b)). Finally, the MSA defines "Group Members" to include an entity's "respective members, managers, directors, officers, agents, representatives, and employees." Ex. 2 (MSA) at 18 (§21(qq)).

employees" of Manager HB2 Origination, LLC—*e.g.*, Perry—"shall have any liability" to ASF (who constitutes an "Issuer Indemnified Party"). Ex. 2 at 18 (§21(qq)), 27 (§33), 11 (§14(b)). This complete waiver of liability independently bars ASF's current suit.

ASF's sole recourse for alleged financial harm arising out of alleged violations of the JOA or MSA was to sue the Alpine Debtors who are party to the JOA directly. ***ASF already did that*** and settled those claims as part of the Alpine Bankruptcy. *See* Settlement Order (Doc. 1548 in the Alpine Bankruptcy, Case No. 23-90739). The bargain ASF struck in the JOA and MSA bars it from taking another bite at the same apple against Perry or any other former officer.

**C.  ASF's breach of fiduciary duties claims fails for two additional reasons.**

ASF's breach of fiduciary duty claim against Perry is governed by Delaware law pursuant to the internal affairs doctrine. *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982). Under Delaware law, ASF's alleged breaches of fiduciary duty fail for two additional reasons beyond the group pleading and contractual liability waiver issues above.

> **1.  ASF's LLC Agreement has an officer exculpation clause that covers Perry that bars the breach of fiduciary duty asserted here.**

ASF acknowledges that—JOA and MSA waivers notwithstanding—it exculpated its officers in its LLC Agreement from all liability for breaches of those duties, except when caused by "gross negligence or willful misconduct." Dkt. 43 at ¶ 58. The LLC Agreement states that "to the extent that they restrict or eliminate the duties and liabilities of a Covered Person to the Company or its members otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person." Ex. 4 (LLC Agreement) at 8. This controls the analysis. *In re W.J. Bradley Mortgage Capital, LLC*, 598 B.R. 150, 166 (Bankr. D. Del. 2019) ("As an officer or manager of a LLC, the Defendants' fiduciary duties are governed by the Operating Agreement."). Under Delaware law, the court must analyze claims of breach of

11

duty on an officer-by-officer basis. *In re HH Liquidation, LLC*, 590 B.R. 211, 274 (Bankr. D. Del. 2018). ASF has failed to plead any facts as to Perry that would support an inference of gross negligence or willful misconduct by him in connection with a breach of duty of care or loyalty.

Under Delaware law, Plaintiff's allegations of gross negligence apply to Perry's duty of care. *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1113 (Del. Ch. 2008) ("[A] corporate director is only considered to have breached his duty of care in instances of gross negligence."). However, the definition of gross negligence "is so strict that it imports the concept of recklessness." *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 n.45 (Del. Ch. 2008).

Allegations of willful misconduct apply to bad faith and the duty of loyalty. *In re W.J. Bradley*, 598 B.R. at 163 ("A sufficiently pled claim for breach of the duty of loyalty requires plaintiff to 'allege facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs.'" (citation omitted)); *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 848 (Del. Ch.), *judgment entered sub nom. In re Metro Storage Int'l LLC v. Harron* (Del. Ch. 2022) (holding breach of duty of loyalty applied when officer placed his own interests above those of the company); *Firefighters' Pension Sys. of City of Kansas City v. Found. Bldg. Materials, Inc.*, 318 A.3d 1105 (Del. Ch. 2024) ("Bad faith can be the result of any emotion that may cause a director to intentionally place his own interests, preferences or appetites before the welfare of the corporation, including greed, hatred, lust, envy, revenge, shame or pride." (cleaned up)).

ASF has nakedly asserted that all five Defendants acted with gross negligence and/or willful bad faith, but has pleaded ***no*** facts as to a specific act by Perry or a specific accompanying state of mind during said alleged act by Perry to sustain such allegations. This is not good enough. To sustain the requisite standard under the LLC Agreement's exculpatory clause, Delaware case law require more specific, officer-by-officer allegations such as alleging that the individual officers

personally benefited by rushing transactions to obtain bonuses, *In re W.J.*, 598 B.R. at 164, or using company time, resources, and information to usurp business opportunities for their own benefit, *Metro Storage*, 275 A.3d at 847–54. Here, ASF does not come close.

### 2. Perry's fiduciary duties flowed to the Alpine Debtors, not ASF.

Wholly owned subsidiaries, like ASF was to the Alpine Debtors, "are expected to operate for the benefit of their parent corporations." *Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 173 (Del. Ch. 2006) *aff'd* 931 A.2d 438 (Del. 2007). And the "fiduciary duties owed by directors [and officers] of a wholly owned subsidiaries run only to the parent." *Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1208 (Del. Ch. 2010).[5] Thus, generally "a plaintiff cannot state a claim against the [officers] of a wholly owned subsidiary merely by alleging that the [officers] acted in the best interests of the parent and to the detriment of the subsidiary." *Id.* at 1210.

When a wholly owned subsidiary becomes insolvent, that default rule changes in one important respect: "creditors gain standing to assert claims derivatively for breach of fiduciary duty." *Quadrant Structured Products Co., Ltd. v. Vertin* (Quadrant II), 115 A.3d 535, 546 (Del. Ch. 2015). The fact of insolvency affects who directors and officers are pursuing maximum economic value on behalf of, and "after insolvency, creditors become the initial residual claimants." *Quadrant Structured Products Co., Ltd. v. Vertin* (Quadrant I), 102 A.3d 155, 175 (Del. Ch. 2014). This is **not** because creditors start being owed fiduciary duties. They do not. *Id.* at 176 ("In light of *Gheewalla*, I do not believe it is accurate any longer to say that the directors of an insolvent corporation owe fiduciary duties to creditors.") (citing *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007)). Those creditors cannot bring direct actions for breach of fiduciary duty; directors and officers still owe a fiduciary duty to the

---

[5] *Hamilton* referred only to directors, but "the fiduciary duties of officers are the same as those of directors." *Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009).

13

company "for the benefit of *all* of its residual claimants"; directors and officers can still "as a matter of business judgment, favor certain non-insider creditors over others"; and directors and officers cannot be liable for "deepening insolvency." *Quadrant II*, 115 A.3d at 546–47.[6]

Because ASF's officers remained at all times under a fiduciary duty to maximize value for the residual claimants, including its parent Alpine Debtors (such as HB2) and *their* creditors, ASF's allegations fail to state a claim for breach of fiduciary duty. The only specific allegations ASF makes about the purported withholdings were supposed benefits to HB2, which wholly owned ASF (and was wholly owned by Alpine). Indeed, ASF acknowledged in the Joint Case Management Plan that its claims are based on all defendants (including Perry) having "managed company funds for the benefit of the Alpine Debtors (of which Defendants were also officers)." Dkt. 34 at 1. Those are permissible business decisions by officers of a wholly owned subsidiary to benefit the parent. *Hamilton Partners*, 11 A.3d at 1210.

Even if the Court were to find that the time of insolvency marked a change in this rule, then on ASF's own pleadings, the date of insolvency was March 23, 2023. Dkt. 43 at ¶ 35 (alleging insolvency on date of Forbearance Agreement). Thus, all purported financial decisions that Plaintiff does not specifically allege occurred *after* March 23, 2023, cannot form a basis for liability. ASF alleged the following actions with respect to how Defendants allegedly "improperly managed company funds":

- withholding ~$1.4 million in June 2023, *id.* ¶¶ 7, 41, 61;
- withholding ~2 million "**During 2022 and 2023**," *id.* ¶¶ 43, 45, 61;
- withholding ~$6.1 million "**During 2022 and 2023**," *id.* ¶¶ 43, 61; and
- removing ~$2.5 million on June 30, 2023, *id.* ¶¶ 8, 46, 51, 63, 70.

---

[6] ASF admits that is "is now owned by its creditors." Dkt. 34 at 1.

If insolvency marks the date upon which Defendants stopped owing all duties strictly to ASF's ultimate parent company, then ASF has still failed to state a claim for the ~$2 million withholding and ~$6.1 million withholding because ASF did not affirmatively plead that those occurred after ASF allegedly became insolvent. This reduces the scope of actionable "breaches" to only the two June 2023 transactions (totaling $3.9 million of the near $12-million of transactions pleaded).

For these reasons, this Court should dismiss ASF's breach of fiduciary duty claim in its entirety. In the alternative, the Court should at the very least partially dismiss any breach-of-fiduciary duty liability theories based on any pre-March 23, 2023, events.

### D. ASF's conversion claim fails.

ASF's conversion claim against Perry is governed by Texas law.[7] ASF "must prove that (1) it legally possessed the property or was entitled to it; **(2) Defendants wrongfully exercised dominion and control over the property inconsistent with Plaintiff's rights**; (3) Plaintiff demanded the property's return; and (4) Defendants refused." *ICI Constr., Inc. v. Hufcor, Inc.*, No. CV H-22-3347, 2023 WL 2392738, at *12 (S.D. Tex. Mar. 7, 2023) (emphasis added).

ASF's allegations fail at the outset because Perry did not wrongfully exercise dominion or control over the property or have knowledge of the alleged conversion. This claim is also barred by the economic loss rule, and suffers numerous additional deficiencies.

1. **ASF fails to plead that Perry either wrongfully exercised dominion or control, or had the requisite knowledge to be liable for HB2's alleged conversion.**

ASF has failed to plead the second element of their conversion claim, that Perry wrongfully

---

[7] "A federal court sitting in diversity must apply the choice-of-law rules of the state in which it sits." *Williams v. Liberty Mut. Ins. Co.*, 741 F.3d 617, 620 (5th Cir. 2014). Texas uses the "most significant relationship test" for tort cases. *Jackson v. W. Telemarketing Corp. Outbound*, 245 F.3d 518, 523 (5th Cir. 2001). Because the wells generating the funds at issue in this case are located in Texas, and the JOA provided the legal relations between ASF and Debtors be governed by Texas law, Texas is the State with the most significant relationship. Ex. 1 (JOA) at 16, 22, Ex. A-1.

exercised dominion or control over the property. As ASF admits in its Complaint, the funds at issue were transferred into HB2's bank. Dkt. 43 at ¶ 70. In other words, ASF has never pleaded that the allegedly "converted" funds were ever in the possession of Perry (despite this being the *fourth* complaint it has filed against Mr. Perry). That alone is fatal to ASF's conversion claim.

Nor could ASF meet the element that Perry committed an act that was wrongful and inconsistent with ASF's rights. Under the terms of the JOA and MSA, HB2 had total discretion to use the funds as they deemed fit. *See* Ex. 1 at Art. XVI (I)(2); Ex. 2 at ¶¶ 2(a), 5, 19. As ASF pleads, Perry was the CEO of HB2.[8] In other words, even after taking all of ASF's allegations as true, HB2 did what it was contractually authorized to do, and Perry (as HB2's CEO) allowed it to happen. That is not conversion. Indeed, ASF, for its part, contractually consented to the transfer of the funds, making conversion impossible. "Conversion involves a taking of property without the owner's consent; hence there can be no conversion where the owner has expressly or impliedly assented to the taking or disposition." *Mack v. Newton*, 737 F.2d 1343, 1354 (5th Cir. 1984).

Finally, even if the alleged conversion was contrary to ASF's rights, ASF has failed to plead that Perry had any knowledge of it. Under Texas law, while corporate officers may be liable for the torts of their Alpine Debtors, they must "knowingly participate[] in the conduct" or have "actual or constructive knowledge of the tortious conduct." *Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.*, 809 F. Supp. 2d 582, 596 (N.D. Tex. 2011). Here, ASF pleads no facts that would suggest that Perry knew that transferring funds from a subsidiary to a corporate parent — expressly authorized by contract — would constitute a *tortious* act.

   **2. ASF's claim is barred by the economic loss rule.**

---

[8] Dkt. 43 at ¶¶ 11, 31 (naming Perry as CEO of the "Debtors"); ¶ 2 (naming HB2 as one of the "Debtors").

The economic loss rule bars tort claims stemming from duties owed under contract. *ICI Constr.* 2023 WL at *18. "Privity of contract is not a requirement for application of the economic loss rule." *ICI Constr.* 2023 WL at *19. Rather, the question to determine whether this rule applies or not is whether the alleged injury to the plaintiff is what they were owed under a contract, ***regardless of whether the defendant is a party to that contract***. *See id*.

For example, in *R.P. Small,* the economic loss rule applied to conversion claims based on alleged failure to comply with royalty or working interest payment obligations, like those at issue here. *See*, *R.P. Small Corp. v. Land Dep't, Inc.*, 505 F. Supp. 3d 681, 711-712 (S.D. Tex. 2020). Notably, the rule barred the claim against both the company that was party to a contract, and the owner and president of the company individually. *Id.*

ASF repeatedly cites the "Transaction Documents," including the JOA and MSA, in their conversion claim, claiming that the Defendants, including Perry, did not do as they were "required" under them. Dkt. 43 at ¶¶ 68-75. Further, ASF has already brought and settled its breach-of-contract claim against the Debtors for this same conduct. *See generally Alpine Summit Funding, LLC*, No. 23-ap-03213. Clearly, as in *R.P. Small,* the alleged conversion "relates to the [] Defendants not complying with their duties under the contract . . . ." *R.P. Small,* 505 F. Supp. 3d at 712. "Therefore, the conversion claim appears to be a breach of contract claim and is barred by the economic loss rule." *Id.*

### 3. ASF's conversion claim is further plagued by four additional deficiencies.

Every deficiency above is independently sufficient to result in dismissal of ASF's conversion claim. But that is not all. ASF also cannot make a legally cognizable conversion claim for four additional reasons:

   a. **Unidentifiable chattel.** The funds at issue were transferred into HB2's bank account. Dkt. 43 at ¶ 70; *see also* Ex. 1 at Art. XVI (I)(2). When funds are

17

transferred to a bank account, "the funds become 'presumably ... integrated with the balance of the respective accounts, and cannot be identified as specific chattel.'" *Anand Printing Mach. Inc. v. Alexander*, 2021 WL 3616099, at *5 (S.D. Tex. Apr. 9, 2021). As such, the funds at issue cannot be subject to a conversion claim. *Id.*

b. **Title claim is disputed.** Because ASF alleges that the property converted is money, it must not be "subject of a title claim by the defendant." *Matter of Okedokun*, 968 F.3d 378, 392 (5th Cir. 2020). The funds were subject to a title claim by HB2, pursuant to the MSA and JOA. The MSA directed that HB2 shall have "full power and authority to . . . take (or refrain from taking) any and all actions which the Manager determines to be necessary . . . ." Ex. 2 at ¶ 2(a). The JOA states that the DACA Account funds "can be moved and appropriated elsewhere if "used for their intended purpose." Ex. 1 at Art. V(D)(4). Due to HB2's contractually sound title claim, ASF cannot make out a tort claim at common law.

c. **Discharge by payment of money generally.** "[M]oney can be a subject of conversion only if it can be described or identified as a specific chattel, but not where an indebtedness can be discharged by a payment of money generally." *Verde Mins., LLC v. Koerner*, No. 2:16-CV-199, 2017 WL 7052205, at *4 (S.D. Tex. Aug. 14, 2017). As stated in *Verde*, "proceeds and bonuses from the execution of leases and sale of oil and gas . . . can be discharged by payment of money generally." *Id.* ASF acknowledges the money that it calls "the ASF Funds" are "proceeds of hydrocarbons attributable to the ASF Wells." Dkt. 43 at ¶ 5. Thus, the funds are not subject to conversion.

d. **Not delivered to Perry.** Because ASF alleges that the property converted is money, they "must show that the money [] was delivered to the defendant for safekeeping" *Okedokun*, 968 F.3d at 392. The funds were never delivered, nor does ASF allege that they were, to Perry "for safekeeping." Thus, as in *Okedokun*, there can be no conversion. 968 F.3d at 392.

Again, each deficiency above is also independently sufficient to warrant dismissal of ASF's conversion claim as a matter of law.

## VI. CONCLUSION

Every one of the deficiencies explained above is a separate and independently sufficient ground that results in dismissal of either or both of ASF's causes of action. Moreover, this is ASF's *fourth* bite at the apple to plead a viable cause of action against Perry, and it has failed to do so yet again. Thus, any amendment request would be futile.

Accordingly, the Court should dismiss ASF's claims with prejudice.

Dated: January 21, 2025

Respectfully submitted,

*/s/Weining Bai*
Weining Bai
State Bar No.: 24101477
Federal Bar No: 2996450
**AHMAD, ZAVITSANOS & MENSING PLLC**
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
wbai@azalaw.com

*Attorney-In-Charge for Defendant Craig Perry*

*Of Counsel:*

John Zavitsanos
State Bar No.: 22251650
Federal Bar No: 9122
Cody Watson
State Bar No.: 24137278
Federal Bar No: 3866646
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
jzavitsanos@azalaw.com
cwatson@azalaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on the January 21, 2025, a copy of the foregoing was served on the following party electronically through the U.S. District Court, Southern District of Texas ECF system to all counsel of record all of whom are Filing Users of the Court's Electronic Filing System.

*/s/ Weining Bai*
Weining Bai