**A.A.P.L. FORM 610 - 1989**

# MODEL FORM OPERATING AGREEMENT

**AMENDED AND RESTATED** OPERATING AGREEMENT

DATED

_____September  12____ , ___2022____ ,
                                      *year*

OPERATOR   **Ageron Ironroc Energy, LLC and Ironroc Energy Partners LLC**

CONTRACT AREA   **See Exhibit A**

COUNTY OR PARISH OF   **See Exhibit A** , STATE OF   **Texas**

COPYRIGHT 1989 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED FORM.

A.A.P.L. NO. 610 – 1989

**EXHIBIT**

**1**

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| **I.** | **DEFINITIONS** | 1 |
| **II.** | **EXHIBITS** | 1 |
| **III.** | **INTERESTS OF PARTIES** | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| **IV.** | **TITLES** | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| | 4. Curing Title | 3 |
| **V.** | **OPERATOR** | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| | 1. Competitive Rates and Use of Affiliates | 4 |
| | 2. Discharge of Joint Account Obligations | 4 |
| | 3. Protection from Liens | 4 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| **VI.** | **DRILLING AND DEVELOPMENT** | 5 |
| | A. INITIAL WELL | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| | 1. Completion | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| | (Option 1) Gas Balancing Agreement | 10 |
| | (Option 2) No Gas Balancing Agreement | 11 |
| **VII.** | **EXPENDITURES AND LIABILITY OF PARTIES** | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 12 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| **VIII.** | **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST** | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**TABLE OF CONTENTS**

|   |   | D. ASSIGNMENT, ~~MAINTENANCE OF UNIFORM INTEREST~~: | ......................................... | 15 |
|   |   | E. WAIVER OF RIGHTS TO PARTITION: | .................................................................. | 15 |
|   |   | F. ~~PREFERENTIAL RIGHT TO PURCHASE~~: | ............................................... | 15 |
| IX. | **INTERNAL REVENUE CODE ELECTION** | ................................................................ | 15 |
| X. | **CLAIMS AND LAWSUITS** | ............................................................................................. | 15 |
| XI. | **FORCE MAJEURE** | ...................................................................................................... | 16 |
| XII. | **NOTICES** | ...................................................................................................................... | 16 |
| XIII. | **TERM OF AGREEMENT** | ............................................................................................... | 16 |
| XIV. | **COMPLIANCE WITH LAWS AND REGULATIONS** | ..................................................... | 16 |
|   |   | A. LAWS, REGULATIONS AND ORDERS: | ................................................................... | 16 |
|   |   | B. GOVERNING LAW: | ............................................................................................... | 16 |
|   |   | C. REGULATORY AGENCIES: | ................................................................................... | 16 |
| XV. | **MISCELLANEOUS** | ....................................................................................................... | 17 |
|   |   | A. EXECUTION: | ........................................................................................................... | 17 |
|   |   | B. SUCCESSORS AND ASSIGNS: | ............................................................................... | 17 |
|   |   | C. COUNTERPARTS: | .................................................................................................. | 17 |
|   |   | D. SEVERABILITY: | ................................................................................................... | 17 |
| XVI. | **OTHER PROVISIONS** | ................................................................................................. | 17 |
|   |   |   |   |   |
|   |   | A. INTERPRETATION: | ............................................................................................... | **17** |
|   |   | B. ADDITIONAL DEFINITIONS: | ............................................................................... | **17** |
|   |   | C. NON-OPERATOR OVERSIGHT; REMOVAL OF OPERATOR IN CONNECTION WITH | | |
|   |   |    FORECLOSURE: | ................................................................................................... | **18** |
|   |   | D. CERTAIN OPERATIONS: | ...................................................................................... | **19** |
|   |   | E. MISCELLANEOUS COSTS: | ................................................................................... | **19** |
|   |   | F. SUCCESSORS AND ASSIGNS: | ............................................................................... | **19** |
|   |   | G. NO RECOURSE: | .................................................................................................... | **19** |
|   |   | H. FORECLOSURE RIGHTS: | ..................................................................................... | **20** |
|   |   | I. HYDROCARBON MARKETING AND GATHERING: | .................................................. | **20** |
|   |   | J. RELATIONSHIP OF THE PARTIES: | ...................................................................... | **20** |
|   |   | K. NOTICES: | .............................................................................................................. | **21** |
|   |   | L. OPERATOR LIABILITY: | ....................................................................................... | **21** |
|   |   | M. HEARING AND ADMINISTRATIVE PROCEEDINGS: | ............................................... | **21** |
|   |   | N. MULTIPLE BILLING: | ............................................................................................ | **21** |
|   |   | O. NETTING AND SETOFF: | ....................................................................................... | **21** |
|   |   | P. BANKRUPTCY: | .................................................................................................... | **21** |
|   |   | Q. NON-OWNING OPERATOR: | ................................................................................. | **22** |
|   |   | R. APPLICABLE LAW: | .............................................................................................. | **22** |
|   |   | S. JURISDICTION; SERVICE OF PROCESS: | ............................................................... | **22** |
|   |   | T. WAIVER OF JURY TRIAL; WAIVER OF SPECIAL DAMAGES | ..................................... | **22** |
|   |   | U. MISCELLANEOUS: | ............................................................................................... | **22** |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989



**AMENDED AND RESTATED OPERATING AGREEMENT**

THIS AGREEMENT, entered into by and between ___**AGERON IRONROC ENERGY, LLC**_____,

hereinafter designated and referred to as "Operator", **solely with respect to the Ageron Contract Area (as defined below), and IRONROC ENERGY PARTNERS LLC, hereinafter designated and referred to as "Operator", solely with respect to all other portions of the Contract Area** and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

**WITNESSETH:**

**WHEREAS, IRONROC ENERGY PARTNERS LLC and ALPINE SUMMIT FUNDING LLC entered into that certain** Operating Agreement dated April 29, 2022 (the "Original Agreement"); **WHEREAS, the Issuer (as defined below) has entered into that certain Asset Purchase Agreement with Seller dated September 12, 2022 (the "Second Asset Purchase Agreement") pursuant to which Issuer acquired the Wellbore Interests (as defined therein), and the parties to this agreement now desire to amend and restate the Original Agreement in its entirety in order to, among other things, include such Wellbore Interests in the Contract Area subject to this Agreement;**

WHEREAS, **certain of** the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent as are hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

**ARTICLE I.**

**DEFINITIONS**
**or as otherwise set forth in Article XVI**

As used in this agreement, the following words and terms shall have the meanings here ascribed to them / :

A.   The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder.

B.   The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C.   The term "Contract Area" shall ~~mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement.  Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."~~ **have the meaning set forth in Article XVI, and means, with respect to AGERON IRONROC ENERGY, LLC, solely the Ageron Contract Area, and with respect to IRONROC ENERGY PARTNERS LLC, solely the other portions of the Contract Area.**

D.   The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE~~, whichever is the lesser~~.

E.   The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

F.   The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority.  If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

G.   The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located.

H.   ~~The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.~~

I.   The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

J.   The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

K.   The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

L.   The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts **necessary to produce Oil and Gas from the current completed Zones from** of land ~~lying within /~~ the Contract Area which are owned by parties to this agreement.

M.   The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N.   The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

O.   The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

P.   The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore.  Such operations include, but are not limited to, well stimulation operations / **, squeeze jobs, acid jobs, or reperforations,** but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

Q.   The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

R.   The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.
**Additional terms used in this agreement are defined in Article XVI.**
/ Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

**ARTICLE II.**

**EXHIBITS**

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

___x___   A.  Exhibit "A," shall include the following information:

(1) Description of lands subject to this agreement,

(2) Restrictions, if any, as to depths, formations, or substances,

(3) Parties to agreement with addresses and telephone numbers for notice purposes,

(4) Percentages or fractional interests of parties to this agreement,

(5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,

(6) Burdens on production.

_____   B.  ~~Exhibit "B," Form of Lease.~~

___x___   C.  Exhibit "C," Accounting Procedure.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    ___x___  D.  Exhibit "D," Insurance.
2    _____  E.  ~~Exhibit "E," Gas Balancing Agreement.~~
3    _____  F.  ~~Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.~~
4    _____  G.  ~~Exhibit "G," Tax Partnership.~~
5    ___x___  H.  Other:  __**Recording Supplement**__
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70
71
72
73
74

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

If any provision of any exhibit, ~~except Exhibits "E," "F" and "G,"~~ is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

### ARTICLE III.
### INTERESTS OF PARTIES

**A. ~~Oil and Gas Interests~~[Reserved]:**

~~If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.~~

**B. Interests of Parties in Costs and Production:**
*in this agreement*

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area ~~up to, but not in excess of,~~ ~~and shall indemnify, defend and hold the other parties free from any liability therefor.~~ ~~Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement,~~ and shall indemnify, defend and hold the other parties free from any liability therefor.

~~No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.~~

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**C. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened / with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." ~~Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.~~

**Subject to Issuer's rights under Section 5.11 of each Asset Purchase Agreement (which shall not be limited by this Article III.C.)** / The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

### ARTICLE IV.
### TITLES

**A. ~~Title Examination:~~**

~~Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.~~

~~Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70
71
72
73
74

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  ~~Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above~~
2  ~~functions.~~

3  ~~No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has~~
4  ~~been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by~~
5  ~~all of the Drilling Parties in such well.~~

6  **B. Loss or Failure of Title:**

7  1. ~~Failure of Title:~~ ~~Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a~~
8  ~~reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest~~
9  ~~(including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title~~
10 ~~failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject~~
11 ~~to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas~~
12 ~~Leases and Interests; and,~~

13 ~~(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if~~
14 ~~applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from~~
15 ~~Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there~~
16 ~~shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

17 ~~(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the~~
18 ~~Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage~~
19 ~~basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or~~
20 ~~Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;~~

21 ~~(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract~~
22 ~~Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable~~
23 ~~to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and~~
24 ~~burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well~~
25 ~~attributable to such failed Lease or Interest;~~

26 ~~(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest~~
27 ~~which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid~~
28 ~~to the party or parties who bore the costs which are so refunded;~~

29 ~~(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises~~
30 ~~by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received~~
31 ~~production for which such accounting is required based on the amount of such production received, and each such party shall~~
32 ~~severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;~~

33 ~~(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of~~
34 ~~the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title~~
35 ~~it shall bear all expenses in connection therewith; and~~

36 ~~(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an~~
37 ~~interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder~~
38 ~~of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest~~
39 ~~is reflected on Exhibit "A."~~

40 2. ~~Loss by Non-Payment or Erroneous Payment of Amount Due:~~ ~~If, through mistake or oversight, any rental, shut-in well~~
41 ~~payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas~~
42 ~~Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary~~
43 ~~liability against the party who failed to make such payment. Unless the party who failed to make the required payment~~
44 ~~secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make~~
45 ~~proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A"~~
46 ~~shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party~~
47 ~~who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership~~
48 ~~of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully~~
49 ~~reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest,~~
50 ~~calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest,~~
51 ~~it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole~~
52 ~~previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~

53 ~~(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease~~
54 ~~burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or~~
55 ~~Interest, on an acreage basis, up to the amount of unrecovered costs;~~

56 ~~(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed~~
57 ~~to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and~~
58 ~~marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination,~~
59 ~~would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest~~
60 ~~termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties~~
61 ~~in proportion to their respective interests reflected on Exhibit "A"; and,~~

62 ~~(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner~~
63 ~~of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~
64 **Subject to Issuer's rights under Section 5.11 of each Asset Purchase Agreement (which shall not be limited by this Article IV.B.3)**
65 3. ~~Other Losses:~~ / ~~All~~ **all** losses of Leases or Interests committed to this agreement, ~~other than those set forth in Articles~~
66 ~~IV.B.1. and IV.B.2. above,~~ shall be joint losses and shall be borne by all parties in proportion to their interests shown on
67 Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because
68 express or implied covenants have not been performed (other than performance which requires only the payment of money),
69 and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no
70 readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

71 4. ~~Curing Title:~~ ~~In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any~~
72 ~~Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety~~
73 ~~(90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed~~
74 ~~or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B.~~
75 ~~shall not apply to such acquisition.~~

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

ARTICLE V.

OPERATOR

A. Designation and Responsibilities of Operator:

**Ageron Ironroc Energy, LLC shall be the Operator of the Ageron Contract Area and Ironroc Energy Partners LLC** shall be the Operator of **all other portions of** the Contract Area, and **Operator** shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. **Operatorship is neither assignable nor may be forfeited except in accordance with Article V.** In performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

B. Resignation or Removal of Operator and Selection of Successor:

1. Resignation or Removal of Operator: **Subject to Article XVI,** Operator may resign at any time by giving written notice thereof to Non-Operators. ~~If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor.~~ Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a **if and to the extent, at such time, Operator owns an interest in the Contract Area** Non-Operator. ~~A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.~~

2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of ~~two~~ **one** (2**1**) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. **and its affiliates** The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

3. ~~Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."~~

C. Employees and Contractors:

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

D. Rights and Duties of Operator:

1. Competitive Rates and Use of Affiliates: All / **operations and activities conducted on or in** wells drilled on the Contract Area shall be / **conducted** drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the / **conduct of such operations and activities** drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before / **such** and activities drilling operations / are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or
2    materials supplied.

3         4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced
4    or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the
5    Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until
6    used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as
7    provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator
8    and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in
9    this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the
10   parties otherwise specifically agree.

11         5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each / ~~Non-Operator~~ **Consenting Party**
12   or its duly authorized representative, at the / ~~Non-Operator's~~ sole risk and cost, full and free access at all reasonable times to **Consenting Party's**
13   all operations of every kind and character being conducted on the Contract Area and to the records of
14   operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access
15   rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate
16   Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such
17   interpretive data was charged to the joint account. Operator will furnish to each / ~~Non-Operator~~ upon request copies of any **Consenting Party**
18   and all reports and information obtained by Operator in connection with production and related items, including, without
19   limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding
20   purchase contracts and pricing information to the extent not applicable to the production of the / ~~Non-Operator~~ seeking the **Consenting Party**
21   information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures
22   shall be conducted in accordance with the audit protocol specified in Exhibit "C."

23         6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to
24   each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications
25   required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder.
26   Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

27         7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, ~~including but not~~
28   ~~limited to the Initial Well:~~

29         (a) Operator will promptly advise / ~~Non-Operators~~ of the date on which the well is spudded, or the date on which **Consenting Parties**
30   drilling operations are commenced.

31         (b) Operator will send to / ~~Non-Operators~~ such reports, test results and notices regarding the progress of operations on the well **Consenting Parties**
32   as the / ~~Non-Operators~~ shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs. **Consenting Parties**

33         (c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing
34   Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted
35   hereunder.

36         8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs
37   incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement.
38   Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

39         9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers
40   compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-
41   insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall
42   be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties
43   as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on
44   or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted
45   and to maintain such other insurance as Operator may require.

46         In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the
47   parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive
48   equipment.

49                 **ARTICLE VI.**
50           **DRILLING AND DEVELOPMENT**
51   **A. Initial Well:**

52         ~~On or before the _____ day of _____, _____, Operator shall commence the drilling of the Initial~~
53   ~~Well at the following location:~~

54

55

56

57

58

59

60   ~~and shall thereafter continue the drilling of the well with due diligence to~~

61

62

63

64

65

66

67   ~~The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation~~
68   ~~in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.~~

69   **B. Subsequent Operations:**

70         1. Proposed Operations: If any party hereto ~~should desire to drill any well on the Contract Area other than the Initial Well, or~~
71   ~~if any party~~ should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of
72   producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under
73   this agreement, the party desiring to ~~drill,~~ Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written
74   notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be
2   performed, the location, proposed depth, objective Zone and the estimated cost of the operation.  The parties to whom such a
3   notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work
4   whether they elect to participate in the cost of the proposed operation.  If a drilling rig is on location, notice of a proposal to
5   Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-
6   eight (48) hours, exclusive of Saturday, Sunday and legal holidays.  Failure of a party to whom such notice is delivered to reply
7   within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.
8   Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties
9   within the time and in the manner provided in Article VI.B.6.

10        If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be
11   contractually committed to participate therein provided such operations are commenced within the time period hereafter set
12   forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as
13   promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case
14   may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of
15   the parties participating therein; provided, however, said commencement date may be extended upon written notice of same
16   by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such
17   additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-
18   way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or
19   acceptance.  If the actual operation has not been commenced within the time provided (including any extension thereof as
20   specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct
21   said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior
22   proposal had been made.  Those parties that did not participate in the drilling of a well for which a proposal to Deepen or
23   Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation,
24   reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance
25   with Article VI.B.5. in the event of a Sidetracking operation.

26        2. Operations by Less Than All Parties:

27        (a) Determination of Participation.  If any party to whom such notice is delivered as provided in Article VI.B.1. or
28   VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this
29   Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no
30   later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the
31   expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the
32   proposed operation and complete it with due diligence.  Operator shall perform all work for the account of the Consenting
33   Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the
34   Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the
35   account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work.  The
36   rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party
37   designated as Operator for an operation in which the original Operator is a Non-Consenting Party.  Consenting Parties, when
38   conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this
39   agreement.

40        If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the
41   applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its
42   recommendation as to whether the Consenting Parties should proceed with the operation as proposed.  Each Consenting Party,
43   within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the
44   proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its
45   proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in
46   the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of
47   Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties'
48   interests that any Consenting Party did not elect to take.  Any interest of Non-Consenting Parties that is not carried by a
49   Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its
50   proposal.  Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a
51   drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a
52   total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays).  The proposing party, at its election, may
53   withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10)
54   days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period.
55   If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties
56   of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the
57   period provided in Article VI.B.1., subject to the same extension right as provided therein.

58        (b) Relinquishment of Interest for Non-Participation.  The entire cost and risk of conducting such operations shall be
59   borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding
60   paragraph.  Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and
61   encumbrances of every kind created by or arising from the operations of the Consenting Parties.  If such an operation results
62   in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore
63   the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that
64   participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate
65   shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not
66   increased by the subsequent operations of the Consenting Parties.  If any well drilled, Reworked, Sidetracked, Deepened,
67   Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in
68   paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the
69   well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the
70   expense and for the account of the Consenting Parties.  Upon commencement of operations for the drilling, Reworking,
71   Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the
72   provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the
73   Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-
74   Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   Deepening, Recompleting or Plugging Back, ~~or a Completion pursuant to Article VI.C.1.   Option No. 2,~~ all of such Non-
2   Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect
3   to participate.   Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or
4   market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes,
5   royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production
6   from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

7         (i)   __100__ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment
8   beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and
9   piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first
10   production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other
11   provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that
12   interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning
13   of the operations; and

14         (ii)   __300__ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening,
15   Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C.,
16   and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections),
17   which would have been chargeable to such Non-Consenting Party if it had participated therein.

18         Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone
19   described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable
20   substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each
21   Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a
22   shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-
23   Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the
24   cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a).   If any such Non-
25   Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions
26   of this Article VI.B.2. (b) shall apply to such party's interest.

27         (c)  Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or
28   Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in
29   such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full
30   recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount.   Similarly, an election not to
31   participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking
32   operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at
33   any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount.   Any such
34   Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the
35   cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties __300__% of
36   that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to
37   such Non-Consenting Party had it participated therein.   If such a Reworking, Recompleting or Plugging Back operation is
38   proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting
39   Parties in said well.

40         (d)  Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's
41   share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem,
42   production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to
43   Non-Consenting Party's share of production not excepted by Article III.C.

44         In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting
45   Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all
46   such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back,
47   Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each
48   party receiving its proportionate part in kind or in value, less cost of salvage.

49         Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations
50   for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to
51   the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing,
52   Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement
53   of such costs of operation, may submit a detailed statement of monthly billings.   Each month thereafter, during the time the
54   Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties
55   shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of
56   the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from
57   the sale of the well's working interest production during the preceding month.   In determining the quantity of Oil and Gas
58   produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or
59   periodic well tests.   Any amount realized from the sale or other disposition of equipment newly acquired in connection with
60   any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited
61   against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such
62   Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-
63   Consenting Party.

64         If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided
65   for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day
66   following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall
67   own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as
68   such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking,
69   Deepening, Recompleting or Plugging Back of said well.   Thereafter, such Non-Consenting Party shall be charged with and
70   shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this
71   agreement and Exhibit "C" attached hereto.

72         3.  Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have
73   been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise
74   terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1 Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required
2 under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening
3 operation just completed.  Stand-by costs subsequent to all parties responding, or expiration of the response time permitted,
4 whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms
5 of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation,
6 but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated
7 between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total
8 interest as shown on Exhibit "A" of all Consenting Parties.

9 In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party
10 may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in
11 Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended
12 response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending
13 the response period.  If more than one party elects to take such additional time to respond to the notice, standby costs shall be
14 allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's
15 interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

16 4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed
17 pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article
18 VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone
19 of which the parties were given notice under Article VI.B.1. ("Initial Objective").  Such well shall not be Deepened beyond the
20 Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate
21 in the Deepening operation.

22 In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective,
23 such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-
24 Consenting Parties).  Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to
25 participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2.  If a Deepening operation
26 is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation,
27 such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

28 (a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying
29 quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs
30 and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-
31 Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting
32 Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other
33 provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well
34 incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the
35 sole account of Consenting Parties.

36 (b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing
37 in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or
38 reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and
39 equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less
40 those costs recouped by the Consenting Parties from the sale of production from the well.  The Non-Consenting Party shall
41 also pay its proportionate share of all costs of re-entering said well.  The Non-Consenting Parties' proportionate part (based
42 on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent
43 Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in
44 connection with such well shall be determined in accordance with Exhibit "C."  If the Consenting Parties have recouped the
45 cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-
46 Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the
47 well for Deepening

48 The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior
49 to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article
50 VI.F.

51 5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an
52 interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its
53 proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore
54 to be utilized as follows:

55 (a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs
56 incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

57 (b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of
58 such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth
59 at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above.  Such party's
60 proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking
61 operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

62 6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to
63 propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such
64 party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform
65 an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal
66 holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be
67 conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such
68 alternate proposal to contain the same information required to be included in the initial proposal.  Each party receiving such
69 proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within
70 twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the
71 subject of the proposals, to participate in one of the competing proposals.  Any party not electing within the time required
72 shall be deemed not to have voted.  The proposal receiving the vote of parties owning the largest aggregate percentage
73 interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the
74

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation
2   within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday
3   and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig
4   is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to
5   relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within
6   such period shall be deemed an election <u>not</u> to participate in the prevailing proposal.

7       7. <u>Conformity to Spacing Pattern.</u> Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be
8   proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract
9   Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

10       8. <u>Paying Wells.</u> No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or
11   Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except
12   with the consent of all parties that have not relinquished interests in the well at the time of such operation.

13   **C. Completion of Wells; Reworking and Plugging Back:**

14       1. <u>Completion:</u> Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well
15   drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling,
16   Deepening or Sidetracking shall include:

17   ☑   <u>Option No. 1:</u> All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and
18       equipping of the well, including necessary tankage and/or surface facilities.

19   ☐   ~~Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. When~~
20   ~~such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results~~
21   ~~thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to~~
22   ~~participate in a Completion attempt whether or not Operator recommends attempting to Complete the well,~~
23   ~~together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice~~
24   ~~shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of~~
25   ~~notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an~~
26   ~~accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting~~
27   ~~with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the~~
28   ~~procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all~~
29   ~~necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface~~
30   ~~facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party~~
31   ~~receiving such notice to reply within the period above fixed shall constitute an election by that party not to~~
32   ~~participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of~~
33   ~~conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the~~
34   ~~provision of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging~~
35   ~~Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations~~
36   ~~thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each~~
37   ~~separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting~~
38   ~~Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party~~
39   ~~in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier~~
40   ~~Completions or Recompletion have recouped their costs pursuant to Article VI.B.2.; provided further, that any~~
41   ~~recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in~~
42   ~~which the Completion attempt is made. Election by a previous Non-Consenting party to participate in a subsequent~~
43   ~~Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable~~
44   ~~materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt,~~
45   ~~insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a~~
46   ~~Completion attempt.~~

47       2. <u>Rework, Recomplete or Plug Back:</u> No well shall be Reworked, Recompleted or Plugged Back except a well Reworked,
48   Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking,
49   Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and
50   Completing and equipping of said well, including necessary tankage and/or surface facilities.

51   **D. Other Operations:**

52       Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____
53   <u>**One Hundred Fifty Thousand**</u> Dollars ($ <u>**150,000**</u>) except in connection with the
54   drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously
55   authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
56   emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion
57   are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the
58   emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so
59   requesting an information copy thereof for any single project costing in excess of   <u>**One Hundred Fifty Thousand**</u> Dollars
60   ($ <u>**150,000**</u>). Any party who has not relinquished its interest in a well shall have the right to propose that
61   Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as
62   salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but
63   not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall
64   be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the
65   amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under
66   Articles VI.B.1. ~~or VI.C.1. Option No. 2~~, which shall be governed exclusively be those Articles). Operator shall deliver such
67   proposal to all parties entitled to participate therein. ~~If within thirty (30) days thereof Operator secures the written consent~~
68   ~~of any party or parties owning at least _____% of the interests of the parties entitled to participate in such operation,~~
69   ~~each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated~~
70   ~~to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms~~
71   ~~of the proposal.~~

72   **E. Abandonment of Wells:**

73       1. ~~Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has~~
74   ~~been drilled or Deepened under the terms of this agreement and is proposed to be completed as~~ a   dry   hole   shall   not   be

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1. ~~plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any~~
2. ~~party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after~~
3. ~~delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the~~
4. ~~proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the~~
5. ~~cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to~~
6. ~~plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday,~~
7. ~~Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such~~
8. ~~forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of~~
9. ~~Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct~~
10. ~~such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and~~
11. ~~abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party~~
12. ~~taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against~~
13. ~~liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and~~
14. ~~restoring the surface, for which the abandoning parties shall remain proportionately liable.~~
15.       2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been
16. conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has
17. been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to
18. such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk
19. and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed
20. abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the
21. proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its
22. operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the
23. applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties
24. against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide
25. proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well
26. within the required period or thereafter to conduct operations on such well shall entitle ~~operator~~ **Operator** to retain or take possession
27. of such well and plug and abandon the well.
28.       Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of
29. the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost
30. of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event
31. the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the
32. value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing
33. operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning
34. parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all
35. of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only
36. insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the
37. interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non-
38. abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of
39. one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, ~~such lease to be on the form~~
40. ~~attached as Exhibit "B."~~ The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located.
41. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their
42. respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract
43. Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.
44.       Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production
45. from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon
46. request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and
47. charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate
48. ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor
49. shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in
50. further operations therein subject to the provisions hereof.
51.       3. Abandonment of Non-Consent Operations: The provisions of Article ~~VI.E.1. or~~ VI.E.2. above shall be applicable as
52. between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided,
53. however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further
54. operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well
55. in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest
56. in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as
57. provided in Article VI.B.2.(b).
58. **F. Termination of Operations:**
59.       Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing,
60. Completion or plugging of a well, ~~including but not limited to the Initial Well,~~ such operation shall not be terminated without
61. consent of parties bearing   **90**  % of the costs of such operation; provided, however, that in the event granite or other
62. practically impenetrable substance or condition in the hole is encountered which renders further operations impractical,
63. Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1., and the
64. provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.
65. **G. Taking Production in Kind: This Article VI.G is subject to Article XVI.**
66.     ☑ **Option No. 1: Gas Balancing Agreement Attached**
67.       Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the
68. Contract Area, exclusive of production which may be used in development and producing operations and in preparing and
69. treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking
70. in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any
71. party taking its share of production in kind shall be required to pay for only its proportionate share of such part of
72. Operator's surface facilities which it uses.
73.       Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in
74. production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party.   Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market.   The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract.   No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

~~In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement.~~   Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

⊟   **Option No. 2: No Gas Balancing Agreement:**

~~Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost.   Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party.   Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.~~

~~Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.~~

~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party.   Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) -day period.   Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.~~

~~Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement.   The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract.   No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of such intended purchase or sale and the price to be paid or the pricing basis to be used.   Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.~~

~~All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.~~

**ARTICLE VII.**

**EXPENDITURES AND LIABILITY OF PARTIES**

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area.   Accordingly, the liens granted among the parties in Article VII.B. are given to secure the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder.   It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals.   In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder.  Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder.  Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

~~Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party.~~ **after the date of this agreement.|**  All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired. **For clarity, the Oil and Gas Interests and / or Oil and Gas Leases of Non-Operator are subject to pre-existing secured first liens with its credit facility or other funded debt providers, and nothing herein shall affect the respective lenders' rights of priority thereunder.**

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code.  The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof.  In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas.  All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties.  The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed.  In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder.  Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator. **See also Article XVI.**

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof.  Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month.  Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received.  If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid.  Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

remedies specified below shall be applicable.    For purposes of this Article VII.D., all notices and elections shall be delivered

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70
71
72
73
74

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default **Subject to Article XVI,** until the date of collection at the rate specified in Exhibit "C" attached hereto. / Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in the Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.**23.**

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1      If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
2  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final
3  determination.  During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes
4  and any interest and penalty.  When any such protested assessment shall have been finally determined, Operator shall pay the tax for
5  the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be
6  paid by them, as provided in Exhibit "C."

7      Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
8  to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

9  **ARTICLE VIII.**
10 **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

11 **A.  Surrender of Leases:**

12     The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
13 or in part unless all parties consent thereto.

14     However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written
15 notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after
16 delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto.  Failure of a
17 party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases
18 described in the notice.  If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or
19 implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be
20 located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender.  If the interest of the
21 assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not
22 consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long
23 thereafter as Oil and/or Gas is produced from the land covered thereby, ~~such lease to be on the form attached hereto as Exhibit "B."~~
24 Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore
25 accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party
26 shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained
27 in any lease made under the terms of this Article.  The party assignee or lessee shall pay to the party assignor or lessor the
28 reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased
29 acreage.  The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less
30 the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface.  If such value is less
31 than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit.  If the
32 assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the
33 interest of each bears to the total interest of all such parties.  If the interest of the parties to whom the assignment is to be made
34 varies according to depth, then the interest assigned shall similarly reflect such variances.

35     Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
36 party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
37 assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
38 agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

39 **B.  Renewal or Extension of Leases:**

40     If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties
41 shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease,
42 promptly upon expiration of the existing Lease.  The parties notified shall have the right for a period of thirty (30) days following
43 delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease
44 affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost
45 allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the
46 parties in the Contract Area.  Each party who participates in the purchase of a renewal or replacement Lease shall be given an
47 assignment of its proportionate interest therein by the acquiring party.

48     If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned
49 by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in
50 the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the
51 purchase of such renewal or replacement Lease.  The acquisition of a renewal or replacement Lease by any or all of the parties hereto
52 shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which
53 less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating
54 Agreement in the form of this agreement.

55     If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in
56 renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

57     The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by
58 the expiring Lease or cover only a portion of its area or an interest therein.  Any renewal or replacement Lease taken before
59 expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the
60 existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time
61 the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the
62 expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this
63 agreement.

64     The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

65 **C.  Acreage or Cash Contributions:**

66     ~~While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other~~
67 ~~operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall~~
68 ~~be applied by it against the cost of such drilling or other operation.  If the contribution be in the form of acreage, the party to whom~~
69 ~~the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the~~
70 ~~proportions said Drilling Parties shared the cost of drilling the well.  Such acreage shall become a separate Contract Area and, to the~~
71 ~~extent possible, be governed by provisions identical to this agreement.  Each party shall promptly notify all other parties of any~~
72 ~~acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area.  The above~~
73 ~~provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled~~
74 ~~inside Contract Area.~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder,
2    such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

3    **D. Assignment:** ~~Maintenance of Uniform Interest:~~

4    ~~For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas~~
5    ~~Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other~~
6    ~~disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells,~~
7    ~~equipment and production unless such disposition covers either:~~
8    ~~1.   the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or~~
9    ~~2.   an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells,~~
10    ~~equipment and production in the Contract Area.~~

11    Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
12    and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and
13    Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of
14    the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale,
15    encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the
16    instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee.  No assignment or other
17    disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect
18    to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation
19    conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security
20    interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

21    If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion,
22    may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures,
23    receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to
24    bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-
25    owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of
26    the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale
27    proceeds thereof.

28    **E. Waiver of Rights to Partition:**
29    If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
30    undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severally its
31    undivided interest therein.

32    **F. Preferential Right to Purchase:**
33    ☒  (Optional; Check if applicable.)
34    ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
35    ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which~~
36    ~~shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase~~
37    ~~price, a legal description sufficient to identify the property, and all other terms of the offer.  The other parties shall then have an~~
38    ~~optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the~~
39    ~~same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the~~
40    ~~purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all~~
41    ~~purchasing parties.  However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage~~
42    ~~its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests,~~
43    ~~or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets~~
44    ~~to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any~~
45    ~~company in which such party owns a majority of the stock.~~

46    **ARTICLE IX.**
47    **INTERNAL REVENUE CODE ELECTION**

48    If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the
49    parties have not otherwise agreed to form a tax partnership pursuant to ~~Exhibit "G" or other~~ an agreement between them, each
50    party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle
51    "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and
52    the regulations promulgated thereunder.  Operator is authorized and directed to execute on behalf of each party hereby affected
53    such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal
54    Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by
55    Treasury Regulation §1.761.  Should there be any requirement that each party hereby affected give further evidence of this
56    election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal
57    Revenue Service or as may be necessary to evidence this election.  No such party shall give any notices or take any other action
58    inconsistent with the election made hereby.  If any present or future income tax laws of the state or states in which the Contract
59    Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter
60    1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party
61    hereby affected shall make such election as may be permitted or required by such laws.  In making the foregoing election, each
62    such party states that the income derived by such party from operations hereunder can be adequately determined without the
63    computation of partnership taxable income.

64    **ARTICLE X.**
65    **CLAIMS AND LAWSUITS**

66    Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure
67    does not exceed __One Hundred Fifty Thousand__ Dollars ($ __150,000__ ) and if the payment is in complete settlement
68    of such claim or suit.  If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over
69    the further handling of the claim or suit, unless such authority is delegated to Operator.  All costs and expenses of handling settling,
70    or otherwise discharging such claim or suit shall be a the joint expense of the parties participating in the operation from which the
71    claim or suit arises.  If a claim is made against any party or if any party is sued on account of any matter arising from operations
72    hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall
73    immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.
74

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension, **except that a lack of funds does not constitute "force majeure".**

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, **personal delivery, email,** / courier service, ~~telegram, telex, telecopier or any other form of facsimile,~~ postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or **when received by email by** to the telecopy, facsimile or telex machine of / such party. The second or any responsive notice shall be deemed delivered when ~~deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy~~ **received by whom such notice is directed** ~~or facsimile, or when personally delivered to~~ / the party to / be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, ~~telex, telecopy or other facsimile~~ within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice. **Each notice delivered via email must be sent as an attachment to the email and indicate that it is a notice under this agreement.**

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☐ ~~Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.~~

☑ Option No. 2: ~~In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this~~ **This** agreement shall continue in force so long as any ~~such well~~ **well in the Contract Area** is capable of production, and for an additional period of __90__ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event ~~the well described in Article VI.A., or any subsequent well~~ **that no well in the Contract Area** ~~drilled hereunder, results in a dry hole, and no other well~~ / is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within _____ 90 _____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

**B. Governing Law:**

**This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of __Texas__ shall govern.**

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or

- 16 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or
2  production of wells, on tracts offsetting or adjacent to the Contract Area.

3        With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages,
4  injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation
5  or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission
6  or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not
7  constitute gross negligence.  Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of
8  production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such
9  an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such
10  incorrect interpretation or application.

11                                        **ARTICLE XV.**
12                                        **MISCELLANEOUS**

13  **A. Execution:**

14        This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been
15  executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of
16  the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which
17  own, in fact, an interest in the Contract Area.  ~~Operator may, however, by written notice to all Non-Operators who have~~
18  ~~become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no~~
19  ~~event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this~~
20  ~~agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of~~
21  ~~drilling operations.  In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease~~
22  ~~as of such termination.  In the event any Non-Operator has advanced or prepaid any share of drilling or other costs~~
23  ~~hereunder, all sums so advanced shall be returned to such Non-Operator without interest.  In the event Operator proceeds~~
24  ~~with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a~~
25  ~~current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the~~
26  ~~Initial Well which would have been charged to such person under this agreement if such person had executed the same and~~
27  ~~Operator shall receive all revenues which would have been received by such person under this agreement if such person had~~
28  ~~executed the same.~~

29  **B. Successors and Assigns:**

30        This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs,
31  devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or
32  Interests included within the Contract Area.

33  **C. Counterparts:**

34        This instrument may be executed in any number of counterparts, each of which shall be considered an original for all
35  purposes.

36  **D. Severability:**

37        For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws,
38  this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to
39  this agreement to comply with all of its financial obligations provided herein shall be a material default.

40                                        **ARTICLE XVI.**
41                                        **OTHER PROVISIONS**

42
43        **It is understood and agreed that if there is any conflict between any part of or all of the terms and provisions of this**
44  **Article XVI and any other terms and provisions of this agreement or its Exhibits, the terms and provisions of this Article XVI shall**
45  **prevail and control to the extent of such conflict. It is understood and agreed that if there is any conflict between any part of or all**
46  **of the terms and provisions of this agreement or its Exhibits and the terms and provisions of the Indenture, the terms and**
47  **provisions of the Indenture shall prevail and control to the extent of such conflict.**

47  **A.    INTERPRETATION:**
48
49        **All references herein to Exhibits, Articles, subsections, clauses and other subdivisions refer to the corresponding**
50  **Exhibits, Articles, subsections, clauses and other subdivisions of or to this agreement unless expressly provided otherwise.  The**
51  **words "*this agreement*," "*herein*," "*hereby*," "*hereunder*" and "*hereof*," and words of similar import, refer to the operating**
52  **agreement to which this Article XVI is attached as a whole and not to any particular Article, subsection, clause or other subdivision**
53  **unless expressly so limited.  The words "*this Article*," "*this subsection*," "*this clause*," and words of similar import, refer only to the**
54  **Article, subsection and clause hereof in which such words occur.  The word "*including*" (in its various forms) means including**
55  **without limitation.  All references to "$" or "*dollars*" shall be deemed references to U.S. Dollars.  Each accounting term not defined**
56  **herein will have the meaning given to it under GAAP standards as interpreted as of the execution date hereof.  Unless expressly**
57  **provided to the contrary, the word "*or*" is not exclusive.  Pronouns in masculine, feminine or neuter genders shall be construed to**
58  **state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be**
59  **construed to include the plural and vice versa, unless the context otherwise requires.  Exhibits referred to herein are attached to**
    **and by this reference incorporated herein for all purposes.  Reference herein to any federal, state, local or foreign Law shall be**
    **deemed to also refer to all rules and regulations promulgated thereunder, unless the context requires otherwise, and shall also be**
    **deemed to refer to such Laws as in effect as of the execution date hereof or as hereafter amended.**

60
61  **B.    ADDITIONAL DEFINITIONS:**

62        **1.      The term "*affiliate*" or "*Affiliate*" (including its derivatives and similar terms) shall mean, when used with**
63  **respect to any Person, another Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by,**
64  **or is under common Control with, such Person.  For purposes of this Agreement, (a) solely for purposes of this Agreement and the**
65  **other applicable Basic Documents (and notwithstanding that such entities are not affiliates in fact of one another), Operator shall be**
66  **deemed to be an Affiliate of Seller, and (b) Seller and its subsidiaries (other than Issuer and its subsidiaries), on the one hand, and**
    **Issuer and its subsidiaries, on the other hand, shall not be considered Affiliates of one another.**

67
68        **2.      The term "*Ageron Contract Area*" means the wellbores of the following Wells and, to the extent INSOFAR**
69  **AND ONLY INSOFAR attributable thereto, the related Wellbore Lease Rights, in each case, included in the Contract Area as**
70  **further described on Exhibit "A", "A-1" and "A-2": (i) AI San Roman 101H (API No. 42-479-44505) and (ii) AI San Roman 102H**
    **(API No. 42-479-44506), each located in Webb County, Texas.**

71
72        **3.      The term "*Asset Purchase Agreements*" shall mean (i) that certain Asset Purchase Agreement, dated as of April**
73  **29, 2022, between HB2 Origination, LLC, as Seller, and Alpine Summit Funding LLC, as Issuer (and buyer thereunder) (the**
74  **"*Initial Asset Purchase Agreement*"), and (ii) the Second Asset Purchase Agreement.**

- 17 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

4.       The term "*Asset Taxes*" shall mean, collectively, the "Asset Taxes" under, and as defined in, each of the Asset Purchase Agreements.

5.       The term "*Back-up Management Agreement*" shall have the meaning assigned to such term in the Indenture.

6.       The term "*Back-Up Manager*" shall have the meaning assigned to such term in the Indenture.

7.       The term "*Basic Documents*" shall have the meaning assigned to such term in the Indenture.

8.       The term "*Burdens*" shall mean, collectively, the "Burdens" under, and as defined in, each of the Asset Purchase Agreements.

9.       The term "*Business Days*" shall have the meaning assigned to such term in the Indenture.

10.     The term "*Control*" and its derivatives shall mean, with respect to any Person, the possession, directly or indirectly, of the power to exercise or determine the voting of more than 50% of the voting rights in a corporation, and, in the case of any other type of entity, the right to exercise or determine the voting of more than 50% of the equity interests having voting rights, or otherwise to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

11.     The term "*Collateral*" shall have the meaning assigned to such term in the Indenture.

12.     The term "*Contract Area*" shall mean (a) the wellbores of the Wells and (b) to the extent and INSOFAR AND ONLY INSOFAR attributable thereto, the related Wellbore Lease Rights.

13.     The term "*Foreclosure*" shall mean a consummated foreclosure on the Collateral under and in accordance with the terms of the Indenture and the Mortgage.

14.     The term "*Governmental Body*" shall mean any (a) nation, state, county, city, town, village, district, or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign, or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (d) multi-national organization or body; or (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

15.     The term "*Governmental Rule*" shall mean with respect to any Person, any Law, rule, regulation, ordinance, order, code, treaty, judgment, decree, directive, guideline, policy or similar form of decision of any Governmental Body binding on such Person.

16.     The term "*HB2 Segregated Account*" shall have the meaning assigned to such term in the Indenture.

17.     The term "*Indenture*" shall mean that certain Amended and Restated Indenture, dated as of September 12, 2022, between Alpine Summit Funding LLC, as Issuer, and UMB Bank, N.A., as Indenture Trustee (as defined therein) and as Paying Agent (as defined therein) and as Securities Intermediary (as defined therein), as amended, amended and restated, supplemented or otherwise modified from time to time, or any credit facility entered into to replace such facility.

18.     The term "*Indenture Trustee*" shall have the meaning assigned to such term in the Indenture.

19.     The term "*Issuer*" shall mean Alpine Summit Funding LLC, a Delaware limited liability company.

20.     The term "*Leases*" shall mean the oil and gas leases described on Exhibit "A-2" attached hereto.

21.     The term "*Laws*" shall mean any applicable United States or foreign, federal, state, regional, or local statute, law, code, rule, treaty, convention, order, decree, injunction, directive, determination or other requirement and, where applicable, any legally binding interpretation thereof by a Governmental Body having jurisdiction with respect thereto or charged with the administration or interpretation thereof (including, without limitation, any Governmental Rule).

22.     The term "*Majority Noteholders*" shall have the meaning given to such term in the Indenture.

23.     The term "*Management Services Agreement*" shall mean that certain Amended and Restated Management Services Agreement, dated as of the date hereof, by and between Alpine Summit Funding LLC and HB2 Origination, LLC, as Manager, as amended, amended and restated, supplemented or otherwise modified from time to time.

24.     The term "*Manager*" shall have the meaning assigned to such term in the Indenture.

25.     The term "*Mortgage*" shall have the meaning assigned to such term in the Indenture.

26.     The term "*Noteholder*" shall have the meaning given to such term in the Indenture.

27.     The term "*Non-Operator*" shall mean any Party other than Operator.

28.     The term "*Operating Expenses*" shall have the meaning assigned to such term in the Indenture.

29.     The term "*Party*" shall mean, individually, the parties to this agreement, and the term "Parties" shall mean, collectively, all of the parties to this agreement.

30.     The term "*Payment Date*" shall have the meaning assigned to such term in the Indenture.

31.     The term "*Person*" shall mean any individual, corporation, limited liability company, estate, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

32.     The term "*Seller*" shall mean HB2 Origination, LLC, a Delaware limited liability company.

33.     The term "*Secured Parties*" shall have the meaning assigned to such term in the Indenture.

34.     The term "*Third Party*" shall mean any Person other than a Party or its Affiliates.

- 18 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

35.     The term "*Wellbore Lease Rights*" shall mean, with respect to each Well, that portion of the Leases listed on Exhibit "A-2", in each case, INSOFAR AND ONLY INSOFAR as the rights thereunder are necessary or used to (A) own, operate, and maintain such Well, (B) participate in and perform subsequent operations at any time applicable to such Well (including maintenance, repair, workovers, reworks, or extensions (including lateral extensions) of the wellbore of such Well), or (C) produce, store, and transport Hydrocarbons from the wellbore of such Well.

36.     The term "*Wells*" shall mean the wells described on Exhibit "A-1" attached hereto.

C.      NON-OPERATOR OVERSIGHT; REMOVAL OF OPERATOR IN CONNECTION WITH FORECLOSURE:

1.      <u>Non-Operator Oversight:</u>  In the event that a Warm Trigger Event or a Hot Trigger Event (each as defined in the Back-Up Management Agreement) has occurred, then Issuer, in consultation with the Back Up Manager and in accordance with the terms of the Back-Up Management Agreement, shall have the right to appoint an Observer (as defined in the Back-Up Management Agreement) to observe and consult with Operator with respect to Operator's conduct and performance of services under this agreement.  The Observer shall have the access rights described in, and with such access subject to the terms of, each of <u>Article V.D.5</u> and <u>Article V.D.8</u>, as if Observer is a Consenting Party. For the avoidance of doubt, the Observer shall not have the ability to direct or control the actions or decisions of Operator or any of its employees, agents, representatives, or contractors, but rather shall be limited to a role of observation.

2.      <u>Removal in Connection with Foreclosure:</u>  <u>Article V.B.1.</u> is hereby amended by adding the following sentence at the end of the first paragraph of <u>Article V.B.1</u>: "Operator may be removed by affirmative vote of the Non-Operators owning a majority of interest based on ownership as shown on Exhibit "A-1" remaining after excluding the voting interest of Operator and any Affiliate of Operator in the event of a Foreclosure; provided that the right to remove Operator under this sentence will expire if such right is not exercised within 90 days after the Foreclosure.".

3.      <u>Resignation of Operator</u>: Notwithstanding anything in this agreement to the contrary, until the date on which the Indenture is satisfied and discharged in accordance with Article XI of the Indenture, Operator may not resign as Operator hereunder without the prior consent of the Majority Noteholders, not to be unreasonably withheld, conditioned or delayed.

D.      CERTAIN OPERATIONS:

1.      Issuer and its successors and assigns shall not have the right to propose or participate, and shall not be required to participate, in any drilling of new wells, Deepening, Sidetracking, Recompletion or Plug Back operations, or any operations on any Oil and Gas Lease, or other mineral fee, subleases or leaseholds, in each case, in which Issuer does not own an interest.

2.      The Parties agree that no new wells shall be drilled under this agreement.

3.      Operator shall conduct all operations within the Contract Area in accordance with the terms of the Leases included within the Contract Area, and Operator shall comply with the terms of the Leases with respect to the ownership and operation of each of the Leases, including all express and implied covenants thereunder. This <u>Article XVI.D.3</u> will be a covenant in addition to, and separate and independent of, the covenants described in <u>Article V.A</u>, will be deemed to be a covenant running with the land and specifically listed in the Exhibit "H" recording supplement executed herewith, and shall not be subject to the limitations contained in <u>Article V.A</u> or in <u>Article XVI.L</u>.

E.      MISCELLANEOUS COSTS:

1.      The following expenses shall be a direct charge except to the extent constituting Non-Reimbursable Expenses under the Management Services Agreement, borne by the Joint Account as provided in Exhibit "C", and shall not be included as administrative overhead as set forth in Part III of Exhibit "C".

(a)     All reasonable costs incurred by Operator for outside engineers, geologists, consultants, landmen, attorneys and other similar services in obtaining spacing, pooling or other orders or rulings from state regulatory bodies or courts regarding the Contract Area.

(b)     All reasonable costs incurred by Operator for Technical Services (as defined in Exhibit "C" attached hereto), for engineers, geologists, consultants, landmen, attorney and other similar services in complying with the Natural Gas Policy Act of 1978, or in complying with federal, state or local Law for the obtaining and monitoring of any well classifications required in the Natural Gas Policy Act of 1978; or in complying with any Laws administered by, or any rules or regulations promulgated by, through, or under the United States Department of Energy regarding the Contract Area.

2.      During the term of this agreement, Operator hereby agrees to not charge any administrative overhead charges as provided in Exhibit "C".

F.      SUCCESSORS AND ASSIGNS:

Each Party hereto covenants and agrees for itself, its successors and assigns, that any sale, assignment, sublease, mortgage, pledge, or other instrument affecting the Oil and Gas Leases and lands subject to this instrument (whether of an operating or non-operating interest or a mortgage, pledge or other security interest) will be made and accepted subject to this instrument; *provided* that if a Party conveys the entirety of its undivided interest in only a portion of the Contract Area, the receiving party and the remaining Parties (and not the conveying Party) shall be deemed to be party to a separate and distinct agreement (that is substantially similar in form and substance to this agreement, subject to any express provisions hereof to the contrary) as to that portion of the Contract Area so conveyed.  Should a Party assign all or a part of its interest in the Contract Area (in each case, other than to an Affiliate), then at such time as the selling Party has paid all of its share of joint interest billing costs in accordance with Exhibit "C" current to the effective date of such sale and the Party to whom it has assigned such interest has assumed the selling Party's obligations hereunder, it shall be deemed that the selling Party shall be released from any responsibility for costs thereafter incurred relative to the undivided interest sold; *provided*, *however*, to the extent a Party retains an undivided interest such Party shall continue to be bound by all of the terms and conditions of this agreement applicable to the retained undivided interest. Upon sale, sublease or assignment of the Oil and Gas Leases and lands subject to this agreement, as of the effective date of such sale, sublease, or assignment, the Party acquiring such rights subject to this agreement shall thereafter assume and be responsible for all of the rights and obligations of the Party selling, subleasing, or assigning as to the undivided interest acquired by a Party.  The party acquiring the interest or security shall be furnished a copy of this agreement and any amendments thereto, and shall expressly agree to be bound by all of its terms and provisions.  It is further agreed in the event of the foreclosure of the mortgage or security interest provided under this agreement, any sale will be expressly made and accepted subject to all of the terms and provisions of this agreement. Any Party hereto (and any successor of a Party hereto) who executed any instrument in favor of any Person without complying with the provisions of this paragraph shall indemnify, defend, and hold the other Parties hereto harmless for and against any and all claims or causes of action by any Person whomsoever, or for any losses sustained, in each case, as a result of the failure of such Party to comply with these provisions.  This indemnity shall also include reimbursement for reasonable attorney's fees incurred in connection with the assertion of the rights herein granted such Parties.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

G.    NO RECOURSE:

Notwithstanding anything that may be expressed or implied in this agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any Party may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this agreement, covenants, agrees and acknowledges that no Persons other than the Parties (and their respective successor and assigns, collectively, the "*Recourse Parties*") shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith against (i) any former, current or future director, officer, agent, Affiliate, manager, incorporator, controlling Person, fiduciary, representative or employee of any Party (or any of the foregoing Persons' successors or permitted assignees), (ii) any former, current, or future general or limited partner, manager, stockholder or member of any Party (or any of the foregoing Persons' successors or permitted assignees) or any Affiliate thereof or (iii) any former, current or future director, officer, agent, employee, Affiliate, manager, incorporator, controlling Person, fiduciary, representative, general or limited partner, stockholder, manager or member of any of the foregoing, but in each case not including the Parties (each, but excluding for the avoidance of doubt, the Recourse Parties, a "*Party Affiliate*"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract or otherwise) by or on behalf of such Party against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Party under this agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

H.    FORECLOSURE RIGHTS:

The provisions and rights of foreclosure in Article VII.B shall not supersede any rights of the Parties under the Management Services Agreement, the Indenture, or any security instruments thereunder, in respect of those agreements or instruments, or be construed as additional rights under the Management Services Agreement, the Indenture, or any security instruments thereunder with respect to any breach or default under those agreements or instruments, and the rights and remedies provided for in the Management Services Agreement, Indenture and any security instruments thereunder, as applicable, shall be the only remedies and rights in the event of an uncured default under those agreements or instruments. Additionally, except as set forth in this Article XVI.H, no right of foreclosure or exercise of a remedy under the Management Services Agreement, the Indenture, or any security instruments thereunder shall affect the rights or obligations of the Parties to this agreement, with the right of foreclosure in Article VII.B being exercisable only on and pursuant to the terms and conditions of this agreement.

I.    HYDROCARBON MARKETING AND GATHERING:

1.    On a daily basis, Operator shall purchase or cause Manager to purchase Issuer's proportionate share of Oil and Gas production attributable to the Wells at the wellhead and sell the same to unaffiliated Third Parties on an arms-length basis.  Any such sale shall be in a manner commercially reasonable under the circumstances. In its purchase and resale of hydrocarbons under this agreement, Operator and Manager shall act in accordance with the express provisions of this agreement and, where neither this agreement nor any other agreement applicable to Operator or Manager in respect of such obligations specifically establishes a particular obligation or standard, in a commercially reasonable manner consistent with generally acceptable standards in the oil and gas business, and will exercise the same degree of diligence and care that Operator or Manager would exercise if managing its own business and affairs.

2.    All proceeds from the sale of Issuer's proportionate share of Oil and Gas production attributable to the Wells shall be paid directly to the HB2 Segregated Account by the purchasers of such production, and Operator shall thereafter remit or cause Manager to remit to Issuer, Issuer's proportionate share of such proceeds within two (2) Business Days following such time as Operator or Manager has identified the portion of such proceeds as payable to Issuer (after calculation and netting of applicable Operating Expenses, Burdens and Asset Taxes), but in event within sixty (60) days after receipt of such proceeds in the HB2 Segregated Account.  The amount paid to Issuer for the sale of its hydrocarbons shall be the net amount realized by Operator or Manager, as applicable, for the sale of the hydrocarbons to the first Third Party unaffiliated purchaser, and shall be net of all applicable Operating Expenses, Burdens and Asset Taxes, including all gathering, marketing, processing, compression, dehydration, demand, treating, deficiency, reservation, and other charges, fees, costs, expenses, losses, and deductions charged to or incurred by Operator or Manager in connection with, or otherwise attributed or allocated, to Issuer's proportionate share of Oil and Gas production (collectively, the "*O&G Marketing Costs*") (*provided* that all such O&G Marketing Costs shall be either: (i) charged by Persons who are neither Manager nor Affiliates of Operator or Manager in arm's length transactions or (ii) if charged by Manager or Affiliates of Operator or Manager, without a marketing fee and on terms and conditions that are reasonably equivalent to (or better than) what would be received in an arms' length transaction (giving effect to the scope and location of services provided) for the same or comparable services). If applicable, Operator or Manager will transport or cause to be transported Issuer's volumes to the relevant receipt point(s) on the interstate pipelines on which Operator, Manager, or any of their Affiliate holds firm capacity rights.

3.    The distribution of the proceeds from the sale of Issuer's proportionate share of Oil and Gas production attributable to the Wells is further subject to Operator's and/or the Manager's (as applicable) netting and offset rights set forth in Article XVI.O, in addition to any other rights and remedies otherwise provided for under this agreement. If the proceeds from the sale of Issuer's proportionate share of Oil and Gas production attributable to the Wells are insufficient to pay the O&G Marketing Costs payable, chargeable, or incurred by Operator or Manager, then Operator or the Manager (as applicable) may invoice Issuer for its proportionate share of such O&G Marketing Costs. ISSUER HEREBY ACKNOWLEDGES AND AGREE THAT NO REPRESENTATION OR WARRANTY IS OR HAS BEEN MADE BY OPERATOR OR MANAGER CONCERNING OR RELATING TO THE PRICE TO BE PAID FOR ISSUER'S OIL AND GAS OR THE AMOUNTS OF ANY OF THE O&G MARKETING COSTS.

4.    Operator or the Manager (on its behalf) will administer (or cause to be administered) the payment of excise, severance, and any other production taxes due on Issuer's proportionate share of Oil and Gas production attributable to the Wells ("*O&G Taxes*"), but neither Operator nor Manager will be responsible for any error or omission in such payment of O&G Taxes, EVEN IF CAUSED IN WHOLE OR IN PART FROM THE ACTIVE, PASSIVE, SOLE OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF OPERATOR OR MANAGER, but excepting to the extent caused by Operator's or Manager's gross negligence or willful misconduct. In addition, Operator shall pay (or cause to be paid) all royalties, overriding royalties, and any other similar payments due on Issuer's proportionate share of Oil and Gas production attributable to the Wells, subject to the terms and conditions of this agreement ("*O&G Burdens*"), but neither Operator nor Manager will be responsible for any error or omission in such payment of O&G Burdens EVEN IF CAUSED IN WHOLE OR IN PART FROM THE ACTIVE, PASSIVE, SOLE OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF OPERATOR OR MANAGER, but excepting to the extent caused by Operator's or Manager's gross negligence or willful misconduct.

5.    Issuer shall retain risk of loss for its proportionate share of Oil and Gas production attributable to the Wells until the point at which Operator or Manager delivers such Oil and Gas at the point of delivery to the applicable purchaser, at which time risk of loss of Issuer's Oil and Gas shall pass to the purchaser. In respect of such Oil and Gas, Operator or Manager shall be deemed to have taken title to Issuer's proportionate share of Oil and Gas production attributable to the Wells not later than at the point of delivery to the purchaser, if such purchaser requires that Operator or Manager represent that it has title under its contract, tariff, or other applicable rule or law.

6.    Issuer shall not have the right to take in kind or separately dispose of its proportionate part of the Oil and Gas produced from the Contract Area, unless Operator provides its written consent to such right. Operator shall market or otherwise

- 20 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

dispose of (or cause to be marketed or disposed of) all Oil and Gas produced from the Contract Area not taken in kind or separately disposed of by Non-Operator as provided above in this <u>Article XVI.I</u>.

**J.      RELATIONSHIP OF THE PARTIES:**

This agreement is not intended to create, and shall not be construed to create, an association for profit, a trust, a joint venture, a mining partnership or other relationship of partnership, or entity of any kind between the Parties, subject to <u>Article IX</u>. The obligations and liability of each Party, arising under and in connection with this agreement, shall be several and not joint. Each Party acknowledges and agrees that the Parties and their Affiliates have participated in and will continue to participate in (directly or indirectly) investments in the oil and gas and exploration and production industry that may, are or will be competitive within or outside of the Contract Area, and each Party hereby expressly waives any potential conflicts of interest in connection with such other investments. Without being in derogation of the Parties' intention that no partnership or joint venture shall exist between the Parties, in the event that, notwithstanding the intention of the Parties hereto, a partnership or joint venture shall be deemed to exist, to the maximum extent permitted by applicable Law, each Party hereby waives any claim or cause of action against, and hereby eliminates all liabilities of, the other Party and their respective Affiliates, employees, agents and representatives for any breach of any fiduciary duty by any such Person, including, without limitation, as may result from a conflict of interest, any breach of loyalty, any breach of the duty of loyalty or care, or any breach of the duty of good faith and fair dealing.  Each Party acknowledges and agrees that in the event of any such conflict of interest, each Party may decide or act on any matter in its sole and absolute discretion taking into account solely its interests and those of its Affiliates, employees, agents and representatives.

**K.      NOTICES:**

All notices and other communications hereunder, unless otherwise specifically provided, shall be in writing and shall be deemed sufficiently given for all purposes hereof if (a) delivered in Person, by courier or by registered or certified United States Mail to the Person to be notified, with receipt obtained, or (b) sent by e-mail transmission, with acknowledgement of receipt obtained (*provided that the receiving Party shall be obligated to affirmatively acknowledge receipt via reply e-mail promptly following receipt of such notice or communication*), in each case to the appropriate address or number as set forth below (or at such other address or number for a Party as shall be specified by like notice).  All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice.  Each notice shall be deemed effective on receipt by the addressee as aforesaid; *provided* that, notice received by e-mail transmission after 5:00 p.m. at the location of the addressee of such notice shall be deemed received on the first Business Day following the date of such electronic receipt.  Until changed pursuant to the foregoing, notices to the Parties shall be addressed as follows:

    (i)        If to Operator, addressed to:
                Ironroc Energy Partners LLC; Ageron Ironroc Energy, LLC
                2445 Technology Forest Blvd, Suite 1010
                The Woodlands, TX, 77381
                Attn:  Chrystie Holmstrom; Kathryn McCoy
                Email: <u>cholmstrom@alpsummit.com</u>; <u>kmccoy@alpsummit.com</u>

                With copies to:
                Porter Hedges LLP
                 1000 Main Street, 36th Floor
                Houston, TX 77002
                Attn:  E. James Cowen
                Email: <u>jcowen@porterhedges.com</u>

    (ii)      If to Issuer, addressed to:
                Alpine Summit Funding LLC
                c/o HB2 Origination, LLC
                3322 West End Avenue, Suite 450
                Nashville, TN 37203
                Attn:  Chrystie Holmstrom; Kathryn McCoy
                Email: <u>cholmstrom@alpsummit.com</u>; <u>kmccoy@alpsummit.com</u>

                With copies to:
                Porter Hedges LLP
                1000 Main Street, 36th Floor
                Houston, TX 77002
                Attn:  E. James Cowen
                Email: <u>jcowen@porterhedges.com</u>

**L.      OPERATOR LIABILITY:**

Notwithstanding anything herein to the contrary, except for failure to comply with its obligations described in <u>Article XVI.D.3</u> above, in no event will Operator have any liability hereunder as Operator hereunder for any claims, actions, damages, liabilities, losses or expenses sustained or incurred in connection with the conduct of any marketing transaction or performance of  any operation or activity prescribed or permitted under this agreement or any breach of any provision regarding the standard of performance of an Operator in performing operations and activities under this agreement, EVEN IF SUCH CLAIMS, ACTIONS, DAMAGES, LIABILITIES, LOSSES OR EXPENSES AROSE IN WHOLE OR IN PART FROM THE ACTIVE, PASSIVE, SOLE OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF OPERATOR, OTHER THAN IF SUCH CLAIMS, ACTIONS, DAMAGES, LIABILITIES, LOSSES OR EXPENSES AROSE FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF OPERATOR; it being understood by each Party that any such claims, actions, damages, liabilities, losses or expenses (other than that caused by the gross negligence or willful misconduct of Operator), will be borne severally by the Parties in proportion to their interest (as set forth on Exhibit "A-1") in the operations or activities giving rise to such claim, damage, loss, liability or expense.

**M.      HEARING AND ADMINISTRATIVE PROCEEDINGS:**

Operator shall act as the representative of all Parties in all hearings and proceedings before administrative bodies concerning the Contract Area and, all costs and expenses incurred by Operator directly or by retention of outside personnel in participation in such hearings or proceedings shall be a proper charge against the Joint Account; *provided, however*, that nothing herein contained shall prohibit any of the Parties other than Operator from participating in any such hearings or proceedings on its behalf and at its own risk, cost, and expense.

**N.      MULTIPLE BILLING:**

Notwithstanding any provision contained herein or in any exhibit attached to the contrary, it is specifically agreed between the Parties hereto that Operator shall be required to render statements and billings only to the undersigned Parties for costs and expenses chargeable to their interests as set out herein. If a Party disposes of a part of its interest to greater than two assignees, then such Party shall be solely responsible for invoicing and collecting from its assignees; *provided, however*, such Party and his assignees may designate in writing a new Person from their group, reasonably acceptable to Operator, to receive statements and billings and pay Operator for costs and expenses chargeable to the entire interest originally credited herein to such Party.

O.    NETTING AND SETOFF:

In addition to any other rights it may have, Operator (or Non-Operator, if Operator is the party in default, or Manager, to the extent Manager is performing any activities pursuant to Article XVI.I) shall: (1) have and be entitled to exercise all rights and remedies of recoupment, setoff, and any similar doctrines, and the exercise of such rights and remedies shall be in addition to all other rights and remedies that may be available to Operator (or Non-Operator, if Operator is the party in default, or Manager, to the extent Manager is performing any activities pursuant to Article XVI.I) at law, in equity, or otherwise; (2) have the right to net or set off any proceeds of production attributable to a Party against amounts due by such Party under this agreement (including Operating Expenses, Burdens and Asset Taxes); and (3) have the right to net or set off a defaulting party's payment obligations under this agreement against any and all amounts Operator (or Non-Operator) may owe to the defaulting party under this agreement.

P.    BANKRUPTCY:

If, following the granting of relief under the Bankruptcy Code to any Party as debtor thereunder, this agreement should be held to be an executory contract under the Bankruptcy Code, then any remaining Party shall be entitled to a determination by debtor or any trustee for debtor within thirty (30) days from the date an order for relief is entered under the Bankruptcy Code as to the rejection or assumption of this agreement. If the debtor or trustee determines to assume this agreement, then the Party seeking determination shall be entitled to adequate assurances as to the future performance of debtor's obligations hereunder and the protection of the interests of all Parties.

Q.    NON-OWNING OPERATOR; DEFINITION OF "OPERATOR":

Notwithstanding the provisions of Article V.B.1, the Operator designated under this agreement may not (and is not required to) own an interest in the Contract Area. The Parties acknowledge and agree that AGERON IRONROC ENERGY, LLC shall serve as the Operator of the Ageron Contract Area hereunder, and IRONROC ENERGY PARTNERS LLC shall serve as the Operator of the remainder of the Contract Area hereunder. For the avoidance of doubt, the provisions in Article V.B.1 that require Operator to own an interest in the Contract Area and to resign if it no longer owns an interest in the Contract Area shall not apply to AGERON IRONROC ENERGY, LLC or IRONROC ENERGY PARTNERS LLC. "Operator" shall mean, severally, AGERON IRONROC ENERGY, LLC solely with respect to the Ageron Contract Area, and IRONROC ENERGY PARTNERS LLC solely with respect to the other portions of the Contract Area.

R.    APPLICABLE LAW:

THIS AGREEMENT AND THE LEGAL RELATIONS BETWEEN THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

S.    JURISDICTION; SERVICE OF PROCESS:

EACH PARTY TO THIS AGREEMENT HEREBY SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, THE COURTS OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF. EACH PARTY (I) CONSENTS TO SUBMIT ITSELF TO THE PERSONAL JURISDICTION OF SUCH COURTS FOR SUCH COVERED CLAIMS, (II) AGREES THAT IT WILL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM ANY SUCH COURT, AND (III) AGREES THAT IT WILL NOT BRING ANY COVERED CLAIM IN ANY COURT OTHER THAN SUCH COURTS. EACH PARTY ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION AND VENUE OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY NON-APPEALABLE JUDGMENT RENDERED THEREBY, IN EACH CASE, IN CONNECTION WITH SUCH COVERED CLAIMS. A COPY OF ANY SERVICE OF PROCESS SERVED UPON THE PARTIES IN CONNECTION WITH A COVERED CLAIM SHALL BE MAILED BY REGISTERED MAIL TO THE RESPECTIVE PARTY EXCEPT THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAWS, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF SERVICE OF PROCESS. IF ANY AGENT APPOINTED BY A PARTY REFUSES TO ACCEPT SERVICE, EACH PARTY AGREES THAT SERVICE UPON THE APPROPRIATE PARTY BY REGISTERED MAIL SHALL CONSTITUTE SUFFICIENT SERVICE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAWS.

T.    WAIVER OF JURY TRIAL; WAIVER OF SPECIAL DAMAGES:

EACH OF THE PARTIES KNOWINGLY, VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY (A) WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY A JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR DIRECTLY OR INDIRECTLY AT ANY TIME ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR ASSOCIATED HEREWITH, (B) WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION OR ARBITRATION ANY SPECIAL DAMAGES (AS DEFINED BELOW), AND (C) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION, IN EACH CASE IT BEING THE EXPRESS INTENT, UNDERSTANDING, AND AGREEMENT OF THE PARTIES THAT SUCH WAIVERS ARE TO BE GIVEN THE FULLEST EFFECT, NOTWITHSTANDING THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY PARTY. AS USED IN THIS SECTION, "SPECIAL DAMAGES" MEANS ALL SPECIAL, EXEMPLARY, PUNITIVE, CONSEQUENTIAL, INDIRECT, REMOTE AND SPECULATIVE DAMAGES (REGARDLESS OF HOW NAMED, AND INCLUDING LOSS OF PROFIT, LOSS OF REVENUE, LOSS OF PRODUCTION OR RESERVES OR ANY OTHER SPECIAL OR INCIDENTAL DAMAGES), BUT DOES NOT INCLUDE ANY CLAIMS OF ANY THIRD PARTY FOR WHICH ONE PARTY HAS AGREED TO INDEMNIFY THE OTHER PARTY UNDER THIS AGREEMENT.

U.    MISCELLANEOUS:

1.    This agreement (and the documents to be executed hereunder and thereunder and the exhibits and schedules attached hereto and thereto), together with the Asset Purchase Agreements, Management Services Agreement, Back-Up Management Agreement, and any Existing JOAs (as defined below), constitute the entire agreement between the Parties pertaining to the subject matter hereof (including the Parties' agreements regarding the exploration, development, operation, production of the Oil and Gas Leases), and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties pertaining to the subject matter hereof. Any common law rules of co-tenancy that may be interpreted and/or applied in such a way so as to allow a Party to perform operations and/or activities on or in respect of the Oil and Gas Leases covered by this agreement that are in circumvention of the terms, conditions and/or principles of this agreement shall be inapplicable and/or ineffective for all purposes, and each Party hereby waives its right to make any claims and/or demands, at law or in equity, that it is permitted to perform such operations and/or activities on the basis of common law rules of co-tenancy.

2.    Notwithstanding anything in this Agreement to the contrary, the obligations of the Parties under this Agreement (including this Article XVI) touch and concern the Oil and Gas Leases in the Contract Area, being things in existence, and shall be covenants running with the land. Such obligation shall burden each Party's interest, and the interest of any permitted successor or assign of such Party, in and to the Oil and Gas Leases in the Contract Area, for the benefit of the other Party.

3.    Any failure by any Party to comply with any of its obligations, agreements or conditions herein contained may be waived by any other Party by an instrument signed by the Party against whom the waiver is sought to be enforced and expressly identified as a waiver, but not in any other manner. No waiver of, or consent to a change in, any provision of this agreement shall

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

be deemed or shall constitute a waiver of, or a consent to a change in, any other provision hereof (whether or not similar), nor shall such waiver, constitute a continuing waiver unless otherwise expressly provided.

4.    All headings in this agreement are for reference purposes only and have no binding effect on the terms, conditions or provisions of this agreement.

5.    This agreement may be amended only by an agreement in writing signed by all Parties and expressly identified as an amendment.

6.    If and for so long as any provision of this agreement shall be deemed to be judged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other provision of this agreement except only so far as shall be necessary to give effect to the construction of such invalidity, and any such invalid provision shall be deemed severed from this agreement without affecting the validity of the balance of this agreement.

7.    The Parties acknowledge that (i) Operator and Non-Operator have had the opportunity to exercise business discretion in relation to the negotiation of this agreement, (ii) this agreement is the result of arm's-length negotiations from equal bargaining positions and (iii) each Party and its counsel participated in the preparation and negotiation of this agreement.  Any rule of construction that a contract be construed against the drafter shall not apply to the interpretation or construction of this agreement.

8.    Nothing in this agreement shall entitle any Person other than the Parties hereto to any claims, cause of action, remedy or right of any kind.

9.    Notwithstanding anything in this agreement, including anything in Exhibit "C" (COPAS), Operator will not make any cash calls or request payment advances for ordinary course operating expenses.

10.    Following a Foreclosure or removal of IRONROC ENERGY PARTNERS LLC and/or AGERON IRONROC ENERGY, LLC, as applicable, as an Operator hereunder and the performance by IRONROC ENERGY PARTNERS LLC and/or AGERON IRONROC ENERGY, LLC, as applicable, of all of such Operator's obligations under Article V.B.2 with respect to the transfer of operatorship from such Operator to a successor Operator, the following Articles, with respect to the removed Operator and its successor, will be deemed deleted from this Article XVI from and after that Foreclosure or removal: Article XVI.C and Article XVI.E.2 (except that Article XVI.C.2 will remain in the event of a Foreclosure and will be deleted upon the earlier of removal of IRONROC ENERGY PARTNERS LLC and/or AGERON IRONROC ENERGY, LLC, as applicable, as an Operator hereunder and 90 days after the Foreclosure).  In addition, following a removal of IRONROC ENERGY PARTNERS LLC and/or AGERON IRONROC ENERGY, LLC, as applicable, as an Operator hereunder and the performance by IRONROC ENERGY PARTNERS LLC and/or AGERON IRONROC ENERGY, LLC, as applicable, of all of such Operator's obligations under Article V.B.2 with respect to the transfer of operatorship from such Operator to a successor Operator, Article XVI.I, with respect to the removed Operator and its successor, will be deemed deleted from this Article XVI.

11.    The following Articles will be deemed deleted from this Joint Operating Agreement: Articles II.B,  II.E.,  II.F., II.G., V.D.7, and VI.A.

12.    The Parties hereby acknowledge that the Contract Area (including the Wells and Wellbore Lease Rights included therein) is subject to and governed by existing operating agreements ("Existing JOAs"), including Existing JOAs to which Third Parties are parties. The Parties agree that the terms of each such Existing JOA shall continue to govern with respect to the portion of the Contract Area covered thereby; provided, however, as between the Parties, the terms of this agreement (including in the event of any conflict or inconsistency between the terms of this agreement and an Existing JOA) will apply to the greatest extent practicable. No Party shall, with respect to any of the Contract Area, enter into a new, or amend any existing, operating agreement with any Third Party that would, in effect, circumvent the spirit and intent of this Agreement.

13.    The memorandum of agreement (the "Memorandum") referenced in Article XIII of this agreement shall be in the form attached as Exhibit "H", and shall be recorded in each Texas county where the Contract Area (or portion thereof) is located. Nothing in this Article XVI.U.13 is intended to constrain or modify the obligations or ability of either Party to execute, record, or file the Memorandum or any recording supplements or other documents either Party deems necessary to evidence, attach, or perfect the liens created by this Agreement.

14.    This agreement may be executed in any number of counterparts, each of which shall be considered together as one instrument. Signed copies of this agreement and facsimiles, pdfs and other electronic versions of it shall have the same force and effect as originals.

[The remainder of this page has been intentionally left blank.]

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1989

1    IN WITNESS WHEREOF, this agreement shall be effective as of the ___12th___ day of __September__,

2    __2022__.

3    _____ who has prepared and circulated this form for execution, represents and warrants

4    that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form

     Operating Agreement, as published in computerized form by Forms-On-A-Disk, Inc. No changes, alterations, or

5    modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in

     Articles _____, have been made to the form.

6    ATTEST OR WITNESS:                          OPERATOR

7                                                IRONROC ENERGY PARTNERS LLC

8    *Valeria Mm̄*                               By _____

9    Valeria  Mendizabal                         Craig Perry
                                                 Type or print name

10                                               Title  Chief Executive Officer

11                                               Date _____9/8/22_____

12                                               Tax ID or S.S. No.    [intentionally omitted]

13                                               AGERON IRONROC ENERGY, LLC

14                                               By _____

15                                               Michael W. McCoy
                                                 Type or print name

16

17                                               Title  Chief Executive Officer

18                                               Date _____

19                                               Tax ID or S.S. No. _____

20                      NON-OPERATORS

21

22                                               ALPINE SUMMIT FUNDING LLC

23   *Valeria Mm̄*                               By _____

24   Valeria  Mendizabal                         Craig Perry
                                                 Type or print name

25

26                                               Title  President and Chief Executive Officer

27                                               Date _____9/8/22_____

                                                 Tax ID or S.S. No.    [intentionally omitted]

28

29                                               _____

30                                               By _____

31

32                                               _____
                                                 Type or print name

33                                               Title _____

34                                               Date _____

35                                               Tax ID or S.S. No. _____

36                                               _____

37   _____            By _____

                              –18–

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1      IN WITNESS WHEREOF, this agreement shall be effective as of the ___12th___ day of ___September___,

2  ___2022___.

3  ~~_____, who has prepared and circulated this form for execution, represents and warrants~~
~~that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form~~

4  ~~Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or~~
~~modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in~~

5  ~~Articles_____, have been made to the form.~~

6  ATTEST OR WITNESS:                                                OPERATOR

7                                                                   IRONROC ENERGY PARTNERS LLC

8  _____            By _____

9  _____            _____
                                             Craig Perry
                                             Type or print name

10

11                                           Title  Chief Executive Officer

                                             Date _____

12
                                             Tax ID or S.S. No. _____

13                                           AGERON IRONROC ENERGY, LLC

14  _____           By  _____

15  _____           _____
                                             Michael W. McCoy
                                             Type or print name

16

17
                                             Title  Chief Executive Officer

18                                           Date   9/8/22

19                                           Tax ID or S.S. No.  [intentionally omitted]

20                           NON-OPERATORS

21

22                                           ALPINE SUMMIT FUNDING LLC

23  _____           By _____

24  _____           _____
                                             Craig Perry
25                                           Type or print name

26                                           Title  President and Chief Executive Officer

27                                           Date _____

28                                           Tax ID or S.S. No. _____

29                                           _____

30  _____           By _____

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1
2    Type or print name

3    Title _____

4    Date _____

5    Tax ID or S.S. No. _____

6
7

8

9

10

11

12

13

14

15

16
17

18

19

20

21

22

23

24
25

26

27

28

29

30

31
32

33

34

35

36

37

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**ACKNOWLEDGMENTS**

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts.

The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of _____ )

_____ ) ss.

County of _____ )

This instrument was acknowledged before me on

_____ by _____

(Seal, if any)            _____

                          Title (and Rank) _____

                          My commission expires: _____

Acknowledgment in representative capacity:

State of _____ )

_____ ) ss.

County of _____ )

This instrument was acknowledged before me on

_____ by _____ as

_____ of _____

(Seal, if any)            _____

                          Title (and Rank) _____

                          My commission expires: _____

## EXHIBIT "A"

Attached to and made a part of that certain Amended and Restated Operating Agreement dated September 12, 2022, by and between Ageron Ironroc Energy, LLC and Ironroc Energy Partners LLC, each as Operator, and Alpine Summit Funding LLC, as Non-Operator

**Wells Subject to this Agreement**.

The wellbores of the wells described on <u>Exhibit A-1</u> attached hereto (the "**Wells**").

The Parties acknowledge that the Sampson-Mueller A 4H Well (API No. 42-149-33532) (the "**Subject Well**") is currently operated by a Third Party pursuant to an Existing JOA and is not, as of the date hereof, included in the Contract Area. If, however, Operator becomes the operator of the Subject Well under the Existing JOA, then, at such time, the Subject Well and the associated Wellbore Lease Rights (as defined in the Second Asset Purchase Agreement) shall be deemed to be included in the Contract Area, and the Parties shall promptly thereafter amend this agreement and the Memorandum then-filed of record to reflect the inclusion of such Subject Well and associated Wellbore Lease Rights in the Contract Area.

**Restrictions**.

With respect to each Well, that portion of the Oil and Gas Leases and Oil and Gas Interests listed on <u>Exhibit A-2</u>, in each case, **INSOFAR AND ONLY INSOFAR** as the rights thereunder are necessary or used to (A) own, operate, and maintain such Well, (B) participate in and perform subsequent operations at any time applicable to such Well (including maintenance, repair, workovers, reworks, or extensions (including lateral extensions) of the wellbore of such Well), or (C) produce, store, and transport Oil and Gas from the wellbore of such Well (such rights to and under the Oil and Gas Leases and Oil and Gas Interests, collectively, the "**Wellbore Lease Rights**").

**Parties to Agreement with Addresses and E-mail Address for Notice Purposes**. See Article XVI.K.

**Percentage Working Interest Ownership of Parties to this Agreement**.

|  | Working Interest | Percentage Interest under this Agreement |
|---|---|---|
| *Operators*: | | |
| Ironroc Energy Partners LLC (solely with respect to that portion of the Contract Area not constituting the Ageron Contract Area) | 0% | 0% |
| Ageron Ironroc Energy, LLC (solely with respect to the Ageron Contract Area) | 0% | 0% |
| | | |
| *Non-Operator*: | | |
| Alpine Summit Funding LLC | See Exhibit A-1* | 100% |

*With respect to each Well, the undivided working interest of Non-Operator in such Well as set forth on <u>Exhibit A-1</u> for such Well.

**<u>Oil and Gas Leases and Oil and Gas Interests subject to this Agreement</u>**.

Those Oil and Gas Leases and Oil and Gas Interests described on <u>Exhibit A-2</u> attached hereto solely to the extent of the Wellbore Lease Rights.

**<u>Burdens</u>**.

All burdens of record as of the date this agreement is entered into.

EXHIBIT "A-1"

Attached to and made a part of that certain Amended and Restated Operating Agreement dated September 12, 2022, by and between Ageron Ironroc Energy, LLC and Ironroc Energy Partners LLC, each as Operator, and Alpine Summit Funding LLC, as Non-Operator

**Part I:  Initial Asset Purchase Agreement Wells**

| Well Name | Well # | API Number | County | State | BPO WI% | BPO NRI% | APO WI% | APO NRI% |
|---|---|---|---|---|---|---|---|---|
| Swedish Chef | 1H | 42-477-30727 | Washington | Texas | 75 | 52.5 | 60 | 42 |
| Swedish Chef | 2H | 42-477-31150* | Washington | Texas | 75 | 52.5 | 60 | 42 |
| Swedish Chef | 3H | 42-477-31151* | Washington | Texas | 75 | 52.5 | 60 | 42 |
| Swedish Chef | 4H | 42-477-31178 | Washington | Texas | 96.74 | 67.72 | 77.39 | 54.18 |
| Grover | 1H | 42-477-31162 | Washington & Lee | Texas | 87.5 | 65.625 | 75 | 56.25 |
| Animal | 1H | 42-287-32758 | Lee | Texas | 96.74 | 68.69 | 82.23 | 58.38 |
| Stella Mae | 2H | 42-149-33525* | Fayette | Texas | 97 | 72.75 | 71.74 | 53.81 |
| Stella Mae | 3H | 42-149-33526* | Fayette | Texas | 97 | 72.75 | 71.74 | 53.81 |
| Constantine | 2H | 42-149-33521* | Fayette & Washington | Texas | 100 | 72.06 | 79.74 | 57.48 |
| Gonzo | 1H | 42-287-32747ᴬ | Lee & Fayette | Texas | 87.5 | 65.01 | 75 | 55.72 |
| Gonzo | 2H | 42-287-32748ᴬ | Lee & Fayette | Texas | 87.5 | 65.52 | 75 | 56.16 |
| Beaker B | 2H | 42-287-32740ᴬ | Lee | Texas | 100 | 75.44 | 100 | 75.44 |
| Beaker B | 3H | 42-287-32741ᴬ | Lee | Texas | 100 | 75.31 | 100 | 75.31 |
| Gonzo | 3H | 42-149-33498ᴬ | Fayette | Texas | 100 | 75.07 | 80 | 60.05 |
| Gonzo B | 4H | 42-149-33499ᴬ | Fayette | Texas | 98.44 | 73.83 | 78.75 | 59.07 |
| Gonzo B | 5H | 42-149-33500ᴬ | Fayette | Texas | 98.44 | 73.83 | 78.75 | 59.07 |
| Constantine | 1H | 42-149-33502*ᴬ | Fayette & Washington | Texas | 92 | 66.30 | 78.4 | 56.51 |
| Huebner-Klaus A.C. Gas Unit No. 1 | 1H | 42-015-31065ᴬ | Austin | Texas | 85 | 63.75 | 50 | 37.5 |

**\* Indicates well is in "After Payout" (i.e., APO) status as of April 1, 2022.**
**ᴬ Indicates AIP Borrower, LP Legacy Well**

**Part II: Second Asset Purchase Agreement Wells**

| Well Name | Well # | API Number | County | State | BPO WI% | BPO NRI% | APO WI% | APO NRI% |
|---|---|---|---|---|---|---|---|---|
| AI San Roman | 101H | 42-479-44505 | Webb | Texas | 85 | 63.33 | 85 | 63.33 |
| AI San Roman | 102H | 42-479-44506 | Webb | Texas | 85 | 63.33 | 85 | 63.33 |
| Statler | 1H | 42-149-32749 | Fayette, Lee & Washington | Texas | 75 | 56.87 | 75 | 56.87 |
| Animal | 2H | 42-287-32760** | Lee | Texas | 97 | 68.87 | 82.01 | 58.23 |

**\*\* Indicates well is in "After Payout" (i.e., APO) status as of June 1, 2022.**

EXHIBIT "A-2"

Attached to and made a part of that certain Amended and Restated Operating Agreement dated September 12, 2022, by and between Ageron Ironroc Energy, LLC and Ironroc Energy Partners LLC, each as Operator, and Alpine Summit Funding LLC, as Non-Operator

**Part I:  Initial Asset Purchase Agreement Leases**

**CONSTANTINE 2H LEASES**

Recorded in the Official Records of Fayette County, Texas:

| Lessor | Lessee | Lease Date | Book # | Page # |
|---|---|---|---|---|
| Christine Dyer Jervis, et al. | Taylor Land & Mineral & Mineral Services, Inc. | 8/28/2018 | 1878 | 451 |
| Union Pacific Railroad Company | Paleo Oil Company LLC | 10/1/2018 | 1878 | 433 |
| Carolyn Keng, et al. | Taylor Land & Mineral & Mineral Services, Inc. | 9/10/2018 | 1876 | 575 |
| Casey Ann Smith, et al. | Taylor Land & Mineral & Mineral Services, Inc. | 9/10/2018 | 1876 | 577 |
| Texas Osage Royalty Pool, Inc. | Paleo Oil Company LLC | 8/15/2018 | 1876 | 459 |
| Jetta-X2, LP | Paleo Oil Company LLC | 11/1/2018 | 1879 | 773 |
| Carolyn Keng | Taylor Land & Mineral & Mineral Services, Inc. | 9/10/2018 | 1882 | 734 |
| Casey Ann Smith, et al. | Taylor Land & Mineral & Mineral Services, Inc. | 9/10/2018 | 1882 | 736 |
| Larry L. Woytek and wife, Becky Woytek | Taylor Land & Mineral & Mineral Services, Inc. | 9/20/2018 | 1882 | 740 |
| Jason R. Adams | Taylor Land & Mineral & Mineral Services, Inc. | 10/24/2019 | 1924 | 414 |
| Jena Adams Tally | Taylor Land & Mineral & Mineral Services, Inc. | 10/24/2019 | 1924 | 413 |
| David Schulz | Taylor Land & Mineral & Mineral Services, Inc. | 11/12/2019 | 1924 | 410 |
| Devon Energy Production Company, L.P. | Matrix Revolution, LLC | 1/31/2019 | 1890 | 620 |
| State of Texas (MF120226) | Paleo Oil Company LLC | 1/21/2020 | 1929 | 886 |
| Betty C. Cook | Taylor Land & Mineral Services | 5/23/2020 | 1946 | 808 |

**STELLA MAE 2H AND 3H LEASES**

Recorded in the Official Records of Fayette County, Texas:

| Lessor | Lessee | Lease Date | Book # | Page # |
|---|---|---|---|---|
| Kenneth Dorbandt | Leexus Oil LLC | 3/1/2009 | 1485 | 723 |
| Steve Franks | Leexus Oil LLC | 2/26/2009 | 1485 | 724 |
| Bill Morgan | Leexus Oil LLC | 2/24/2009 | 1485 | 725 |
| Carol Morgan | Leexus Oil LLC | 2/24/2009 | 1485 | 726 |
| Leann Melissa Morgan | Leexus Oil LLC | 2/19/2009 | 1485 | 727 |
| Lori Lee Morgan | Leexus Oil LLC | 2/19/2009 | 1485 | 728 |
| Lyndon Frank Morgan | Leexus Oil LLC | 2/23/2009 | 1485 | 729 |
| Malinda L. Morgan | Leexus Oil LLC | 2/18/2009 | 1485 | 730 |
| Edward Robinson | Leexus Oil LLC | 3/4/2009 | 1485 | 731 |
| Rudy Scheel | Leexus Oil LLC | 2/23/2009 | 1496 | 282 |
| Arnold Schultz, Jr. | Leexus Oil LLC | 3/6/2009 | 1485 | 732 |
| Dale Schultz and wife, Martha Schultz | Leexus Oil LLC | 11/7/2008 | 1485 | 733 |
| Garry Carlton Schultz | Leexus Oil LLC | 3/11/2009 | 1485 | 734 |
| Larry Guy Schultz | Leexus Oil LLC | 1/7/2009 | 1485 | 735 |
| Leland B. Schultz | Leexus Oil LLC | 11/12/2008 | 1485 | 736 |
| Lyndon F. Schultz | Leexus Oil LLC | 3/2/2009 | 1485 | 737 |
| Melton Schultz | Leexus Oil LLC | 3/16/2009 | 1485 | 738 |
| Norman Schultz | Leexus Oil LLC | 2/17/2009 | 1485 | 739 |
| Paul Schultz | Leexus Oil LLC | 1/22/2009 | 1485 | 740 |
| Preston H. Schultz | Leexus Oil LLC | 11/20/2008 | 1487 | 728 |
| William Schultz | Leexus Oil LLC | 4/3/2009 | 1485 | 741 |
| Lana Morgan Silva | Leexus Oil LLC | 2/18/2009 | 1485 | 742 |
| Lorie Schultz Sommermeyer | Leexus Oil LLC | 11/17/2008 | 1487 | 729 |
| Nancy F. Thetford | Leexus Oil LLC | 1/5/2009 | 1485 | 743 |
| Frank C. Shelden and wife Millicent Brown Shelden | County, Management, Inc. | 7/25/1979 | 134 | 384 |

**ANIMAL 1H LEASES**

Recorded in the Official Records of Lee County, Texas:

| Lessor | Lessee | Lease Date | Book # | Page # |
|---|---|---|---|---|
| Gladys Marie Prine | Ironrock Webb Energy Group, LLC | 9/30/2019 | 1260 | 372 |
| Pearly Louise Watts Els | Ironrock Webb Energy Group, LLC | 9/30/2019 | 1260 | 370 |
| Linda Ruth West Stork | Ironrock Webb Energy Group, LLC | 9/30/2019 | 1260 | 368 |
| David Westley Stork | Ironrock Webb Energy Group, LLC | 9/30/2019 | 1260 | 364 |
| Amy Kate Stork | Ironrock Webb Energy Group, LLC | 9/30/2019 | 1260 | 366 |
| Janet Simmang | Ironrock Webb Energy Group, LLC | 9/5/2019 | 1260 | 362 |
| Shawna Hall Salas | Ironrock Webb Energy Group, LLC | 10/11/2019 | 1260 | 374 |
| Patrick Creppel | Ironrock Webb Energy Group, LLC | 9/5/2019 | 1260 | 360 |
| Timothy Christopher Hall | Ironrock Webb Energy Group, LLC | 10/11/2019 | 1260 | 376 |
| Nikki L. Alston and Kenneth W. Alston | Prominence Oil & Gas, LLC | 6/20/2021 | 1301 | 313 |
| Ronald Thomas Hall | Prominence Oil & Gas, LLC | 6/15/2021 | 1302 | 684 |

**SWEDISH CHEF UNIT LEASES**

Recorded in the Official Records of Washington County, Texas:

| Lessor | Lessee | Lease Date | Book # | Page # |
|---|---|---|---|---|
| Virginia Fischer, et al | Fort Trinidad Investors, LLC | 4/1/2018 | 1638 | 025 |
| Virginia Fischer, et al | Fort Trinidad Investors, LLC | 4/1/2018 | 1655 | 512 |
| William Charles Merten, et ux | Texian Mineral & Royalty, LLC | 8/2/2018 | 1643 | 094 |
| Mary Beth Merten Jewell, et vir | Texian Mineral & Royalty, LLC | 6/6/2018 | 1638 | 197 |
| Darrell & Rebecca Plagens | Texian Mineral & Royalty, LLC | 6/20/2018 | 1637 | 282 |
| Jerry H. Merten, et ux | Texian Mineral & Royalty, LLC | 6/19/2018 | 1637 | 278 |
| Rebecca Ann Plagens, et al | Texian Mineral & Royalty, LLC | 9/6/2018 | 1645 | 661 |
| Barry Lee Goldberg, et ux | Texian Mineral & Royalty, LLC | 6/20/2018 | 1637 | 276 |
| Nora Lee Goldberg | Texian Mineral & Royalty, LLC | 6/23/2018 | 1637 | 280 |
| State of Texas (MF095755) | Texian Mineral & Royalty, LLC | 11/19/2019 | 1703 | 380 |

Exhibit A-2 – Page 3 of 16

**GROVER UNIT LEASES**

Recorded in the Official Records of Washington County, Texas:

| Lessor | Lessee | Lease Date | Book # | Page # |
|---|---|---|---|---|
| Ross Lee Barrington and wife, Teri Linn Barrington | Matrix Revolution, LLC | 02/23/21 | 1772 | 748 |
| Dennis D. Young | Matrix Revolution, LLC | 03/08/21 | 1776 | 235 |
| Douglas & Sedalia Ullrich | TMRX Petroleum | 03/20/18 | 1628 | 217 |
| John J. D'Louhy | TMRX Petroleum | 02/15/18 | 1628 | 883 |
| Edward M. Lee and Ellen Lee Family Trust | Matrix Revolution, LLC | 01/13/21 | 1762 | 862 |
| Jerrett D. Kessler | TMRX Petroleum | 12/10/18 | 1664 | 898 |
| Dusti Marburger | TMRX Petroleum | 12/10/18 | 1664 | 898 |
| Jack W. Weidemann & Bobbie A. Weidemann, husband and wife | TMRX Petroleum | 06/20/18 | 1637 | 777 |
| Lance Gebert & Debra Gebert, husband and wife | TMRX Petroleum | 05/09/18 | 1640 | 215 |
| Lee James Bookout | TMRX Petroleum | 05/09/18 | 1637 | 146 |
| Lloyd & Judy Matejowsky | TMRX Petroleum | 05/09/18 | 1637 | 144 |
| Harley R. Weyand and wife, Carol Weyand | TMRX Petroleum | 01/15/21 | 1772 | 739 |
| James & Julia Holmes | TMRX Petroleum | 03/20/18 | 1633 | 695 |
| Dr. Martin Stanley Fischer & wife, Mary Lee | TMRX Petroleum | 01/15/21 | 1776 | 240 |
| Douglas & Sedalia Ullrich | TMRX Petroleum | 03/20/18 | 1628 | 217 |
| Larry Lester Woytek | TMRX Petroleum | 03/01/18 | 1628 | 881 |
| Elaine Nancy Haynes | TMRX Petroleum | 03/01/18 | 1628 | 876 |
| Betty Woytek Whitehead | TMRX Petroleum | 03/01/18 | 1628 | 874 |
| James Calvin Sellers and wife, Emily Elaine Sellers | TMRX Petroleum | 03/01/18 | 1628 | 878 |
| Highground, formally Baptist Foundation | Matrix Revolution, LLC | 11/23/20 | 1757 | 401 |
| Robert Lucherk | Matrix Revolution, LLC | 01/19/21 | 1766 | 289 |
| Cynthia Lucherk Brittain | Matrix Revolution, LLC | 01/19/21 | 1766 | 293 |
| Timothy Lucherk | Matrix Revolution, LLC | 01/19/21 | 1766 | 285 |
| Kenneth Lucherk | Matrix Revolution, LLC | 01/19/21 | 1766 | 291 |
| Kimberly Lucherk Wilson | Matrix Revolution, LLC | 01/19/21 | 1766 | 287 |
| Kevin Lucherk | Matrix Revolution, LLC | 01/19/21 | 1766 | 295 |
| Rafael Gomes and Elena Espiondola | Matrix Revolution, LLC | 11/02/20 | 1722 | 745 |

Exhibit A-2 – Page 4 of 16

**AIP BORROWER, LP LEGACY LEASES**

| Lessor | Lessee | Lease Date | Book # | Page # | Instrument# | County | State |
|---|---|---|---|---|---|---|---|
| Jerry L. Schafer | Paleo Oil Company LLC | 7/19/2018 | 1233 | 1050 | 2018-02835 | Lee | Texas |
| Jetta-X2, LP | Paleo Oil Company LLC | 11/1/2018 | 1879 | 773 | 18-07583 | Fayette | Texas |
| Stanley Budnik | Paleo Oil Company LLC | 7/19/2018 | 1233 | 1054 | 2018-02836 | Lee | Texas |
| Taylor Land & Mineral Services, Inc. | Paleo Oil Company LLC | 10/15/2018 | 1878 | 476 | 18-07311 | Fayette | Texas |
| Taylor Land & Mineral Services, Inc. | Paleo Oil Company LLC | 10/15/2018 | 1878 | 473 | 18-07310 | Fayette | Texas |
| Texas Osage Royalty Pool Inc | Paleo Oil Company LLC | 5/24/2018 | 1874 | 610 | 18-06471 | Fayette | Texas |
| Texas Osage Royalty Pool Inc | Paleo Oil Company LLC | 8/15/2018 | 1876 | 459 | 18-06810 | Fayette | Texas |
| William E. Budnik | Paleo Oil Company LLC | 7/19/2018 | 1233 | 1046 | 2018-02833 | Lee | Texas |
| Loretta Chilek | Taylor Land & Mineral Services, Inc. | 5/24/2018 | 1872 | 831 | 18-06121 | Fayette | Texas |
| Karp Holdings | Taylor Land & Mineral Services, Inc. | 10/9/2018 | 1876 | 886 | 18-06934 | Fayette | Texas |
| Willfred G. Foehr, et ux | Taylor Land & Mineral Services, Inc. | 8/10/2018 | 1876 | 465 | 18-06814 | Fayette | Texas |
| Bruce Burleson | Taylor Land & Mineral Services, Inc. | 8/13/2018 | 1882 | 723 | 18-08234 | Fayette | Texas |
| Carol Timme | Taylor Land & Mineral Services, Inc. | 10/10/2018 | 1882 | 724 | 18-08235 | Fayette | Texas |
| Dorothy Rather | Taylor Land & Mineral Services, Inc. | 10/9/2018 | 1882 | 725 | 18-08236 | Fayette | Texas |
| Thomas Lowery | Taylor Land & Mineral Services, Inc. | 8/5/2018 | 1876 | 464 | 18-06813 | Fayette | Texas |
| Hugo Rodriguez, et ux | Taylor Land & Mineral Services, Inc. | 8/10/2018 | 1878 | 439 | 18-07296 | Fayette | Texas |
| Leexus Oil & Gas, LLC | Taylor Land & Mineral Services, Inc. | 1/10/2019 | 1885 | 549 | 19-00242 | Fayette | Texas |
| Linda Skinner | Taylor Land & Mineral Services, Inc. | 8/21/2018 | 1876 | 466 | 18-06815 | Fayette | Texas |
| Ledbetter Cemetery Assoc. | Taylor Land & Mineral Services, Inc. | 8/28/2018 | 1878 | 446 | 18-07301 | Fayette | Texas |
| Janet Matthijetz | Taylor Land & Mineral Services, Inc. | 8/8/2018 | 1876 | 463 | 18-06812 | Fayette | Texas |
| Carolyn Keng, et al | Taylor Land & Mineral Services, Inc. | 9/10/2018 | 1876 | 575 | 18-06841 | Fayette | Texas |
| Joan Goehring | Taylor Land & Mineral Services, Inc. | 8/10/2018 | 1878 | 442 | 18-07298 | Fayette | Texas |
| Robin Zapalac | Taylor Land & Mineral Services, Inc. | 8/28/2018 | 1878 | 469 | 18-07307 | Fayette | Texas |
| Christine Dyer Jervis & Jon H. Jervis | Taylor Land & Mineral Services, Inc. | 8/28/2018 | 1878 | 471 | 18-07309 | Fayette | Texas |
| Christine Jervis | Taylor Land & Mineral Services, Inc. | 8/28/2018 | 1878 | 470 | 18-07308 | Fayette | Texas |
| Lillian Dyer Trust | Taylor Land & Mineral Services, Inc. | 8/28/2018 | 1878 | 444 | 18-07299 | Fayette | Texas |
| Robert Reid, et ux | Taylor Land & Mineral Services, Inc. | 8/31/2018 | 1878 | 445 | 18-07300 | Fayette | Texas |

| Lessor | Lessee | Lease Date | Book # | Page # | Instrument# | County | State |
|---|---|---|---|---|---|---|---|
| Curtis Moore | Taylor Land & Mineral Services, Inc. | 9/10/2018 | 1878 | 447 | 18-07302 | Fayette | Texas |
| Erma Webster | Taylor Land & Mineral Services, Inc. | 9/10/2018 | 1882 | 739 | 18-08244 | Fayette | Texas |
| Hubert Silva and wife Ruby | Taylor Land & Mineral Services, Inc. | 10/4/2018 | 1878 | 449 | 18-07303 | Fayette | Texas |
| Rita Clay | Taylor Land & Mineral Services, Inc. | 10/5/2018 | 1878 | 450 | 18-07304 | Fayette | Texas |
| Larry L. Woytek, et ux | Taylor Land & Mineral Services, Inc. | 9/20/2018 | 1882 | 740 | 18-08245 | Fayette | Texas |
| Kenneth Lehmann | Taylor Land & Mineral Services, Inc. | 9/10/2018 | 1882 | 741 | 18-08246 | Fayette | Texas |
| Kitchens Real Estate Partnership, Ltd. | Taylor Land & Mineral Services, Inc. | 9/20/2018 | 1882 | 742 | 18-08247 | Fayette | Texas |
| Herbert Jackson | Taylor Land & Mineral Services, Inc. | 9/20/2018 | 1882 | 735 | 18-08241 | Fayette | Texas |
| Luis Flores | Taylor Land & Mineral Services, Inc. | 11/5/2018 | 1882 | 738 | 18-08243 | Fayette | Texas |
| Wayne Navarro and Joyce Navarro | Taylor Land & Mineral Services, Inc. | 8/5/2018 | 1876 | 462 | 18-06811 | Fayette | Texas |
| Providence Minerals, Ltd. | Taylor Land & Mineral Services, Inc. | 1/14/2019 | 1887 | 659 | 19-00723 | Fayette | Texas |
| Charles Weerts | Taylor Land & Mineral Services, Inc. | 6/13/2018 | 1876 | 468 | 18-06817 | Fayette | Texas |
| Michael Weerts | Taylor Land & Mineral Services, Inc. | 6/13/2018 | 1876 | 467 | 18-06816 | Fayette | Texas |
| Penelope Carter | Taylor Land & Mineral Services, Inc. | 9/11/2018 | 1876 | 888 | 18-06935 | Fayette | Texas |
| Theodora Boehm | Taylor Land & Mineral Services, Inc. | 9/11/2018 | 1876 | 890 | 18-06936 | Fayette | Texas |
| Ledbetter Volunteer Fire Dept. | Taylor Land & Mineral Services, Inc. | 9/6/2018 | 1882 | 730 | 18-08239 | Fayette | Texas |
| Casey Smith, et al | Taylor Land & Mineral Services, Inc. | 9/10/2018 | 1876 | 577 | 18-06842 | Fayette | Texas |
| Carolyn Keng | Taylor Land & Mineral Services, Inc. | 1/14/2018 | 1882 | 734 | 18-08240 | Fayette | Texas |
| Casey Smith & Jamie Manning | Taylor Land & Mineral Services, Inc. | 1/14/2018 | 1882 | 736 | 18-08242 | Fayette | Texas |
| Christine Dyer Jervis, et al | Taylor Land & Mineral Services, Inc. | 8/28/2018 | 1878 | 451 | 18-07305 | Fayette | Texas |
| JRJ Land & Cattle, et al | Taylor Land & Mineral Services, Inc. | 8/28/2018 | 1878 | 467 | 18-07306 | Fayette | Texas |
| Donald Smith | Taylor Land & Mineral Services, Inc. | 11/5/2018 | 1885 | 551 | 19-00243 | Fayette | Texas |
| Gwen Bryant | Taylor Land & Mineral Services, Inc. | 11/5/2018 | 1885 | 555 | 19-00245 | Fayette | Texas |
| Marcia G. Roberson | Taylor Land & Mineral Services, Inc. | 11/5/2018 | 1885 | 553 | 19-00244 | Fayette | Texas |
| Lillie S. Jones | Taylor Land & Mineral Services, Inc. | 11/5/2018 | 1886 | 794 | 19-00518 | Fayette | Texas |
| Monica Baker | Taylor Land & Mineral Services, Inc. | 11/5/2018 | 1886 | 792 | 19-00517 | Fayette | Texas |
| Ronald Smith | Taylor Land & Mineral Services, Inc. | 11/5/2018 | 1886 | 796 | 19-00519 | Fayette | Texas |
| Dorothy Moore | Taylor Land & Mineral Services, Inc. | 1/11/2019 | 1887 | 658 | 19-00722 | Fayette | Texas |
| Triumph Missionary Baptist Church | Taylor Land & Mineral Services, Inc. | 10/5/2018 | 1886 | 799 | 19-00521 | Fayette | Texas |

Exhibit A-2 – Page 6 of 16

| Lessor | Lessee | Lease Date | Book # | Page # | Instrument# | County | State |
|---|---|---|---|---|---|---|---|
| Clifton Painter, et ux | Taylor Land & Mineral Services, Inc. | 1/17/19 | 1886 | 801 | 19-00522 | Fayette | Texas |
| Ledbetter Landmark, LLC | Taylor Land & Mineral Services, Inc. | 10/23/2018 | 1886 | 788 | 19-00516 | Fayette | Texas |
| Ray George & Rita Gillum | Texian Mineral & Royalty, LLC | 10/1/17 | 1222 | 709 | 2018-00428 | Lee | Texas |
| Jeffrey Blume and Sandra R. Blume | Texian Mineral & Royalty, LLC | 11/8/2017 | 1222 | 706 | 2018-00427 | Lee | Texas |
| Jeffrey Blume and Sandra R. Blume | Texian Mineral & Royalty, LLC | 11/8/2017 | 1850 | 937 | 18-01468 | Fayette | Texas |
| Jeffrey Blume and Sandra R. Blume | Texian Mineral & Royalty, LLC | 11/8/2017 | 1850 | 934 | 18-01467 | Fayette | Texas |
| Jeffrey Blume and Sandra R. Blume | Texian Mineral & Royalty, LLC | 11/8/2017 | 1850 | 940 | 18-01469 | Fayette | Texas |
| Solis Family Properties, L.P. | Texian Mineral & Royalty, LLC | 9/6/2017 | 1851 | 350 | 18-01561 | Fayette | Texas |
| Ronald Holle, and wife Dorothy | Todd Weiss | 11/3/2017 | 1223 | 1041 | 2018-00754 | Lee | Texas |
| Fulton Quien Sabe Ranches LP | Beland Energy LLC | 4/19/2018 | 1866 | 179 | 18-04762 | Fayette | Texas |
| Marlene Schmidt Waak | Beland Energy LLC | 4/19/2018 | 1859 | 672 | 18-03468 | Fayette | Texas |
| Cindy Randermann | Taylor Land & Mineral Services, Inc. | 9/20/2018 | 1239 | 307 | 2018-04091 | Lee | Texas |
| Gaylynn Lawrence | Taylor Land & Mineral Services, Inc. | 9/20/2018 | 1239 | 309 | 2018-04093 | Lee | Texas |
| Chase Lawrence | Taylor Land & Mineral Services, Inc. | 9/20/2018 | 1239 | 311 | 2018-04095 | Lee | Texas |
| Thomas Wrinkle, et ux | Taylor Land & Mineral Services, Inc. | 9/7/2018 | 1237 | 551 | 2018-03700 | Lee | Texas |
| Rita Wrinkle | Taylor Land & Mineral Services, Inc. | 9/7/2018 | 1237 | 552 | 2018-03701 | Lee | Texas |
| Marshall Bennett | Taylor Land & Mineral Services, Inc. | 8/20/2018 | 1239 | 315 | 2018-04099 | Lee | Texas |
| Donna Phillips | Taylor Land & Mineral Services, Inc. | 9/10/2018 | 1239 | 314 | 2018-04098 | Lee | Texas |
| Jesus Delarosa | Taylor Land & Mineral Services, Inc. | 10/2/2018 | 1239 | 696 | 2018-04201 | Lee | Texas |
| Hector Chairez | Taylor Land & Mineral Services, Inc. | 8/15/2018 | 1239 | 697 | 2018-04202 | Lee | Texas |
| Jose Perez | Taylor Land & Mineral Services, Inc. | 8/15/2018 | 1239 | 698 | 2018-04203 | Lee | Texas |
| Rojelio S. Torres, et ux | Taylor Land & Mineral Services, Inc. | 9/19/2018 | 1239 | 312 | 2018-04096 | Lee | Texas |
| Candy Clark | Taylor Land & Mineral Services, Inc. | 8/2/2018 | 1239 | 695 | 2018-04200 | Lee | Texas |
| Jennifer McCormick | Taylor Land & Mineral Services, Inc. | 8/15/2018 | 1239 | 693 | 2018-04198 | Lee | Texas |
| Jon Ray, et ux | Taylor Land & Mineral Services, Inc. | 8/28/2018 | 1239 | 310 | 2018-04094 | Lee | Texas |
| Norris Fuchs | Taylor Land & Mineral Services, Inc. | 9/19/2018 | 1239 | 308 | 2018-04092 | Lee | Texas |
| Stephen Cornwell | Taylor Land & Mineral Services, Inc. | 9/20/2018 | 1239 | 306 | 2018-04090 | Lee | Texas |
| John E. Prewitt | Taylor Land & Mineral Services, Inc. | 10/9/2018 | 1239 | 694 | 2018-04199 | Lee | Texas |
| Jose Alvarez | Taylor Land & Mineral Services, Inc. | 8/20/2018 | 1239 | 313 | 2018-04097 | Lee | Texas |
| Ray Maass, et ux | Taylor Land & Mineral Services, Inc. | 8/28/2018 | 1239 | 305 | 2018-04089 | Lee | Texas |

Exhibit A-2 – Page 7 of 16

| Lessor | Lessee | Lease Date | Book # | Page # | Instrument# | County | State |
|---|---|---|---|---|---|---|---|
| Christine Dyer Jervis, et al | Beland Energy, LLC | 2/20/2018 | 1857 | 841 | | Fayette | Texas |
| Devon Energy Production Co., L.P. | Matrix Revolution, LLC | 1/31/2019 | 1890 | 620 | | Fayette | Texas |
| Devon Energy Production Co., L.P. | Matrix Revolution, LLC | 1/31/2019 | 1246 | 986 | | Lee | Texas |
| Donald M. Ward | Paleo Oil Company LLC | 7/26/2018 | 1233 | 1041 | 2018-02832 | Lee | Texas |
| Gary D. Ward | Paleo Oil Company LLC | 7/26/2018 | 1233 | 855 | 2018-02801 | Lee | Texas |
| Wesley Ward | Paleo Oil Company LLC | 7/26/2018 | 1233 | 856 | 2018-02802 | Lee | Texas |
| State of Texas (MF120226) | Paleo Oil Company LLC | 1/21/2020 | 1929 | 886 | | Fayette | Texas |
| Betty C. Cook | Taylor Land & Mineral Services, Inc. | 5/23/2020 | 1946 | 808 | | Fayette | Texas |
| Bonnie Orsak & husband, Daniel | Taylor Land & Mineral Services, Inc. | 5/8/2018 | 1872 | 826 | | Fayette | Texas |
| Wilbert Otto Dernehl, Jr. | Taylor Land & Mineral Services, Inc. | 5/8/2018 | 1872 | 827 | | Fayette | Texas |
| Billy Jack Albers, et al | Taylor Land & Mineral Services, Inc. | 5/28/2018 | 1874 | 83 | | Fayette | Texas |
| David Schulz | Taylor Land & Mineral Services, Inc. | 11/12/2019 | 1924 | 410 | | Fayette | Texas |
| Jason R. Adams | Taylor Land & Mineral Services, Inc. | 10/24/2019 | 1924 | 414 | | Fayette | Texas |
| Jena Adams Tally | Taylor Land & Mineral Services, Inc. | 10/24/2019 | 1924 | 413 | | Fayette | Texas |
| Ginger Faye Ebner | Taylor Land & Mineral Services, Inc. | 5/24/2018 | 1872 | 830 | | Fayette | Texas |
| Reagie Ebner & wife, Michele Ebner | Taylor Land & Mineral Services, Inc. | 8/5/2018 | 1872 | 828 | | Fayette | Texas |
| Valgene Ebner | Taylor Land & Mineral Services, Inc. | 5/15/2018 | 1872 | 829 | | Fayette | Texas |
| Chovanec Management Trust | Todd Weiss | 12/7/2017 | 1850 | 669 | | Fayette | Texas |
| Alice Kuehn Sparks | Polaris E&P, LLC | 12/6/2017 | 1220 | 217 | 2017-04149 | Lee | Texas |
| Angela Davis | HB2 Origination, LLC | 8/10/2019 | 1257 | 388 | 2019-03081 | Lee | Texas |
| Angela R. Fulcher | Taylor Land & Mineral Services, Inc. | 6/19/2018 | 1233 | 726 | 2018-02769 | Lee | Texas |
| Billy Elizondo, et ux | Taylor Land & Mineral Services, Inc. | 9/19/2018 | 124] | 98 | 2018-04614 | Lee | Texas |
| Candy Clark | Taylor Land & Mineral Services, Inc. | 8/20/2018 | 1239 | 695 | 2018-04200 | Lee | Texas |
| Carrot D. McGehee | Texian Mineral & Royalty, LLC | 5/30/2018 | 1233 | 692 | 2018-02761 | Lee | Texas |
| Chase Lawrence | Taylor Land & Mineral Services, Inc. | 9/20/2018 | 1239 | 311 | 2018-04095 | Lee | Texas |
| Cindy Randermann | Taylor Land & Mineral Services, Inc. | 9/20/2018 | 1239 | 307 | 2018-04091 | Lee | Texas |
| Elroy E. Kuehn | Polaris E&P, LLC | 12/5/2017 | 1219 | 1091 | 2017-04104 | Lee | Texas |
| Gary Gerdes | Taylor Land & Mineral Services, Inc. | 6/13/2018 | 1233 | 689 | 2018-02759 | Lee | Texas |
| Gary Gerdes | Taylor Land & Mineral Services, Inc. | 6/13/2018 | 1233 | 691 | 2018-02760 | Lee | Texas |
| Gary W. Gerdes | Paleo Oil Company, LLC | 10/12/2018 | 1241 | 99 | 2018-04615 | Lee | Texas |

Exhibit A-2 – Page 8 of 16

| Lessor | Lessee | Lease Date | Book # | Page # | Instrument# | County | State |
|---|---|---|---|---|---|---|---|
| Gold Endeavor Development, LLC | Taylor Land & Mineral Services, Inc. | 7/6/2018 | 1234 | 486 | 2018-03028 | Lee | Texas |
| Harold Pieratt, et ux | Taylor Land & Mineral Services, Inc. | 6/25/2018 | 1233 | 693 | 2018-02762 | Lee | Texas |
| Hector Chairez | Taylor Land & Mineral Services, Inc. | 8/15/2018 | 1239 | 697 | 2018-04202 | Lee | Texas |
| Irma R. De la Cruz | HB2 Origination, LLC | 8/10/2019 | 1257 | 391 | 2019-03084 | Lee | Texas |
| Jared Wolfe, et ux | GeoSouthern Energy Partners, LP | 2/21/2017 | 1205 | 382 | 2017-01014 | Lee | Texas |
| Jennifer N. McCormick | Taylor Land & Mineral Services, Inc. | 8/15/2018 | 1239 | 693 | 2018-04198 | Lee | Texas |
| Jesus Delarosa | Taylor Land & Mineral Services, Inc. | 10/2/2018 | 1239 | 696 | 2018-04201 | Lee | Texas |
| Jetta X-2, L.P. | Paleo Oil Company, LLC | 11/1/2018 | 1241 | 121 | 2018-04621 | Lee | Texas |
| Jetta X-2, L.P. | Paleo Oil Company, LLC | 11/1/2018 | 1879 | 773 | 2018-07583 | Lee | Texas |
| John E. Prewett, et ux | Taylor Land & Mineral Services, Inc. | 10/9/2018 | 1239 | 694 | 2018-04199 | Lee | Texas |
| John Ray, et ux | Taylor Land & Mineral Services, Inc. | 8/28/2018 | 1239 | 310 | 2018-04094 | Lee | Texas |
| Jose Alvarez | Taylor Land & Mineral Services, Inc. | 8/20/2018 | 1239 | 313 | 18-04097 | Lee | Texas |
| Jose Perez | Taylor Land & Mineral Services, Inc. | 8/15/2018 | 1239 | 698 | 2018-04203 | Lee | Texas |
| Kenneth E, Carey, et ux | HB2 Origination, LLC | 8/10/2019 | 1257 | 392 | 2019-03085 | Lee | Texas |
| Kenneth Wayne Rethke | Beland Energy, LLC | 2/26/2018 | 1228 | 94 | 2018-02833 | Lee | Texas |
| Larry Eslick, et ux | HB2 Origination, LLC | 6/3/2019 | 1254 | 1113 | 2019-02488 | Lee | Texas |
| Lee County Water Supply | Taylor Land & Mineral Services, Inc. | 9/11/2018 | 1241 | 96 | 2018-04613 | Lee | Texas |
| Marion M. Hawkins | HB2 Origination, LLC | 6/13/2019 | 1255 | 926 | 2019-02683 | Lee | Texas |
| Marion M Hawkins | HB2 Origination, LLC | 6/13/2019 | 1255 | 925 | 2019-02682 | Lee | Texas |
| Marshall Bennett | Taylor Land & Mineral Services, Inc. | 8/20/2018 | 1239 | 315 | 2018-04099 | Lee | Texas |
| Martin E. Janczak, et ux | GeoSouthern Energy Partners, LP | 3/7/2017 | 1205 | 364 | 2017-00997 | Lee | Texas |
| Mary Beth Sledge | HB2 Origination, LLC | 8/10/2019 | 1257 | 1050 | 2019-03218 | Lee | Texas |
| Metro Container, LLC | HB2 Origination, LLC | 1/24/2020 | 1267 | 1 | 2020-00506 | Lee | Texas |
| Michael S. Janczak, et ux | GeoSouthern Energy Partners, LP | 3/7/2017 | 1207 | 894 | 2017-01498 | Lee | Texas |

Exhibit A-2 – Page 9 of 16

| Lessor | Lessee | Lease Date | Book # | Page # | Instrument# | County | State |
|---|---|---|---|---|---|---|---|
| Norberto Lara Jr. | HB2 Origination, LLC | 8/10/2019 | 1257 | 389 | 2019-03082 | Lee | Texas |
| Norris Fuchs | Taylor Land & Mineral Services, Inc. | 9/19/2018 | 1239 | 308 | 2018-04092 | Lee | Texas |
| Nutshell, Inc. | Taylor Land & Mineral Services, Inc. | 6/19/2018 | 1233 | 727 | 2018-02770 | Lee | Texas |
| Nutshell, Inc. | GeoSouthern Energy Partners, LP | 3/1/2017 | 1205 | 384 | 2017-01016 | Lee | Texas |
| Placke Family Ltd, | TMRX Petroleum, LLC | 7/30/2018 | 1235 | 958 | 2018-03344 | Lee | Texas |
| Plainview Petroleum | HB2 Origination, LLC | 1/15/2020 | 1266 | 572 | 2020-00384 | Lee | Texas |
| Rafael Salazar | Taylor Land & Mineral Services, Inc. | 10/2/2018 | 1241 | 100 | 2018-04616 | Lee | Texas |
| Ray Maass, et ux | Taylor Land & Mineral Services, Inc. | 8/28/2018 | 1239 | 305 | 18-04089 | Lee | Texas |
| Rick Fulcher, Sr., et ux | GeoSouthern Energy Partners, LP | 3/1/2017 | 1205 | 383 | 2017-01015 | Lee | Texas |
| Rojelio S. Torres, et ux | Taylor Land & Mineral Services, Inc. | 9/19/2018 | 1239 | 312 | 2018-04096 | Lee | Texas |
| Roy T. Locke | HB2 Origination, LLC | 8/10/2019 | 1257 | 387 | 2019-03080 | Lee | Texas |
| Ruth A. Placke Life Estate and Ramp Farm, Ltd. | TMRX Petroleum, LLC | 7/30/2018 | 1235 | 960 | 2018-03346 | Lee | Texas |
| Shirley Kuehn Adkins | Polaris E&P, LLC | 12/6/2017 | 1220 | 605 | 2017-04221 | Lee | Texas |
| Stephanie DeAngelo | HB2 Origination, LLC | 8/10/2019 | 1258 | 329 | 2019-03265 | Lee | Texas |
| Stephen Cornwell, et ux | Taylor Land & Mineral Services, Inc. | 8/20/2018 | 1239 | 306 | 18-04090 | Lee | Texas |
| Susan Strauch | HB2 Origination, LLC | 8/10/2019 | 1257 | 390 | 2019-03083 | Lee | Texas |
| Texas Osage Royalty Pool, Inc. | Paleo Oil Company, LLC | 3/15/2018 | 1228 | 490 | 2018-01765 | Lee | Texas |
| The Sipes Living Trust | Taylor Land & Mineral Services, Inc. | 9/19/2018 | 1241 | 95 | 2018-04612 | Lee | Texas |
| Timothy & Carolyn McGhee | HB2 Origination, LLC | 6/3/2019 | 1254 | 1116 | 2019-02489 | Lee | Texas |
| Tower Rock Royalties | HB2 Origination, LLC | 1/15/2020 | 1266 | 571 | 2020-00383 | Lee | Texas |
| Vance T. Bradford | Taylor Land & Mineral Services, Inc. | 7/6/2018 | 1234 | 484 | 2018-03026 | Lee | Texas |
| Warner A. Mize | Texian Mineral & Royalty, LLC | 7/10/2017 | 1216 | 913 | 2017-03315 | Lee | Texas |
| William Placke | TMRX Petroleum, LLC | 7/30/2018 | 1235 | 959 | 2018-03345 | Lee | Texas |
| Union Pacific Railroad Company | Paleo Oil Company LLC | 10/1/2018 | 1240 | 375 | 2018-04394 | Lee | Texas |

Exhibit A-2 – Page 10 of 16

| Lessor | Lessee | Lease Date | Instrument# | County | State |
|--------|--------|-----------|-------------|--------|-------|
| Moehlman, Shirley J. H. Klaus | Gasper Rice Resources, Ltd. | 6/6/2005 | 055017 | Austin | Texas |
| Canik, Gilbert E. et al | Gasper Rice Resources, Ltd. | 6/4/2005 | 055016 | Austin | Texas |
| Huff, Judith | Carr Resources, Inc. | 8/9/2016 | 163829 | Austin | Texas |
| Horlen, Gale Huff | Carr Resources, Inc. | 8/9/2016 | 163828 | Austin | Texas |
| Barnett, Sandra F., Individually and as Independent Executrix of the Est. of James G. Barnett, deceased | Carr Resources, Inc. | 10/24/2011 | 120533 | Austin | Texas |
| Bettis, Laurie Beth Hegemeyer et al | Carr Resources, Inc. | 8/23/2016 | 165104 | Austin | Texas |
| Huff, Judith | Carr Resources, Inc. | 8/9/2016 | 163829 | Austin | Texas |
| Horlen, Gale Huff | Carr Resources, Inc. | 8/9/2016 | 163828 | Austin | Texas |
| Geisler, Evelyn | Gasper Rice Resources, Ltd. | 6/1/2005 | 055015 | Austin | Texas |
| Barry, Jyirildean M. and Alice Ann Barry | Carr Resources, Inc. | 2/5/2015 | 151302 | Austin | Texas |
| Platte, Ernest | Gasper Rice Resources, Ltd. | 7/1/2005 | 055020 | Austin | Texas |
| Pfeffer, Gloria Luedke | Gasper Rice Resources, Ltd. | 6/30/2005 | 055463 | Austin | Texas |
| Pfeffer, Woody Dean | Gasper Rice Resources, Ltd. | 7/7/2005 | 055957 | Austin | Texas |
| Potter, Verbean Gale Pfeffer et al | Carr Resources, Inc. | 1/20/2015 | 151304 | Austin | Texas |
| Pfeffer, Gary Dale | Gasper Rice Resources, Ltd. | 9/6/2005 | 056711 | Austin | Texas |
| Pfeffer, DuWayne | Carr Resources, Inc. | 2/11/2015 | 151307 | Austin | Texas |
| Pilcik, Bruce et ux | Gasper Rice Resources, Ltd. | 5/31/2005 | 054274 | Austin | Texas |
| Mertz, Daniel Charles | Gasper Rice Resources, Ltd. | 6/23/2005 | 055459 | Austin | Texas |
| Bass, Kevin Douglas | Carr Resources, Inc. | 4/17/2014 | 142366 | Austin | Texas |
| Lahrmann, Russell Paul et ux, Lisa R. | Gasper Rice Resources, Ltd. | 7/20/2005 | 055956 | Austin | Texas |
| Lahrmann, Lloyd, Ind.& as Trustee | Gasper Rice Resources, Ltd. | 7/20/2005 | 055958 | Austin | Texas |
| Kaase, Mary Ann and Angeline Ann Kaase Howard | Gasper Rice Resources, Ltd. | 4/23/2008 | 083182 | Austin | Texas |
| Algar Land & Mineral Trust | Carr Resources, Inc. | 11/6/2014 | 150227 | Austin | Texas |
| Pomykal, Norman | Carr Resources, Inc. | 5/23/2011 | 112720 | Austin | Texas |
| Kacir Wheeler, LLC | Carr Resources, Inc. | 7/21/2017 | 174147 | Austin | Texas |
| Kacir, Sidney | Carr Resources, Inc. | 8/15/2011 | 114167 | Austin | Texas |
| Skrabanek, Dorothy | Carr Resources, Inc. | 12/23/2011 | 120531 | Austin | Texas |
| Fite, Gloria Ruth Schiller | Carr Resources, Inc. | 5/23/2011 | 112719 | Austin | Texas |
| Pomykal, Gayle | Carr Resources, Inc. | 5/23/2011 | 112721 | Austin | Texas |

Exhibit A-2 – Page 11 of 16

| Lessor | Lessee | Lease Date | Instrument# | County | State |
|--------|--------|------------|-------------|--------|-------|
| Wood, William Ronnie et al | Carr Resources, Inc. | 4/22/2014 | 142372 | Austin | Texas |
| Schiller, Edward W. | Carr Resources, Inc. | 8/15/2011 | 114168 | Austin | Texas |
| Kacir, Kyle A. | Carr Resources, Inc. | 8/18/2011 | 114165 | Austin | Texas |
| Kacir, Karl W. | Carr Resources, Inc. | 8/22/2011 | 114166 | Austin | Texas |
| Kacir, Kent C. | Carr Resources, Inc. | 8/22/2011 | 114976 | Austin | Texas |
| Moody, Katherine | Carr Resources, Inc. | 6/18/2014 | 143319 | Austin | Texas |
| Alvarado, Karen | Carr Resources, Inc. | 8/3/2018 | 184902 | Austin | Texas |
| Farrow, Gayle | Carr Resources, Inc. | 12/14/2018 | 190440 | Austin | Texas |
| Bethke, Karen | Carr Resources, Inc. | 12/14/2018 | 190441 | Austin | Texas |
| Pilcik, Bruce R. et ux | Carr Resources, Inc. | 5/23/2011 | 112716 | Austin | Texas |
| Pilcik Bronson Ray et ux | Carr Resources, Inc. | 5/23/2011 | 112717 | Austin | Texas |
| Wallace, Ava Margaret | Carr Resources, Inc. | 5/24/2017 | 173314 | Austin | Texas |
| Kuehn, Edwin A. et ux | Carr Resources, Inc. | 5/30/2011 | 112718 | Austin | Texas |
| King, Hurley O. et ux | Carr Resources, Inc. | 5/30/2011 | 112723 | Austin | Texas |
| Mahon, Jerry et ux | Carr Resources, Inc. | 1/11/2019 | 190442 | Austin | Texas |
| Mahon, Jerry et ux | Carr Resources, Inc. | 5/2/2017 | 172282 | Austin | Texas |
| Crathers, Mable Dean | Carr Resources, Inc. | 5/23/2011 | 112724 | Austin | Texas |
| King, Willie Mae | Carr Resources, Inc. | 3/31/2014 | 142365 | Austin | Texas |
| King, Howard Jr. | Carr Resources, Inc. | 5/31/2017 | 173312 | Austin | Texas |
| Parker, Ora Nell | Carr Resources, Inc. | 3/31/2014 | 142363 | Austin | Texas |
| Mays, Shirleen | Carr Resources, Inc. | 3/31/2014 | 142362 | Austin | Texas |
| King, Derry Lewis | Carr Resources, Inc. | 3/31/2014 | 142358 | Austin | Texas |
| Henry, Merlean | Carr Resources, Inc. | 3/31/2014 | 142359 | Austin | Texas |
| Hall, Mable | Carr Resources, Inc. | 3/31/2014 | 142360 | Austin | Texas |
| Taylor, Genette | Carr Resources, Inc. | 3/31/2014 | 142361 | Austin | Texas |
| King, Willie Mae | Carr Resources, Inc. | 3/31/2014 | 142365 | Austin | Texas |
| Brown, Marilyn et al | Carr Resources, Inc. | 4/14/2014 | 142368 | Austin | Texas |
| Eben, Clarence | Gasper Rice Resources, Ltd. | 7/26/2005 | 055023 | Austin | Texas |
| Bass, Kevin Douglas | Carr Resources, Inc. | 9/2/2014 | 144408 | Austin | Texas |

Exhibit A-2 – Page 12 of 16

**Part II: Second Asset Purchase Agreement Leases**

**AI SAN ROMAN UNIT LEASES**

Recorded in the Official Records of Webb County, Texas.

| Lessor | Lessee | Recording | Date |
|--------|--------|-----------|------|
| San Roman Ranch Mineral Partners, Ltd. | Ageron Energy II, LLC | 5123/855 | 9/23/21 |

**STATLER UNIT LEASES**

Recorded in the Official Records of Fayette County, Texas, or Lee County, Texas, as is indicated below:

| Lessor | Lessee | County | Recording | Date |
|--------|--------|--------|-----------|------|
| Penelope Carter | Taylor Land & Mineral Services, Inc. | Fayette | 1876/888 | 9/11/18 |
| Theodora Boehm | Taylor Land & Mineral Services, Inc. | Fayette | 1876/890 | 9/11/18 |
| Janet Matthijetz | Taylor Land & Mineral Services, Inc. | Fayette | 1876/463 | 8/8/18 |
| Carolynn Keng, et al | Taylor Land & Mineral Services, Inc. | Fayette | 1876/575 | 9/10/18 |
| Casey Smith, et al | Taylor Land & Mineral Services, Inc. | Fayette | 1876/577 | 9/10/18 |
| Texas Osage Royalty Pool Inc | Paleo Oil Company LLC | Fayette | 1876/459 | 8/15/18 |
| Jetta-X2, LP | Paleo Oil Company LLC | Fayette | 1879/773 | 11/1/18 |
| Larry L. Woytek, et ux | Taylor Land & Mineral Services, Inc. | Fayette | 1882/740 | 9/20/18 |
| Jason R. Adams | Taylor Land & Mineral Services, Inc. | Fayette | 1924/414 | 10/24/2019 |
| Jena Adams Tally | Taylor Land & Mineral Services, Inc. | Fayette | 1924/413 | 10/24/2019 |
| David Schulz. | Taylor Land & Mineral Services, Inc. | Fayette | 1924/410 | 11/12/2019 |
| Billy Jack Albers, et al | Taylor Land & Mineral Services, Inc. | Fayette | 1874/83 | 5/28/2018 |
| Ronald Holle, and wife Dorothy | Todd Weiss | Lee | 1223/1041 | 11/3/17 |
| Ray George & Rita Gillum | Texian Mineral & Royalty, LLC | Lee | 1222/709 | 10/1/17 |
| Jeffrey Blume and Sandra R. Blume | Texian Mineral & Royalty, LLC | Fayette | 1850/931 | 11/8/17 |
| Jeffrey Blume and Sandra R. Blume | Texian Mineral & Royalty, LLC | Fayette | 1850/934 | 11/8/17 |
| Jeffrey Blume and Sandra R. Blume | Texian Mineral & Royalty, LLC | Fayette | 1850/937 | 11/8/17 |
| Wayne Navarro and Joyce Navarro | Taylor Land & Mineral Services, Inc. | Fayette | 1876/462 | 8/5/18 |
| Fulton Quein Sabe Ranches | TMRX Petroleum, LLC. | Lee & Fayette | 1232/1147 1866/179 | 4/19/18 |

Exhibit A-2 – Page 13 of 16

| Lessor | Lessee | County | Recording | Date |
|---|---|---|---|---|
| Marlene Schmidt Waak | TMRX Petroleum, LLC. | Lee & Fayette | 1228/0095 1859/672 | 4/19/18 |
| William E. Budnik | Paleo Oil Company LLC | Lee | 1233/1046 | 7/19/2018 |
| Stanley Budnik | Paleo Oil Company LLC | Lee | 1233/1054 | 7/19/2018 |
| Jerry L. Schafer | Paleo Oil Company LLC | Lee | 1233/1050 | 7/19/18 |
| Ginger Faye Ebner | Taylor Land & Minerals Services, Inc. | Fayette | 1872/830 | 5/24/2018 |
| Texas Osage Royalty Pool | Paleo Oil Company LLC | Fayette | 1874/610 | 5/24/18 |
| Charles Weerts | Taylor Land & Mineral Services, Inc. | Fayette | 1876/467 | 6/13/18 |
| Michael Weerts | Taylor Land & Mineral Services, Inc. | Fayette | 1876/468 | 6/13/18 |
| Keith Arthur Weerts | Taylor Land & Mineral Services, Inc. | Fayette | 1920/369 | 11/8/19 |
| Providence Minerals, Ltd. | Taylor Land & Mineral Services, Inc. | Fayette | 1887/659 | 1/14/19 |
| Willfred G. Foehr, et ux | Taylor Land & Mineral Services, Inc. | Fayette | 1876/465 | 8/10/18 |
| Taylor Land & Mineral Services, Inc. | Paleo Oil Company LLC | Fayette | 1878/476 | 10/15/18 |
| Thomas Lowery | Taylor Land & Mineral Services, Inc. | Fayette | 1876/464 | 8/5/18 |
| Hugo Rodriguez, et ux | Taylor Land & Mineral Services, Inc. | Fayette | 1878/439 | 8/27/18 |
| Ledbetter Volunteer Fire Dept. | Taylor Land & Mineral Services, Inc. | Fayette | 1878/440 1882/730 | 9/6/18 |
| Union Pacific Railroad Company | Paleo Oil Company LLC | Fayette | 1878/433 | 10/1/18 |
| State of Texas (MF120225) | Paleo Oil Company LLC | Lee | 1266/1160 | 1/21/202 |
| Christine Dyer Jervis and Jon H. Jervis | Taylor Land & Mineral Services, Inc. | Fayette | 1878/471 | 8/28/18 |
| Robert Reid, et ux | Taylor Land & Mineral Services, Inc. | Fayette | 1878/445 | 8/31/18 |
| Clinton Painter, et ux | Taylor Land & Mineral Services, Inc. | Fayette | 1886/801 | 1/7/18 |
| Maida Lucio | Taylor Land & Mineral Services, Inc. | Fayette | 1924/412 | 11/12/19 |
| Taylor Land & Mineral Services, Inc. | Paleo Oil Company LLC | Fayette | 1878/473 | 10/15/18 |
| Bruce Burleson | Taylor Land & Mineral Services, Inc. | Fayette | 1882/723 | 8/13/18 |
| Carol Timme | Taylor Land & Mineral Services, Inc. | Fayette | 1882/724 | 10/10/18 |
| Dorothy Rather | Taylor Land & Mineral Services, Inc. | Fayette | 1882/725 | 10/9/18 |
| Ledbetter Cemetery Assoc. | Taylor Land & Mineral Services, Inc. | Fayette | 1878/446 | 8/28/18 |
| Joan Goehring | Taylor Land & Mineral Services, Inc. | Fayette | 1878/442 | 8/10/18 |
| Robin Zapalac | Taylor Land & Mineral Services, Inc. | Fayette | 1878/469 | 8/28/18 |
| Christine Jervis | Taylor Land & Mineral Services, Inc. | Fayette | 1878/470 | 8/28/18 |
| Lillian Dyer Trust | Taylor Land & Mineral Services, Inc. | Fayette | 1878/444 | 8/28/18 |
| Curtis Moore | Taylor Land & Mineral Services, Inc. | Fayette | 1878/447 | 9/10/18 |

Exhibit A-2 – Page 14 of 16

| Lessor | Lessee | County | Recording | Date |
|---|---|---|---|---|
| Erma Webster | Taylor Land & Mineral Services, Inc. | Fayette | 1882/739 | 9/10/18 |
| Hubert Silva and wife Ruby | Taylor Land & Mineral Services, Inc. | Fayette | 1878/449 | 10/4/18 |
| Rita Clay | Taylor Land & Mineral Services, Inc. | Fayette | 1878/450 | 10/5/18 |
| Kenneth Lehmann | Taylor Land & Mineral Services, Inc. | Fayette | 1882/741 | 9/10/18 |
| Kitchens Real Estate Partnership, Ltd. | Taylor Land & Mineral Services, Inc. | Fayette | 1882/742 | 9/20/18 |
| Herbert Jackson | Taylor Land & Mineral Services, Inc. | Fayette | 1882/735 | 9/20/18 |
| Luis Flores | Taylor Land & Mineral Services, Inc. | Fayette | 1882/738 | 11/5/18 |
| Carolynn Keng | Taylor Land & Mineral Services, Inc. | Fayette | 1882/734 | 1/14/18 |
| Casey Smith & Jamie Manning | Taylor Land & Mineral Services, Inc. | Fayette | 1882/736 | 1/14/18 |
| Christine Dyer Jervis, et al | Taylor Land & Mineral Services, Inc. | Fayette | 1878/451 | 8/28/18 |
| Land & Cattle, et al | Taylor Land & Mineral Services, Inc. | Fayette | 1878/467 | 8/28/18 |
| Donald Smith | Taylor Land & Mineral Services, Inc. | Fayette | 1885/551 | 11/5/18 |
| Gwen Bryant | Taylor Land & Mineral Services, Inc.- | Fayette | 1885/555 | 11/5/18 |
| Marcia G. Roberson | Taylor Land & Mineral Services, Inc. | Fayette | 1885/553 | 11/5/18 |
| Lillie S. Jones | Taylor Land & Mineral Services, Inc. | Fayette | 1886/794 | 11/5/18 |
| Monica Baker | Taylor Land & Mineral Services, Inc. | Fayette | 1886/792 | 11/5/18 |
| Ronald Smith | Taylor Land & Mineral Services, Inc. | Fayette | 1886/796 | 11/5/18 |
| Dorothy Moore | Taylor Land & Mineral Services, Inc. | Fayette | 1887/658 | 1/11/19 |
| Triumph Missionary Baptist Church | Taylor Land & Mineral Services, Inc. | Fayette | 1886/799 | 10/5/18 |
| Ledbetter Landmark, LLC | Taylor Land & Mineral Services, Inc. | Fayette | 1886/788 | 10/23/18 |
| Jose Alvarez | Taylor Land & Mineral Services, Inc. | Lee | 1239/313 | 8/20/18 |
| Ronnie Blasig and Sandra Blasig | Taylor Land & Mineral Services, Inc. | Fayette | 1892/330 | 9/20/18 |
| Jessie and Walter Spates | Taylor Land & Mineral Services, Inc. | Fayette | 1924/408 | 11/4/19 |
| Porfirio Flores Jr et ux | Taylor Land & Mineral Services, Inc. | Fayette | 1924/422 | 10/24/19 |
| Benita J Thomas | Taylor Land & Mineral Services, Inc. | Fayette | 1920/375 | 10/24/19 |
| Patricia A Winkfield | Taylor Land & Mineral Services, Inc. | Fayette | 1920/374 | 10/24/19 |
| Kenneth Fillmore | Taylor Land & Mineral Services, Inc. | Fayette | 1920/373 | 10/24/19 |
| Loyel Fillmore | Taylor Land & Mineral Services, Inc. | Fayette | 1924/423 | 10/24/19 |
| Lee Johnson | Taylor Land & Mineral Services, Inc. | Fayette | 1926/305 | 10/24/19 |
| Karen Sanchez | Taylor Land & Mineral Services, Inc. | Fayette | 1924/416 | 10/24/19 |
| Patricia Ann Barnett | Taylor Land & Mineral Services, Inc. | Fayette | 1924/415 | 10/24/19 |
| Patricia B King- Boto | Taylor Land & Mineral Services, Inc. | Fayette | 1931/21 | 10/24/19 |
| Beverly Mire | Taylor Land & Mineral Services, Inc. | Fayette | 1931/22 | 10/24/19 |

| Lessor | Lessee | County | Recording | Date |
|---|---|---|---|---|
| Jack E Stork | Taylor Land & Mineral Services, Inc. | Fayette | 1920/372 | 10/24/19 |
| Austin King III | Taylor Land & Mineral Services, Inc. | Fayette | 1924/421 | 11/15/19 |
| Donald Ray King | Taylor Land & Mineral Services, Inc. | Fayette | 1924/420 | 11/18/19 |
| Douglas Ulrich | Taylor Land & Mineral Services, Inc. | Fayette | 1926/304 | 12/17/19 |
| Margie Wilkerson | Taylor Land & Mineral Services, Inc. | Fayette | 1928/697 | 1/13/2020 |
| Doris Kimble | Taylor Land & Mineral Services, Inc. | Fayette | 1926/300 | 11/8/2019 |
| Dexter Brown | Taylor Land & Mineral Services, Inc. | Fayette | 1926/306 | 12/5/2019 |
| Clara Burke | Taylor Land & Mineral Services, Inc. | Fayette | 1926/301 | 11/8/2019 |
| Clara B Wilkerson | Taylor Land & Mineral Services, Inc. | Fayette | 1926/302 | 11/8/2019 |
| Bernice Hill | Taylor Land & Mineral Services, Inc. | Fayette | 1926/303 | 11/8/2019 |
| Henry H Hernandez et ux | Taylor Land & Mineral Services, Inc. | Fayette | 1924/406 | 4/12/2019 |
| Fayette County | HB2 Origination, LLC | Fayette | 1995/892 | 3/10/2021 |
| Nina L. Batts | HB2 Origination, LLC | Fayette | 1992/521 | 5/6/2021 |
| Maybell Lott | HB2 Origination, LLC | Fayette | 192/520 | 5/6/2021 |

**ANIMAL 2H LEASES**

Recorded in the Official Records of Lee County, Texas:

| Lessor | Lessee | Date | Recording |
|---|---|---|---|
| Gladys Marie Prine | Ironrock Webb Energy Group, LLC | 9/30/2019 | 1260/372 |
| Pearly Louise Watts Els | Ironrock Webb Energy Group, LLC | 9/30/2019 | 1260/370 |
| Linda Ruth West Stork | Ironrock Webb Energy Group, LLC | 9/30/2019 | 1260/368 |
| David Westley Stork | Ironrock Webb Energy Group, LLC | 9/30/2019 | 1260/364 |
| Amy Kate Stork | Ironrock Webb Energy Group, LLC | 9/30/2019 | 1260/366 |
| Janet Simmang | Ironrock Webb Energy Group, LLC | 9/5/2019 | 1260/362 |
| Shawna Hall Salas | Ironrock Webb Energy Group, LLC | 10/11/2019 | 1260/374 |
| Patrick Creppel | Ironrock Webb Energy Group, LLC | 9/5/2019 | 1260/360 |
| Timothy Christopher Hall | Ironrock Webb Energy Group, LLC | 10/11/2019 | 1260/376 |
| Nikki L. Alston and Kenneth W. Alston | Prominence Oil & Gas, LLC | 6/20/2021 | 1301/313 |
| Ronald Thomas Hall | Prominence Oil & Gas, LLC | 6/15/2021 | 1302/684 |

Exhibit A-2 – Page 16 of 16

COPAS 2005 Accounting Procedure
Recommended by COPAS

**c o p a s**

**Exhibit "—"C"**
**ACCOUNTING PROCEDURE**
**JOINT OPERATIONS**

1   Attached to and made part of  that certain Amended and Restated Operating Agreement dated September 12, 2022, by and between
2   Ageron Ironroc Energy, LLC and Ironroc Energy Partners LLC, each as Operator, and Alpine Summit Funding LLC, as Non-Operator
3
4
5
6                                          **I. GENERAL PROVISIONS**
7
8   **IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE**
9   **COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE**
10  **BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.**
11
12  **IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE**
13  **PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT**
14  **FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT**
15  **OF THE PARTIES IN SUCH EVENT.**
16
17  1.   **DEFINITIONS**
18
19       All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:
20
21       **"Affiliate"**  has the meaning set forth in the Agreement. means for a person, another person that controls, is controlled by, or is under common control with that person. In this
22       definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities
23       of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an
24       individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.
25
26       **"Agreement"** means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting
27       Procedure is attached.
28
29       **"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified
30       in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).
31
32       **"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest
33       Railway Receiving Point to the property.
34
35       **"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.
36
37       **"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is
38       to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable
39       field personnel.
40
41       **"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's
42       field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may
43       include, but are not limited to:
44
45       •   Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance,
46           construction, well remedial work, equipment movement and drilling
47       •   Responsibility for day-to-day direct oversight of rig operations
48       •   Responsibility for day-to-day direct oversight of construction operations
49       •   Coordination of job priorities and approval of work procedures
50       •   Responsibility for optimal resource utilization (equipment, Materials, personnel)
51       •   Responsibility for meeting production and field operating expense targets
52       •   Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental
53           part of the supervisor's operating responsibilities
54       •   Responsibility for all emergency responses with field staff
55       •   Responsibility for implementing safety and environmental practices
56       •   Responsibility for field adherence to company policy
57       •   Responsibility for employment decisions and performance appraisals for field personnel
58       •   Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group
59           or team leaders.
60
61       **"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be
62       shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.
63
64       **"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection,
65       maintenance, repair, abandonment, and restoration of the Joint Property.
66

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

1

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**"Joint Property"** means the real and personal property subject to the Agreement.

**"Laws"** means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties or their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

**"Material"** means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

**"Non-Operators"** means the Parties to the Agreement other than the Operator.

~~**"Offshore Facilities"** means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.~~

**"Off-site"** means any location that is not considered On-site as defined in this Accounting Procedure.

**"On-site"** means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of ~~Offshore Facilities, Shore Base Facilities,~~ fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

**"Operator"** means the Party designated pursuant to the Agreement to conduct the Joint Operations.

**"Parties"** means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

**"Participating Interest"** means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

**"Participating Party"** means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

**"Personal Expenses"** means reimbursed costs for travel and temporary living expenses.

**"Railway Receiving Point"** means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

~~**"Shore Base Facilities"** means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.~~

**"Supply Store"** means a recognized source or common stock point for a given Material item.

**"Technical Services"** means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

2.   **STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

c o p a s

**3.  ADVANCES AND PAYMENTS BY THE PARTIES**

A.  Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B.  Except as provided below, each Party shall pay ~~or in the Agreement or Indenture~~ its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1)  being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2)  being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3)  being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4)  charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

**4.  ADJUSTMENTS**

A.  Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; ~~however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment.~~ The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B.  All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1)  a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

(2)  an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

(3)  a government/regulatory audit, or

(4)  a working interest ownership or Participating Interest adjustment.

**5.  EXPENDITURE AUDITS**

A.  A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account ~~within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered~~; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received with respect to such hydrocarbons as they pertain to payout accounting required under the Agreement. ~~Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.~~

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

**c o p a s**

those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; ~~however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. /All claims shall be supported with sufficient documentation.~~ **All claims shall be supported with reasonable documentation.**

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B.  The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C.  The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D.  If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E.  ☐ *(Optional Provision – Forfeiture Penalties)*
~~If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.~~

6.  **APPROVAL BY PARTIES**

A.  GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

c o p a s

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B.    ~~AMENDMENTS~~[RESERVED]

~~If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____ (_____) or more Parties, one of which is the Operator, having a combined working interest of at least _____ percent (_____%), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.~~

C.    ~~AFFILIATES~~

~~For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.~~

~~For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.~~

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

**1.    RENTALS AND ROYALTIES**

**Without limiting the Parties' rights or obligations under the Agreement,** /Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

**2.    LABOR**

A.    Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1)    Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2)    Operator's employees directly employed on ~~Shore Base Facilities, Offshore Facilities, or other~~ facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3)    Operator's employees providing First Level Supervision,

(4)    Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5)    Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B.    Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.    Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**c o p a s**

D.   Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E.   Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or  that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F.   Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G.   Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H.   Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3.   **MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.   **TRANSPORTATION**

A.   Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B.   Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1)   If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property . The Operator shall consistently  apply the selected alternative.

(2)   If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5.   **SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6.   **EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A.   The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, ~~Shore Base Facilities, Offshore Facilities,~~ and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____eight_____ percent (___8___%) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**c o p a s**

equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B.    In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

7.    **AFFILIATES**

A.    Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) (i) the Affiliate is identified and the Affiliate goods and services are **and (ii) such charges are on arms' length terms as would be obtainable in a comparable arms' length transaction with a** specifically detailed in the approved AFE or other authorization; and (ii) the total costs for such Affiliate's goods and services billed **person other than an Affiliate.** to such individual project do not exceed $_____ If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B.    For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the **if the charges exceed $10,000 in a given calendar year** /charges exceed $_____ in a given calendar year.

C.    The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission will be zero dollars ($ 0.00).

8.    **DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

9.    **LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or  necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's /legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

10.    **TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11.  INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. ~~In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.~~

**12.  COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13.  ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration,  and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

**14.  ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15.  OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

**[RESERVED]**
~~III.  OVERHEAD~~

~~As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.~~

~~Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:~~

- ~~warehousing, other than for warehouses that are  jointly owned under this Agreement~~
- ~~design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)~~
- ~~inventory costs not chargeable under Section V (*Inventories of Controllable Material*)~~
- ~~procurement~~
- ~~administration~~
- ~~accounting and auditing~~
- ~~gas dispatching and gas chart integration~~

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**c o p a s**

- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

**1.    OVERHEAD – DRILLING AND PRODUCING OPERATIONS**

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

☐  **(Alternative 1)** Fixed Rate Basis, Section III.1.B.
☐  **(Alternative 2)** Percentage Basis, Section III.1.C.

A.    TECHNICAL SERVICES

(i)    Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section 1.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

☐  **(Alternative 1 – Direct)** shall be charged **direct** to the Joint Account.

☐  **(Alternative 2 – Overhead)** shall be covered by the **overhead** rates.

(ii)    Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section 1.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

☐  **(Alternative 1 – All Overhead)** shall be covered by the **overhead** rates.

☐  **(Alternative 2 – All Direct)** shall be charged **direct** to the Joint Account.

☐  **(Alternative 3 – Drilling Direct)** shall be charged **direct** to the Joint Account, **only** to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead – Major Construction and Catastrophe*) shall be covered by the overhead rates.

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

B.    OVERHEAD – FIXED RATE BASIS

(1)    The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $_____ (prorated for less than a full month)

Producing Well Rate per month $_____

(2)    Application of Overhead – Drilling Well Rate shall be as follows:

(a)    Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**c o p a s**

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work-days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

(a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C. OVERHEAD—PERCENTAGE BASIS

(1) Operator shall charge the Joint Account at the following rates:

(a) Development Rate _____ percent (_____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (*Legal Expense*) and all Material salvage credits.

(b) Operating Rate _____ percent (_____%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead—Percentage Basis shall be as follows:

(a) The Development Rate shall be applied to all costs in connection with:

[i] drilling, redrilling, sidetracking, or deepening of a well
[ii] a well undergoing plugback or workover operations for a period of five (5) or more consecutive work-days
[iii] preliminary expenditures necessary in preparation for drilling
[iv] expenditures incurred in abandoning when the well is not completed as a producer
[v] construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead-Major Construction and Catastrophe*).

(b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead-Major Construction and Catastrophe*).

2. OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.    If the Operator absorbs the engineering, design and drafting costs related to the project:

(1)    _____% of total costs if such costs are less than $100,000; plus

(2)    _____% of total costs in excess of $100,000 but less than $1,000,000; plus

(3)    _____% of total costs in excess of $1,000,000.

B.    If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1)    _____% of total costs if such costs are less than $100,000; plus

(2)    _____% of total costs in excess of $100,000 but less than $1,000,000; plus

(3)    _____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

**3.    AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

### IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

**1.    DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

c o p a s

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

2.   **TRANSFERS**

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A.   PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1)   Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

(a)   For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

(b)   For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2)   Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3)   Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4)   As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B.   FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1)   Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2)   Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3)   Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4)   Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C.   TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**c o p a s**

D.   CONDITION

(1)   Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section 1.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)   Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)   Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)   Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section 1.6.A (*General Matters*).

(5)   Condition "E" – Junk shall be priced at prevailing scrap value prices.

E.   OTHER PRICING PROVISIONS

(1)   Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2)   Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**3.    DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but **only with the prior written approval of the Non-Operators owning that Material** shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

**4.    SPECIAL PRICING PROVISIONS**

A.    PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B.    SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C.    MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

**1.    DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A.    A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B.    Actual transportation costs and Personal Expenses for the inventory team.

C.    Reasonable charges for report preparation and distribution to the Non-Operators.

**2.    NON-DIRECTED INVENTORIES**

A.    OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B.    NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C.    SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

EXHIBIT "D"

Attached to and made a part of that certain Amended and Restated Operating Agreement dated September 12, 2022, by and between Ageron Ironroc Energy, LLC and Ironroc Energy Partners LLC, each as Operator, and Alpine Summit Funding LLC, as Non-Operator

## INSURANCE

The Operator shall maintain the following insurance in connection with its operation of the Contract Area:

1.  Workers' compensation insurance providing statutory benefits in accordance with the Laws of the state or other Governmental Body having jurisdiction over each employee of the Operator (or Operator's affiliates) engaged in operation of the Contract Area.

    Employer's liability with limits not less than the following:

    a.  Bodily injury by accident, $1,000,000 each accident

    b.  Bodily injury by disease, $1,000,000 each employee

    c.  Bodily injury by disease, $1,000,000 aggregate

2.  Commercial general liability insurance, with limits of $1,000,000 per occurrence, $2,000,000 aggregate, including the following:

    a.  Bodily injury and property damage liability
    b.  Premises/operations
    c.  Independent contractors
    d.  Personal and advertising injury (limited to $1,000,000)
    e.  Products - completed operations
    f.  Blanket contractual liability
    g.  Blowout and cratering
    h.  Explosion, collapse and underground
    i.  Sudden and accidental pollution liability

3.  Commercial automobile liability insurance with bodily injury and property damage combined single limit of $1,000,000 per occurrence, owned, hired, and non-owned vehicles

4.  Control of well/operator's extra expense insurance, with limits of $10,000,000 (or $30,000,000 if the operation is on a multi-well pad), including Care, Custody and Control insurance with limits of $5,000,000 (or $15,000,000 if the operation is on a multi-well pad).

5.  Commercial umbrella liability insurance with limits of $10,000,000 per occurrence, $20,000,000 aggregate, with coverage no less broad than, and following the form terms and conditions of, the underlying policies.

Each such insurance policy (with the exception of workers' compensation) shall name or cover the Non-Operator as an additional insured, and each such insurance policy shall contain a waiver of subrogation in favor of the Non-Operator.

It is understood and agreed that the insurance policies described above will contain various standard exclusions, restrictions, and limitations wherein coverages are not available and/or not economically feasible. It is also understood and agreed that some policies may contain such deductibles or retentions as Operator may reasonably determine. In the event an insurance claim is made by the Operator on behalf of the joint account, and the insurance proceeds are subject to reduction as a result of an exclusion, restriction, limitation, retention or deductible provision, the amount of such reduction shall be a direct charge to the Operator and/or Non-Operator in accordance with the liability allocation provisions in this Agreement.

All policies obtained or provided pursuant to this Exhibit D (including any policies obtained by a Non-Operator as set forth below) will be primary and non-contributory with respect to any other insurance maintained by the parties themselves, and will contain waivers of subrogation against the parties and their other insurers.

The parties shall have the right to maintain their own insurance with respect to all or any of the insurance coverages set out above specifically including, without limitation, operator's control of well/extra expense insurance. Any party electing to maintain its own insurance in lieu of participating in the insurance obtained by Operator pursuant to the foregoing provisions shall notify Operator that such party will maintain its own insurance, furnish certificates evidencing such insurance, and following such notification, shall not be charged for any portion of the premiums or other costs relating to, and shall have no rights in or with respect to, the corresponding insurance coverage obtained by the Operator pursuant to the foregoing provisions. Upon request, any party electing to maintain its own insurance as set forth above shall furnish to the other party certificates evidencing such insurance. In the event that a party obtains such insurance itself, it shall not be named or covered as an additional insured in the corresponding policy maintained by the Operator and such Non-Operator shall be solely responsible for its share of all costs, expenses, liabilities or other losses that would otherwise be covered by the corresponding policy maintained by the Operator.

Subject to the foregoing provisions, all premiums paid on such insurance shall be charged to the joint account.

Except by mutual consent of the parties, no other insurance shall be maintained for the joint account, and all losses not covered by such insurance shall be charged to the parties in accordance with the liability allocation provisions in this Agreement. Any other insurance desired by a party hereto (specifically including, without limitation, physical damage insurance covering the jointly owned property), or any insurance coverage desired by a party in excess of the limits set forth above, may be obtained and carried by such party at its sole cost and expense. Any such additional coverage shall be for the sole benefit of the party obtaining the same.

Operator shall not be liable to Non-Operator for loss suffered on account of the insufficiency of insurance carried or the insurer with whom carried, nor shall Operator be liable to Non-Operator for any loss accruing by reason of Operator's inability to provide or maintain the insurance above mentioned.

**END OF EXHIBIT "D"**

AAPL – FORM 610RS – 1989

**EXHIBIT "H"**

Attached to and made a part of that certain Amended and Restated Operating Agreement dated September 12, 2022, by and between Ageron Ironroc Energy, LLC and Ironroc Energy Partners LLC, each as Operator, and Alpine Summit Funding LLC, as Non-Operator

**NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER**

**MODEL FORM RECORDING SUPPLEMENT TO**
**OPERATING AGREEMENT AND FINANCING STATEMENT**

THIS AGREEMENT, entered into by and between ___**Ageron Ironroc Energy, LLC, solely with respect to the Ageron Contract Area (defined below), and Ironroc Energy Partners LLC, solely with respect to all other portions of the Contract Area**___ , **each** hereinafter referred to as "Operator," and the signatory party or parties other than Operator, hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

WHEREAS, **certain of** the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A" (said land, Leases and Interests being hereinafter called the "Contract Area"), ~~and in any instance in which the Leases or Interests of a party are not of record, the record owner and the party hereto that owns the interest or rights therein are reflected on Exhibit "A"~~;

**WHEREAS, Ironroc Energy Partners LLC, as Operator, and Alpine Summit Funding LLC, as Non-Operator, entered into that certain Operating Agreement dated April 29, 2022, memoranda of which were recorded: (1) as Instrument No. 222824 in the Official Public records of Austin County, Texas; (2) as Instrument No. 22-03337, Vol. 2046, Page 730 in the Official Public Records of Fayette County, Texas; (3) as Instrument No. 2022-02017, Vol. 1322, Page 0076 in the Official Public Records of Lee County, Texas; and (4) at Volume 1839, Page 501 in the Official Public records of Washington County, Texas (the "Original Agreement").**

WHEREAS, the parties hereto have executed an **Amended and Restated** Operating Agreement dated _____**September 12**_____, __**2022**__ (herein, **and as hereafter amended, restated, supplemented or modified,** the "Operating Agreement"), **amending and restating in its entirety the Original Agreement and** covering the Contract Area for the purpose of exploring and developing **the Contract Area** ~~such lands, Leases and Interests for Oil and Gas~~; and

WHEREAS, the parties hereto have executed this agreement for the purpose of imparting notice to all persons of the rights and obligations of the parties under the Operating Agreement and for the further purpose of perfecting those rights capable of perfection.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties hereto, it is agreed as follows:

1.    This agreement supplements the Operating Agreement, which Agreement in its entirety is incorporated herein by reference, and all terms used herein shall have the meaning ascribed to them in the Operating Agreement.

2.    The parties do hereby agree that:

A.  The Oil and Gas Leases and/or Oil and Gas Interests of the parties comprising the Contract Area shall be subject to and burdened with the terms and provisions of this agreement and the Operating Agreement, and the parties do hereby commit such Leases and Interests to the performance thereof.

B.  The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and provisions of the Operating Agreement, as supplemented by this agreement.

C.  All costs and liabilities incurred in operations under this agreement and the Operating Agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties hereto, as provided in the Operating Agreement.

D.  Regardless of the record title ownership to the Oil and Gas Leases and/or Oil and Gas Interests ~~identified on Exhibit "A,"~~ **included in the Contract Area,** all production of Oil and Gas from the Contract Area shall be owned by the parties as provided in the Operating Agreement; provided nothing contained in this agreement shall be deemed an assignment or cross-assignment of interests covered hereby.

E.  Each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area as provided in the Operating Agreement.

F.  **Subject to the terms of the Operating Agreement,** ~~An~~ **an** overriding royalty, production payment, net profits interest or other burden payable out of production hereafter created, assignments of production given as security for the payment of money and those overriding royalties, production payments and other burdens payable out of production heretofore created and defined as Subsequently Created Interests in the Operating Agreement shall be (i) borne solely by the party whose interest is burdened therewith, (ii) subject to suspension if a party is required to assign or relinquish to another party an interest which is subject to such burden, and (iii) subject to the lien and security interest hereinafter provided if the party subject to such burden fails to pay its share of expenses chargeable

AAPL – FORM 610RS - 1989

hereunder and under the Operating Agreement, all upon the terms and provisions and in the times and manner provided by the Operating Agreement.

G.  The Oil and Gas Leases and/or Oil and Gas Interests which are subject hereto may not be assigned or transferred except in accordance with those terms, provisions and restrictions in the Operating Agreement regulating such transfers.

This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective heirs, devisees, legal representatives, and assigns, and the terms hereof **and thereof** shall be deemed to **burden, to** run with**, and to touch and concern,** the leases**, lands** or and interests included within the lease Contract Area.

H.  The parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-participation in subsequent operations, all in accordance with the terms and provisions of the Operating Agreement.

I.  The rights and obligations of the parties and the adjustment of interests among them in the event of a failure or loss of title, each party's right to propose operations, obligations with respect to participation in operations on the Contract Area and the consequences of a failure to participate in operations, the rights and obligations of the parties regarding the marketing of production, and the rights and remedies of the parties for failure to comply with financial obligations shall be as provided in the Operating Agreement.

J.  Each party's interest under this agreement and under the Operating Agreement shall be subject to relinquishment for its failure to participate in subsequent operations and each party's share of production and costs shall be reallocated on the basis of such relinquishment, all upon the terms and provisions provided in the Operating Agreement.

K.  All other matters with respect to exploration and development of the Contract Area and the ownership and transfer of the Oil and Gas Leases and/or Oil and Gas Interest therein shall be governed by the terms and provisions of the Operating Agreement.

3.  The parties hereby grant reciprocal liens and security interests as follows:

A.  Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement and the Operating Agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid under this agreement and the Operating Agreement, the assignment or relinquishment of interest in Oil and Gas Leases as required under this agreement and the Operating Agreement, and the proper performance of operations under this agreement and the Operating Agreement. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement and the Operating Agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from the sale of production at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

B.  ~~Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement and the Operating Agreement by, through or under such party.~~ All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement and the Operating Agreement **after the date of such agreements**, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by the Operating Agreement and this instrument as to all obligations attributable to such interest under this agreement and the Operating Agreement whether or not such obligations arise before or after such interest is acquired. **For clarity, the Oil and Gas Interests and / or Oil and Gas Leases of Non-Operator are subject to pre-existing secured first liens with their respective credit facility or other funded debt providers, and nothing herein shall affect the respective lenders' rights or priority thereunder.**

C.  To the extent that the parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interest or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest, has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

D.  If any party fails to pay its share of expenses within one hundred-twenty (120) days after rendition of a statement therefor by Operator the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in this paragraph 3 and in the Operating Agreement, and each paying party may independently pursue any remedy available under the Operating Agreement or otherwise.

E.  If any party does not perform all of its obligations under this agreement or the Operating Agreement, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement or the Operating Agreement, to the extent allowed by governing ~~law~~**Law**, the defaulting party waives any available right of redemption from and after the date of

- 2 -

AAPL – FORM 610RS - 1989

judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law**Law**, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder or under the Operating Agreement, such power to be exercised in the manner provided by applicable law **Law** or otherwise in a commercially reasonable manner and upon reasonable notice.

F.   The lien and security interest granted in this paragraph 3 supplements identical rights granted under the Operating Agreement.

G.   To the extent permitted by applicable law**Law**, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law **Law** of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due under this agreement and the Operating Agreement for services performed or materials supplied by Operator.

H.   The above described security will be financed at the wellhead of the well or wells located on the Contract Area and this Recording Supplement may be filed in the land records in the County or Parish in which the Contract Area is located, and as a financing statement in all recording offices required under the Uniform Commercial Code or other applicable state statutes to perfect the above-described security interest, and any party hereto may file a continuation statement as necessary under the Uniform Commercial Code, or other state laws**Law**.

4.   This agreement shall be effective as of the date of the Operating Agreement as above recited. Upon termination of this agreement and the Operating Agreement and the satisfaction of all obligations thereunder, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon the request of Operator, if Operator **and Non-Operator** has **have** complied with all of its financial obligations.

5.   This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns. No sale, encumbrance, transfer or other disposition shall be made by any party of any interest in the Leases or Interests subject hereto except as expressly permitted under the Operating Agreement and, if permitted, shall be made expressly subject to this agreement and the Operating Agreement and without prejudice to the rights of the other parties. If the transfer is permitted, the assignee of an ownership interest in any Oil and Gas Lease shall be deemed a party to this agreement and the Operating Agreement as to the interest assigned from and after the effective date of the transfer of ownership, **subject to the terms and conditions of the Operating Agreement**; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. **Subject to the terms and conditions of the Operating Agreement, No** **no** assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party under this agreement or the Operating Agreement with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted under this agreement and the Operating Agreement in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. of the Operating Agreement and hereby shall continue to burden the interest transferred to secure payment of any such obligations.

6.   In the event of a conflict between the terms and provisions of this agreement and the terms and provisions of the Operating Agreement, then, as between the parties, the terms and provisions of the Operating Agreement shall control.

7.   This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. In the event that any provision herein is illegal or unenforceable, the remaining provisions shall not be affected, and shall be enforced as if the illegal or unenforceable provision did not appear herein. **Capitalized terms used but not defined herein have the meanings set forth in the Operating Agreement.**

**8.   Other Provisions.**

**Subject to the terms of the Operating Agreement, Operator shall conduct all operations within the Contract Area in accordance with the terms of the Leases included within the Contract Area, and Operator shall comply with the terms of the Leases with respect to the ownership and operation of each of the Leases, including all express and implied covenants thereunder. This covenant is a covenant in addition to, and separate and independent of, the covenants described in Article V.A of the Operating Agreement and will be deemed to be a covenant touching, concerning, burdening, and running with the land.**

**The parties hereby acknowledge that the Contract Area is subject to and governed by existing operating agreements ("Existing JOAs"), including Existing JOAs to which Third Parties are parties. The parties agree that the terms of each such Existing JOA shall continue to govern with respect to the portion of the Contract Area covered thereby; provided, however, as between the parties, the terms of the Operating Agreement (including in the event of any conflict or inconsistency between the terms of the Operating Agreement and an Existing JOA) will apply to the greatest extent practicable. No party shall, with respect to any of the Contract Area, enter into a new, or amend any existing, operating agreement with any Third Party that would, in effect, circumvent the spirit and intent of the Operating Agreement.**

**As used herein, "Ageron Contract Area" means the wellbores of the following Wells and, to the extent and INSOFAR AND ONLY INSOFAR attributable thereto, the related Wellbore Lease Rights, in each case, included in the Contract Area as further described on Exhibits "A", "A-1", and "A-2": (i) AI San Roman 101H (API No. 42-479-44505) and (ii) AI San Roman 102H (API No. 42-479-44506), each located in Webb County, Texas.**

**As used herein, "Contract Area" has the meaning set forth above in the preamble, and means, with respect to AGERON IRONROC ENERGY, LLC, solely the Ageron Contract Area, and with respect to IRONROC ENERGY PARTNERS LLC, solely the other portions of the Contract Area.**

- 3 -

AAPL – FORM 610RS - 1989

**As used herein, "Operator" shall mean, severally, AGERON IRONROC ENERGY, LLC solely with respect to the Ageron Contract Area, and IRONROC ENERGY PARTNERS LLC solely with respect to the other portions of the Contract Area.**

8.    Other provisions.

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model  Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles _____, have been made to the form.~~

IN WITNESS WHEREOF, this agreement shall be effective as of the ___12th___ day of ___September___ , ___2022___ .

**OPERATOR**

ATTEST OR WITNESS

            **Ironroc Energy Partners LLC**

By:  **Craig Perry**

            **Type or Print Name**
Title:  **Chief Executive Officer**
Date:
Address:

ATTEST OR WITNESS

            **Ageron Ironroc Energy, LLC**

**By:**  **Michael W. McCoy**

            **Type or Print Name**
**Title:**  **Chief Executive Officer**
**Date:**
**Address:**

**NON-OPERATORS**

ATTEST OR WITNESS

            **Alpine Summit Funding LLC**

By:  **Craig Perry**

            **Type or Print Name**
Title:  **President and Chief Executive Officer**
Date:
Address:

~~ATTEST OR WITNESS~~

~~By:~~

            **Type or Print Name**
~~Title:~~
~~Date:~~
~~Address:~~

~~ATTEST OR WITNESS~~

~~By:~~

            **Type or Print Name**
~~Title:~~
~~Date:~~
~~Address:~~

–4–

**ACKNOWLEDGMENTS**

~~**NOTE:**~~

~~The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.~~

~~**Individual Acknowledgment**~~

~~State of _____ §~~

~~_____ § ss.~~

~~County of _____ §~~

~~This instrument was acknowledged before me on _____~~

~~by _____~~

~~(Seal, if any)                                        _____~~

~~_____                            Title (and Rank) _____~~

~~_____                            My commission expires: _____~~

~~**Acknowledgment in Representative Capacity**~~

State of _____ §

§ ss.

County of _____ §

This instrument was acknowledged before me on __**September**____, **2022**_____

by __**Craig Perry**_____ as **Chief Executive Officer**_____ of

**Ironroc Energy Partners LLC**_____.

(Seal, if any)                                        _____

Title (and Rank) _____

My commission expires: _____

State of _____ §

§ ss.

County of _____ §

    This instrument was acknowledged before me on ___September___, 2022 _____

by ___Michael W. McCoy_____ as **Chief Executive Officer**_____ of

**Ageron Ironroc Energy, LLC**_____.

**(Seal, if any)**                                                        _____

                                                   **Title (and Rank)** _____

                                                   **My commission expires:** _____

State of _____ §

§ ss.

County of _____ §

    This instrument was acknowledged before me on ___September___, 2022 _____

by ___Craig Perry_____ as **President and Chief Executive Officer**_____ of

**Alpine Summit Funding LLC**_____.

**(Seal, if any)**                                                        _____

                                                   **Title (and Rank)** _____

                                                   **My commission expires:** _____