*Execution Version*

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

## OF

## ALPINE SUMMIT FUNDING LLC

This Amended and Restated Limited Liability Company Agreement (together with the schedules attached hereto, this "*Agreement*") of ALPINE SUMMIT FUNDING LLC, a Delaware limited liability company (the "*Company*"), is entered into as of April 29, 2022 by ALPINE SUMMIT FUNDING HOLDINGS LLC, a Delaware limited liability company, as sole equity member (the "*Member*"), and Orlando C. Figueroa, as the Independent Manager (as defined on <u>Schedule A</u> hereto) and as the potential Special Member (as defined on <u>Schedule A</u> hereto) (together with the Member, the "*Parties*"). Capitalized terms used and not otherwise defined herein have the meanings set forth on <u>Schedule A</u> hereto or, if not defined therein, shall have the respective meanings assigned to them in the Indenture.

WHEREAS, the Company was formed pursuant to and in accordance with the Delaware Limited Liability Company Act, Title 6 of the Delaware Code, Section 18-101 *et seq.*, as amended from time to time (the "*Act*"), by (i) the filing of the Certificate of Formation of the Company with the Secretary of State of the State of Delaware on April 7, 2022, and (ii) the Limited Liability Company Agreement of the Company, dated as of April 7, 2022 (the "*Original LLC Agreement*"), entered into by the Member;

WHEREAS, the Parties desire to amend and restate the Original LLC Agreement in its entirety in the manner set forth herein; and

WHEREAS, all conditions under the Original LLC Agreement to amend and restate the Original LLC Agreement in the manner set forth herein have been satisfied and the Parties hereto are authorized to adopt this Agreement without the consent of any other Person.

NOW THEREFORE, the parties hereto, by execution of this Agreement, hereby continue the Company without dissolution as a limited liability company pursuant to and in accordance with the Act, and amend and restate the Original LLC Agreement in its entirety as follows:

1.    **Name**.  The name of the limited liability company is: Alpine Summit Funding LLC.

2.    **Principal Place of Business**.  The principal place of business of the Company shall be located at 3322 West End Avenue, Suite 450, Nashville, TN 37203, or such other location as may hereafter be determined by the Member.

3.    **Term**.  The term of the Company shall be perpetual unless the Company is dissolved, wound up and terminated in accordance with this Agreement and the Act. The Company will continue its existence as a separate legal entity until cancellation of the Certificate of Formation in accordance with the Act.

4.    **Purpose**.  Subject to the limitations on the Company's activities set forth in <u>Section 15</u> below, the Company is formed for the following purposes:

**EXHIBIT**

**4**

(a)     to acquire, hold, manage, dispose of, and otherwise deal with, the Wells;

(b)     to issue Notes from time to time under and subject to the conditions of the Indenture, to pledge its interest in the Wells and other Collateral under the terms of the Indenture to secure the Notes and to perform activities that are necessary, suitable or convenient to accomplish those purposes, including without limitation, the following:

   i.    to execute, deliver and perform the Basic Documents, including, but not limited to, one or more purchase agreements, management agreements, joint operating agreements, depository agreements, note purchase agreements, back-up management agreements, custodial agreements, bailment agreements, paying agency agreements, investment agreements, hedging agreements, and such other documents relating to the transactions contemplated by the Indenture;

   ii.   to execute, deliver and perform all other documents, certificates, instruments and agreements that are provided to it and are contemplated by the Basic Documents to be executed, delivered and performed by the Company;

   iii.  to deposit and apply the proceeds of the sale of the Notes;

   iv.   to assign, grant, transfer, pledge, mortgage and convey all or any portion of the Collateral pursuant to the Indenture and to hold, manage and distribute to the Member pursuant to the terms of this Agreement any proceeds released from the lien of, and remitted to the Company pursuant to, the Indenture;

   v.    to execute, deliver and perform assignments and assumptions with respect to certain rights and responsibilities under the Basic Documents;

   vi.   to take whatever action shall be required to be taken by the Company by the terms of, and to exercise its rights and perform its duties under, each of the documents referred to above as set forth therein;

   vii.  take, or cause to be taken, all actions deemed necessary or appropriate by the Member in connection with an offering, issuance and sale of the Notes or other securities to be issued by the Company, including, without limitation (a) the preparation, execution, delivery and filing with any required regulatory entities of an offering document for the Notes or other securities of the Company and any and all applications or other appropriate requests for qualification of the Notes or other securities of the Company and amendments thereto under applicable State Blue Sky Laws and (b) filing, providing or authorizing the filing or provision of such other documents and information with all governmental, regulatory and rating agencies as deemed necessary or appropriate by the Member in connection with such offer, issuance and

sale, and (c) the filing of periodic reports therewith as deemed necessary or appropriate by the Member;

viii.    take such other actions as are specified herein or are incidental to the foregoing;

ix.    to take any and all other actions necessary to maintain the existence of the Company as a limited liability company in good standing under the laws of the State of Delaware or to qualify the Company to do business as a foreign limited liability company in any other state or jurisdiction in which such qualification is required and to obtain and maintain any licenses, permits, approvals or consents necessary, advisable or convenient to the conduct of its business in any such jurisdiction; and

x.    to engage in any other lawful act or activity as a limited liability company and to exercise any powers permitted to a limited liability company under the Act, in each case, to the extent related or incidental to, or necessary, convenient or advisable for, the accomplishment of the purposes listed in clauses (i) through (ix) above.

5.    **Registered Agent and Registered Office**.  The address of the registered office of the Company in the State of Delaware is c/o Cogency Global Inc., 850 New Burton Road, Suite 201, County of Kent, Dover, DE 19904.  The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware are Cogency Global Inc., 850 New Burton Road, Suite 201, County of Kent, Dover, DE 19904.

6.    **Member**.  The mailing address of the Member is set forth on Schedule B attached hereto.  The Member hereby continues as a member of the Company upon execution of a counterpart signature page to this Agreement.  Subject to Section 15, the Member may act by written consent.

7.    **Powers; Management; Officers**.

(a)    Subject to Section 15, the Company, and the Member and the Officers on behalf of the Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 4 and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

(b)    Subject to Section 15, the business and affairs of the Company shall be managed by the Member.  The Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members of a limited liability company under the laws of the State of Delaware.  To the extent of its powers set forth in this Agreement and subject to Section 15, the Member is an agent of the Company for the purpose of the Company's business, and the actions of the Member taken in accordance with such powers set forth in this Agreement shall bind the Company.  Subject to Section 16, the Member may determine at any time in its sole and absolute discretion the number of Independent Managers.  The initial number of Independent

3

Managers shall be one. The initial Independent Manager designated by the Member is Orlando C. Figueroa.

(c)     The Company is hereby authorized to execute, deliver and perform, and the Member or any Officer, acting alone, on behalf of the Company, is hereby authorized to execute and deliver, the Basic Documents and all documents, agreements, certificates, or financing statements contemplated thereby or related thereto and any amendments thereto, all without any further act, vote or approval of any Member, Officer or other Person notwithstanding any other provision of this Agreement. The foregoing authorization shall not be deemed a restriction on the powers of the Member or any Officer to enter into other agreements on behalf of the Company. The execution, delivery and performance by the Company, and the execution and delivery by the Member or any Officer on behalf of the Company, of any of the Basic Documents prior to the date hereof is hereby ratified, approved and confirmed in all respects.

(d)     The Member may, from time to time as it deems advisable, select natural persons who are employees or agents of the Company and designate them as officers of the Company (the "*Officers*") and assign any titles to such persons (including, without limitation, President, Vice President, Secretary, and Treasurer). Unless the Member decides otherwise, if the title assigned to an Officer is one commonly used for officers of a business corporation formed under the General Corporation Law of the State of Delaware, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Subject to Section 15, the Member may delegate to any Officer any of the Member's powers under this Agreement, including, without limitation, the power to bind the Company. Any delegation pursuant to this Section 7(d) may be revoked at any time by the Member. An Officer may be removed with or without cause at any time by the Member. Notwithstanding any provision of this Agreement, any Officer's Certificate contemplated to be executed and delivered by the Company pursuant to the Basic Documents may be executed and delivered on behalf of the Company by any officer of the Manager or any Officer of the Company. The Officers designated by the Member on the date hereof are listed on Schedule C hereto. The Company shall be operated by the Member (subject to the consent of the Independent Manager in certain circumstances as expressly provided for herein) in such a manner as the Member together with the Independent Manager, if applicable, deem reasonable and necessary or appropriate to preserve the limited liability of the Member, the separateness of the Company from the business and affairs of the Member or any Affiliate of the Member, and so long as the Notes or the Hedge Agreements are outstanding and for a period of one year and one day after the Indenture Termination Date, the special purpose, bankruptcy remote status of the Company.

8.     **Capital Contributions**. The Member has contributed capital to the Company of an agreed value as reflected by the Member's capital account and the books and records of the Company. In accordance with Section 12(b), a Special Member shall not be required to make any capital contributions to the Company.

9.     **Additional Contributions**. Notwithstanding any provision of this Agreement (including, without limitation, Section 15), the Member is not required to make any additional capital contribution to the Company. However, the Member may make additional capital contributions to the Company at any time upon the written consent of such Member. To the extent that the Member makes an additional capital contribution to the Company, the Member shall revise

4

the books and records of the Company to reflect such additional capital contribution. Except as provided in Section 25, the provisions of this Agreement, including this Section 9, are intended to benefit the Member and the Special Member and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Company (other than a Covered Person) (and, no such creditor of the Company shall be a third-party beneficiary of this Agreement) and the Member and the Special Member shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

10. **Allocation of Profits and Losses**.  The Company's profits and losses shall be allocated to the Member.

11. **Distributions**.  Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or any other applicable law or any Basic Document.

12. **Resignation of a Member; Special Member.**

(a)      So long as the Notes or the Hedge Agreements are outstanding and for a period of one year and one day after the Indenture Termination Date, the Member may not resign, except as (i) permitted under the Basic Documents and (ii) with the prior written consent of the Majority Noteholders, unless, in the case of this clause (ii) the Company shall cause an Opinion of Counsel to be delivered to the Indenture Trustee and the Noteholders stating that such resignation (A) will not cause the Company to become a corporation or another entity taxable as a corporation for U.S. federal income tax purposes, (B) will not result in a significant modification of the Notes under Section 1.1001-3 of the Regulations, and (C) will not cause the Notes that were characterized as indebtedness at issuance to be treated as other than indebtedness for U.S. federal income tax purposes; *provided* that the Opinion of Counsel will be subject to the same conditions, exclusions and limitations as any Opinion of Counsel with respect to such matters given upon the issuance of the Notes.  If the Member is permitted to resign pursuant to this Section 12(a), an additional member of the Company shall be admitted to the Company, subject to Section 13, upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. Such admission shall be deemed effective immediately prior to the resignation and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

(b)      Upon the occurrence of any event that causes the Member to cease to be a member of the Company (other than upon continuation of the Company without dissolution upon (i) an assignment by the Member of all of its Membership Interest in the Company and the admission of the transferee pursuant to Sections 13 and 19, or (ii) the resignation of the Member and the admission of an additional member of the Company pursuant to Sections 12(a) and 13), each Person acting as an Independent Manager pursuant to Section 16 shall, without any action of any Person and simultaneously with the Member ceasing to be a member of the Company, automatically be admitted to the Company as a Special Member and shall continue the Company without dissolution.  No Special Member may resign from the Company or transfer its rights as a

Special Member unless (i) a successor Special Member has been admitted to the Company as a Special Member by executing a counterpart to this Agreement, and (ii) such successor has also accepted its appointment as an Independent Manager pursuant to <u>Section 16</u>; *provided*, however, a Special Member shall automatically cease to be a member of the Company upon the admission to the Company of a substitute Member.  A Special Member shall be a member of the Company that has no interest in the profits, losses and capital of the Company and has no right to receive any distributions of Company assets.  Pursuant to Section 18-301 of the Act, a Special Member shall not be required to make any capital contributions to the Company and shall not receive a Membership Interest in the Company.  A Special Member, in its capacity as Special Member, may not bind the Company.  Except as required by any mandatory provision of the Act, a Special Member, solely in its capacity as Special Member (and not in its capacity as an Independent Manager), shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the Company, including, without limitation, the merger, consolidation or conversion of the Company.  In order to implement the admission to the Company of each Special Member, each Person acting as an Independent Manager pursuant to <u>Section 16</u> shall execute a counterpart to this Agreement. Prior to its admission to the Company as a Special Member, any Person acting as an Independent Manager pursuant to <u>Section 16</u> shall not be a member of the Company.

       13.    **Admission of Additional Members**.

       (a)    Subject to <u>Section 24</u>, so long as the Notes or the Hedge Agreements are outstanding and for a period of one year and one day after the Indenture Termination Date, no additional Member may be admitted to the Company pursuant to <u>Section 12(a)</u>, this <u>Section 13</u> or <u>Section 19</u>  or by merger or consolidation except with the prior written consent of the Majority Noteholders, unless, the Company shall cause an Opinion of Counsel to be delivered to the Indenture Trustee and the Noteholders stating that such admission (a) will not cause the Company to become a corporation or another entity taxable as a corporation for U.S. federal income tax purposes, (b) will not result in a significant modification of the Notes under Section 1.1001-3 of the Regulations, and (c) will not cause the Notes that were characterized as indebtedness at issuance to be treated as other than indebtedness for U.S. federal income tax purposes; *provided*, that the Opinion of Counsel will be subject to the same conditions, exclusions and limitations as any Opinion of Counsel with respect to such matters given upon the issuance of the Notes.

       (b)    Notwithstanding anything to the contrary contained in this Agreement, including without limitation, <u>Sections 13(a)</u>, <u>19</u> and <u>24</u>, and without the need for any act or consent of any Person, (i) the Member is hereby authorized to execute, deliver and perform the Holdings Pledge Agreement and to pledge, grant one or more security interests in, or otherwise encumber its Memberships Interests as contemplated by the Holdings Pledge Agreement, and (ii) the execution, delivery and performance of the Holdings Pledge Agreement by the Member (including any transfer thereunder) shall not be considered a violation of any provision of this Agreement. Notwithstanding anything to the contrary in this Agreement, including without limitation <u>Sections 13(a)</u>, <u>19</u> and <u>24</u>, upon a foreclosure, sale or other transfer of the Membership Interests pursuant to the Holdings Pledge Agreement, (i) the Person acquiring such Membership Interests shall, if it executes and delivers a counterpart to this Agreement, automatically be admitted as member of the Company effective as of such foreclosure, sale or other transfer, with all of the rights and obligations of the Member hereunder, (ii) the transferring Member shall thereafter cease to be a member of the Company, and (iii) the Company shall be continued without dissolution.  The

Company acknowledges that the pledge of the Membership Interests made by the Member in connection with the Holdings Pledge Agreement shall be a pledge not only of profits and losses of the Company, but also a pledge of all rights and obligations of the Member.  Following a foreclosure, sale or other transfer of the Membership Interests in the Company pursuant to the Holdings Pledge Agreement, the successor member may transfer its interests in the Company, subject to this Section 13 and Sections 19 and 24.  Notwithstanding any provision in the Act or any other provision contained herein to the contrary, the Member shall be permitted to pledge and, upon any foreclosure of such pledge in connection with the admission of the Indenture Trustee or its designee as the member, to transfer to the Indenture Trustee or its designee the Member's rights and powers to manage and control the affairs of the Company pursuant to the terms of the Holdings Pledge Agreement.  Upon the exercise of its rights under the Holdings Pledge Agreement, the Indenture Trustee or its designee shall have, among its other powers, the right to appoint and remove an Independent Manager pursuant to the terms of Section 16 herein.

14.    **Limited Liability; Exculpation; Indemnification**.

(a)    Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and neither the Member nor any Special Member nor any Independent Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member, Special Member or Independent Manager of the Company.

(b)    To the fullest extent permitted by applicable law, neither the Member nor any Special Member nor any Officer nor any Independent Manager nor any officer, director, employee, representative, agent or Affiliate of the foregoing (collectively, the "Covered Persons") shall be liable to the Company or any other Person who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

(c)    To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 14 by the Company shall be provided out of and to the extent of Company assets only, and the Member and the Special Member shall not have personal liability on account thereof; and provided further, that so long as the Notes or the Hedge Agreements are outstanding and for a period of one year and one day after the Indenture Termination Date, no indemnity payment from funds of the Company (as distinct from funds from other sources, such as insurance) of any indemnity under

this <u>Section 14</u> shall be payable from amounts allocable to any other Person pursuant to the Basic Documents.

(d)     To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this <u>Section 14</u>.

(e)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Member might properly be paid.

(f)     The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Covered Person to the Company or its members otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

(g)     Notwithstanding the foregoing provisions, so long as the Notes or the Hedge Agreements are outstanding and until one year and one day after the Indenture Termination Date, any obligation to provide indemnification set forth herein shall be fully subordinate to the indebtedness, liabilities and obligations of the Company under or in connection with this Agreement, the other Basic Documents or any related document in effect as of any date of determination, and, to the fullest extent permitted by law, shall not constitute a claim against the Company in the event that the Company's assets are insufficient to pay all its obligations to creditors.

(h)     The foregoing provisions of this <u>Section 14</u> shall survive any termination of this Agreement.

15.     **Limitations on the Company's Activities**.

    (a) This <u>Section 15</u> is being adopted in order to comply with certain provisions required in order to qualify the Company as a "***special purpose entity.***"

    (b) For so long as the Notes or the Hedge Agreements are outstanding and for a period of one year and one day after the Indenture Termination Date, the Member shall not amend, alter, change or repeal the definitions of "Independent Manager," "Material Action" or <u>Sections 1</u>, <u>2</u>, <u>3</u>, <u>4</u>, <u>6</u>, <u>7</u>, <u>8</u>, <u>9</u>, <u>10</u>, <u>11</u>, <u>12</u>, <u>13</u>, <u>14</u>, <u>15</u>, <u>16</u>, <u>17</u>, <u>18</u>, <u>19</u>, <u>20</u>, <u>21</u>, <u>22</u>, <u>23</u>, <u>25</u> or <u>30</u> or <u>Schedule A</u> of this Agreement (to the extent that the terms defined in <u>Schedule A</u> are used in any of the foregoing sections) (the "***Special Purpose Provisions***"), or any other provision of this or any other document governing the

8

formation, management or operation of the Company in a manner that is inconsistent with any of the Special Purpose Provisions, without the prior written consent of the Independent Manager and the Majority Noteholders. Subject to this Section 15(b), the Member reserves the right to amend, alter, change or repeal any provisions contained in this Agreement in accordance with Section 22.

(c) For so long as the Notes or the Hedge Agreements are outstanding and for a period of one year and one day after the Indenture Termination Date, other than to the Indenture Trustee as contemplated in the Basic Documents, the Member shall not grant a security interest in its Membership Interest in the Company without the prior written consent of the Majority Noteholders.

(d) For so long as the Notes or the Hedge Agreements are outstanding and for a period of one year and one day after the Indenture Termination Date, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises. For so long as the Notes or the Hedge Agreements are outstanding and for a period of one year and one day after the Indenture Termination Date, the Company covenants that:

    i. the Company shall pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses and any compensation due to the Independent Manager or the Member) from its assets as the same shall become due and payable, except for expenses paid on its behalf pursuant to the Basic Documents or arm's length contractual arrangements providing for operating, maintenance or administrative services;

    ii. the Company shall observe all limited liability company, corporate, or organizational formalities, maintain books, records, financial statements and bank accounts separate from those of its Affiliates, except as permitted by the Indenture and the other Basic Documents, and the Company's assets shall not be listed as assets on the financial statement of any other entity except as required by the applicable Accounting Standard (as defined in the Indenture); provided, however, that appropriate notation shall be made on any consolidated statements to indicate its separateness from any Affiliates and to indicate that its assets and credit are not available to satisfy the debt and other obligations of such Affiliate or any other Person except as otherwise contemplated by the Basic Documents;

    iii. the Company shall be, and at all times shall hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate);

iv.  the Company shall hold all of its assets in its own name and shall not commingle its funds and other assets with those of any Affiliate, other than as expressly required or contemplated by the Basic Documents;

v.  the Company shall not conduct the business of or act on behalf of any other Person (except as required by the Basic Documents);

vi.  the Company shall be, and at times shall hold itself out to the public and all other Persons as, a legal entity separate and distinct from any other Person (including any Affiliate), correct any known misunderstanding regarding its status as a separate entity, conduct business solely in its own name, and not identify itself as a division of any of its Affiliates or any of its Affiliates as a division of the Company (except for income tax purposes), and the Company shall conduct and operate its business in its own name;

vii.  the Company shall not permit its name to be used by any Affiliate of the Company in the conduct of such Affiliate's business and shall not use the name of any Affiliate in the conduct of the Company's business;

viii.  the Company shall file its own tax returns, if any, as may be required under applicable law, to the extent (i) not part of a consolidated group filing a consolidated return or returns or (ii) not treated as a division for tax purposes of another taxpayer, and pay any taxes required to be paid under applicable law;

ix.  the Company shall maintain its assets, including the Collateral, in such a manner that it would not be costly or difficult to identify, segregate or ascertain its assets from those of any other Person;

x.  except as contemplated by the Basic Documents, the Company shall maintain an arm's length relationship with its Affiliates, and not enter into any transaction with any Affiliate unless such transaction is (i) on such terms and conditions (including terms relating to amounts paid thereunder) as would be generally available if such business transaction were with an entity that was not an Affiliate in comparable transactions, and (ii) pursuant to enforceable agreements;

xi.  the Company shall not hold out its credit or assets as being available to satisfy the obligations of others nor guarantee the obligation of any Person;

xii.  the Company shall maintain adequate capital in light of its contemplated business purpose, transactions, and liabilities (provided, however, the foregoing shall not require any member of

the Company to have any obligation to make any contribution of capital to the Company);

xiii. the Company shall not grant a security interest in any of its assets to secure the obligations of any other Person;

xiv. the Company shall not, directly or indirectly, engage in any business or activity other than the actions that are both (i) required or permitted to be performed under Section 4 of this Agreement and (ii) permitted or contemplated by the terms of the Basic Documents;

xv. the Company shall not incur any indebtedness, liability, obligation, or expense, or own any assets, other than in each case those that are both (i) necessary to achieve the purposes set forth in Section 4 of this Agreement and (ii) permitted or contemplated by the Basic Documents;

xvi. the Company shall not make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any Person, other than as permitted by the Basic Documents;

xvii. the Company shall maintain complete records of all transactions (including all transactions with any Affiliate);

xviii. the Company shall comply in all material respects with all requirements of applicable law regarding its operations and shall comply in all material respects with the provisions of the Indenture and its organizational documents (including, without limitation, the Special Purpose Provisions);

xix. the Company shall not form, acquire, or hold any subsidiary;

xx. the Company shall use separate stationery, invoices and checks bearing the Company's name; and

xxi. the Company shall comply in all material respects with each of the assumptions made with respect to it in any non-consolidation opinion, and the certifications contained in any certificate referred to therein, delivered by counsel in connection with the transactions contemplated by the Basic Documents.

(e) Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, the Member, any Officer or any other Person, so long as the Notes or the Hedge Agreements are outstanding and for a period of one year and one day after the Indenture Termination Date, neither the Member nor any Officer nor any other Person shall be authorized or empowered on behalf of the Company to, nor shall they permit the Company to, and the Company shall not, without the prior

written consent of the Independent Manager, take any Material Action, provided, however, that, so long as the Notes or the Hedge Agreements are outstanding and for a period of one year and one day after the Indenture Termination Date, the Member may not authorize the taking of any Material Action, unless there is at least one Independent Manager then serving in such capacity and such Independent Manager has consented to such action.

16.    **Independent Manager**.  For so long as the Notes or the Hedge Agreements are outstanding and until one year and one day after the Indenture Termination Date, the Member shall cause the Company at all times to have at least one (1) Independent Manager who will be appointed by, and, subject to this Section 16, may be removed by, the Member. An Independent Manager is a "manager" of the Company within the meaning of the Act; however, all right, power and authority of an Independent Manager shall be limited to the extent necessary to exercise those rights and perform those duties specifically set forth in this Agreement and an Independent Manager shall otherwise have no authority to bind the Company. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any duty otherwise existing at law or in equity, the Independent Manager shall consider only the interests of the Company, including its respective creditors, in acting or otherwise voting on the matters referred to in Section 15. No Independent Manager shall at any time serve as trustee in bankruptcy for any Affiliate of the Company.  So long as the Notes or the Hedge Agreements are outstanding and until one year and one day after the Indenture Termination Date, no Independent Manager may be removed or replaced without Cause and unless the Company provides the Indenture Trustee, each Noteholder and each Hedge Counterparty with no less than three (3) days' prior written notice of (a) any proposed removal of an Independent Manager, together with a statement as to the reasons for such removal, and (b) the identity of the proposed replacement Independent Manager, together with a certification that such replacement satisfies the requirements set forth in this Agreement for an Independent Manager.  No resignation or removal of an Independent Manager, and no appointment of a successor Independent Manager, shall be effective until the successor Independent Manager shall have executed a counterpart to this Agreement. In the event of death, incapacity or other termination of an Independent Manager or any other vacancy in the position of an Independent Manager, the Member shall, as soon as practicable, appoint a successor Independent Manager. At such time as the Notes or the Hedge Agreements are no longer outstanding and it is one year and one day after the Indenture Termination Date, any provision of Section 15 or otherwise herein requiring the consent of the Independent Manager shall no longer be effective.

17.    **Books and Records; Fiscal Year; Accounting**.  The Member shall maintain complete and accurate books and records of the Company's business and affairs as required by the Act. The Member and its duly authorized representatives shall have complete access to all books and records of the Company at the Company's principal office during normal business hours. The Company's fiscal year shall be the calendar year.  The Company's books of account shall be kept using the method of accounting determined by the Member.

18.    **Reports**. The Member shall, after the end of each fiscal year, use reasonable efforts to cause the Company's independent accountants, if any, to prepare and transmit to the Member as promptly as possible any such tax information as may be reasonably necessary to enable the Member to prepare its federal, state and local income tax returns relating to such fiscal year.

19.    **Assignments**.  Subject to <u>Section 24</u>, so long as the Notes or the Hedge Agreements are outstanding and until one year and one day after the Indenture Termination Date, the Member may not assign in whole or in part its Membership Interests in the Company without the prior written consent of the Majority Noteholders.  Subject to <u>Section 13</u>, the transferee of a Membership Interest in the Company shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.  If the Member transfers all of its Membership Interests in the Company pursuant to this <u>Section 19</u>, such admission shall be deemed effective immediately prior to the transfer and, immediately following such admission, the transferor Member shall cease to be a member of the Company. Notwithstanding anything in this Agreement to the contrary (other than <u>Section 13</u>), any successor to the Member by merger or consolidation in compliance with the Basic Documents shall, without further act, be the Member hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Company shall continue without dissolution. To the fullest extent permitted by law, any purported transfer of a Membership Interest not in accordance with this <u>Section 19</u> shall be null and void and shall not be given effect for any purpose whatsoever.

20.    **Waiver of Partition; Nature of Interest**. Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each of the Member and the Special Member hereby irrevocably waives any right or power that such Person might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or, to the fullest extent permitted by applicable law, to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company. The Member shall not have any interest in any specific assets of the Company, and the Member shall not have the status of creditor with respect to any distribution pursuant to <u>Section 11</u> hereof. The interest of the Member in the Company is personal property.

21.    **Governing Law**.  This Agreement shall be governed by, and construed under, the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said law.

22.    **Amendment**.  Subject to the restrictions set forth in <u>Section 15(b)</u>, this Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Member.  Notwithstanding anything to the contrary in this Agreement, so long as the Notes or the Hedge Agreements are outstanding and until one year and one day after the Indenture Termination Date, the Member may not amend, modify or otherwise change any material provision of this Agreement without the prior written consent of the Majority Noteholders, unless the Company shall cause an Opinion of Counsel to be delivered to the Indenture Trustee and the Noteholders stating that such action (a) will not cause the Company to become a corporation or another entity taxable as a corporation for U.S. federal income tax purposes, (b) will not result in a significant modification of the Notes under Section 1.1001-3 of the Regulations, and (c) will not cause the Notes that were characterized as indebtedness at issuance to be treated as other than indebtedness for U.S. federal income tax purposes; *provided*, that the Opinion of Counsel will be subject to the same conditions, exclusions and limitations as

13

any Opinion of Counsel with respect to such matters given upon the issuance of the Notes. Notwithstanding the foregoing, the Member may amend, modify or otherwise change this Agreement to: (a) cure any ambiguity, (b) correct or supplement any provision in a manner consistent with the intent of this Agreement and the other Basic Documents or (c) otherwise amend, modify or change any immaterial provision of this Agreement, in each case, without obtaining the consent of the Majority Noteholders, but with delivery of an Officer's Certificate to the Indenture Trustee stating that such amendment is so permitted under one or more of the foregoing clauses (a)-(c) of this proviso.

23.    **Dissolution**.

(a)     Subject to Section 15, the Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following:  (i) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the business of the Company is continued in a manner permitted by this Agreement or the Act or (ii) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act. Upon the occurrence of any event that causes the last remaining member of the Company to cease to be a member of the Company or that causes the Member to cease to be a member of the Company (other than upon continuation of the Company without dissolution upon (i) an assignment by the Member of all of its Membership Interest in the Company and the admission of the transferee pursuant to Sections 13 and 19, or (ii) the resignation of the Member and the admission of an additional member of the Company pursuant to Sections 12(a) and 13), to the fullest extent permitted by law, the personal representative of such member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of such member in the Company.

(b)     Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member or a Special Member shall not cause the Member or a Special Member, respectively, to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(c)     Notwithstanding any other provision of this Agreement, each of the Member and the Special Member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of the Member or a Special Member, or the occurrence of an event that causes the Member or a Special Member to cease to be a member of the Company.

(d)     In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(e)     The Company shall terminate when (i) all of the assets of the Company (after payment of or due provision for all debts, liabilities and obligations of the Company as

described in paragraph (d) above and in Section 18-804 of the Act) shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.

24.   **Certain Tax Matters**.

(a)   It is the intention of the Parties hereto that, solely for purposes of federal income taxes, state and local income and franchise taxes, and any other taxes imposed on, measured by or based upon gross or net income, (i) if there is only one beneficial equity owner of the Company, the Company shall be treated as a disregarded entity separate from its owner pursuant to § 301.7701-2(c)(2) of the Regulations and (ii) if there is more than one beneficial equity owner of the Company (for example, either because the Membership Interests of the Member in the Company are treated as having more than one owner or a Note issued by the Company is not respected as debt for tax purposes), the Company shall be treated as a partnership, and that the provisions of this Agreement shall be construed in accordance with such intent.  The Parties hereto agree to take no action inconsistent with such treatment, unless required otherwise by applicable law.

(b)   The Parties hereto intend that the Notes issued by the Company be classified, and the Company shall treat the Notes, as debt for all tax purposes and not as equity or other beneficial interests in the Company.

(c)   If the Company is classified as a partnership pursuant to the Regulations promulgated under Section 7701 of the Code:  (i) all income, gain, loss and deduction of the Company shall be allocated among the partners thereof in accordance with each such partner's interest in the partnership as determined pursuant to the applicable Regulations; *provided* that this Agreement may be amended in accordance with Section 22 hereof to include provisions, if any, necessary to allow for such allocations to track as closely as possible the manner in which cash and other property are to be distributed to such partners under this Agreement, to the extent that such allocations have substantial economic effect under the applicable Regulations, (ii) such partners shall appoint a partnership representative for the partnership as such term is defined in Section 6223(a) of the Code (the "***Partnership Representative***") and (iii) in accordance with the Regulations, the partnership shall designate the Partnership Representative as the partnership representative of the partnership.  In the event that no Person qualified to be a partnership representative under the Regulations is appointed by the partners as the Partnership Representative, the Member shall be the Partnership Representative of the partnership.

(d)   The Partnership Representative shall, to the extent eligible, make the election under Section 6221(b) of the Code with respect to the Code and take any other action, such as disclosures and notifications, necessary to effectuate such election, and, if such election is not available, to the extent applicable, the Partnership Representative shall make the election under Section 6226(a) of the Code with respect to the Company and take any other action, such as filings, disclosures and notifications, necessary to effectuate such election.  Consistent with the foregoing, the Company and the members are each authorized, in their sole discretion, to make any available election related to Sections 6221 through 6241 of the Code and take any actions it deems necessary or appropriate to comply with the requirements of the Code and conduct the Company's affairs under Sections 6221 through 6241 of the Code.

(e)      The Parties hereto agree to take no action that would cause the Company to be treated, for federal income tax purposes, as an association or a publicly traded partnership taxable as a corporation.

(f)      The Membership Interests have not been and will not be registered under the Securities Act and will not be listed on any exchange.  No Membership Interest (or interest therein, including any related rights to interest in the capital or profits of the Company or the right to Company distributions) may be traded on or through an "established securities market" or a "secondary market" (or the substantial equivalent thereof), in each case within the meaning of § 1.7704-1 of the Regulations.  Subject to compliance by a transferee of a Membership Interest with the following sentence, the Member agrees that it will take no action that would cause the Company to be treated, for federal income tax purposes, as an association or a publicly traded partnership taxable as a corporation.  No transfer, sale, pledge or other disposition of a Membership Interest (including any interest therein, except as permitted in the following sentence) shall be made unless prior to such transfer, sale, pledge or other disposition, the Company shall have received from the transferee of such Membership Interest (i) a representation letter to the effect that such transferee is a United States person within the meaning of Section 7701(a)(30) of the Code and is not a "pass thru entity" referred to in Section 1(h)(10)(D), (E) or (F) of the Code or other flow through entity under § 1.7704-1(h) of the Regulations or (ii) (A) a representation letter to the effect that such a transferee is a United States person within the meaning of Section 7701(a)(30) of the Code and agrees that it will take no action that would cause the Company to be treated, for federal income tax purposes, as an association or a publicly traded partnership taxable as a corporation and (B) an Opinion of Counsel stating that such transfer, sale, pledge or other disposition will not cause the Company to be treated, for federal income tax purposes, as an association or a publicly traded partnership taxable as a corporation; and, to the fullest extent permitted by law, any purported transfer of a Membership Interest without compliance with either clause (i) or clause (ii) of this sentence shall be void and of no effect.  No Member shall enter into any financial instrument payments on which, or the value of which, is determined in whole or in part by reference to such Membership Interest, or the Company (including the amount of Company distributions on the Membership Interests, the value of the Company's assets, or the result of the Company's operations), or any contract that otherwise is described in § 1.7704-1(a)(2)(i)(B) of the Regulations, *provided*, that this sentence shall not preclude the entry into a financial instrument or contract that would otherwise be described in this sentence, to the extent that such financial instrument or contract is (i) treated as debt for U.S. federal income tax purposes and (ii) not convertible into or exchangeable for an interest in the capital or profits of the Company and does not provide for a payment of equivalent value.  By accepting and holding a Membership Interest, the holder thereof shall be deemed to have represented and warranted that it is not acquiring the Membership Interest by or for the account of any entity in violation of the above restrictions, and to have agreed that if such restrictions are violated, the holder will promptly dispose of the Membership Interest.

(g)      No transfer shall be effective if immediately after such transfer there would be more than ninety five (i) beneficial owners of the Membership Interests (or interests therein) and (ii) direct or indirect beneficial owners of an interest in any Notes (or interests therein) that are treated as equity in the Company for federal income tax purposes, as determined for purposes of § 1.7704-1(h) of the Regulations.  To the fullest extent permitted by law, any purported transfer

in violation of the provisions of this <u>subsection (g)</u> shall be of no force and effect, void ab initio, and not operate to transfer any rights to the transferee.

(h)    As long as any Note or Hedge Agreement is outstanding, the Company shall have a single Recognized Member.

25.    **Benefits of Agreement; No Third-Party Rights**.  Except for the Indenture Trustee with respect to the Special Purpose Provisions (so long as the Notes or the Hedge Agreements are outstanding and until one year and one day after the Indenture Termination Date), none of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or by any creditor of the Member or a Special Member, and nothing in this Agreement shall be deemed to create any right in any Person (other than Covered Persons) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person (other than Covered Persons).  The Indenture Trustee, for the benefit of each Secured Party, is entitled to rely on the representations and warranties of the Company and the Member in this Agreement as though such representations and warranties were addressed to the Indenture Trustee for the benefit of each Secured Party.

26.    **Certificates**.  Reagan Brown, as an "authorized person" of the Company within the meaning of the Act, has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware, which execution, delivery and filing is hereby ratified and approved.  Upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, his powers as an "authorized person" of the Company ceased, and the Member and each Officer thereupon became a designated "authorized person" of the Company and shall continue as a designated "authorized person" of the Company within the meaning of the Act.  The Member or any Officer, as an "authorized person" of the Company within the meaning of the Act, shall execute, deliver and file, or cause the execution, delivery and filing of, all certificates (and any amendments and/or restatements thereof) required or permitted by the Act to be filed with the Secretary of State of the State of Delaware.  The Member or any Officer shall execute, deliver and file, or cause the execution, delivery and filing of any certificates (and amendments and/or restatements thereof) necessary for the Company to qualify to do business in Texas and in any other jurisdiction in which the Company may wish to conduct business. The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act.

27.    **Other Business**.  Notwithstanding any duty otherwise existing at law or in equity, the Member, the Special Member, any Officer and any Independent Manager and any Affiliate of the Member or the Special Member or the Independent Manager may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others, and the Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

28.    **Severability of Provisions**. Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement that are valid, enforceable and legal.

29.    **Entire Agreement**. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

30.    **Binding Agreement**. Notwithstanding any other provision of this Agreement, the Member agrees that this Agreement, including, without limitation, the Special Purpose Provisions, constitutes a legal, valid and binding agreement of the Member, and is enforceable against the Member by the Independent Manager, in accordance with its terms.  In addition, the Independent Manager shall be an intended beneficiary of this Agreement.

31.    **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

32.    **Notices**. Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Company, to the Company at its address in <u>Section 2</u>, (b) in the case of the Member, to the Member at its address as listed on <u>Schedule B</u> attached hereto and (c) in the case of either of the foregoing, at such other address as may be designated by written notice to the other party.

33.    **Effectiveness**. This Agreement shall be effective as of the date first set forth above.

[Signature Page Follows]

18

**IN WITNESS WHEREOF**, the undersigned, intending to be legally bound hereby, have duly executed this Agreement as of the date first set forth above.

MEMBER:

ALPINE SUMMIT FUNDING HOLDINGS LLC

By: _____
   Name: Craig Perry
   Title:   President and Chief Executive Officer

      **IN WITNESS WHEREOF**, the undersigned, intending to be legally bound hereby, have duly executed this Agreement as of the date first set forth above.

                                   **INDEPENDENT MANAGER AND
POTENTIAL SPECIAL MEMBER:**

                                   _____
                                   Name:  Orlando C. Figueroa

**SCHEDULE A**

Definitions

## 1.  Definitions

When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

"Act" shall have the meaning set forth in the recitals.

"Affiliate" means, when used with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with, such Person. As used in this definition of Affiliate, the term "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of a Person, whether through ownership of such Person's voting securities, by contract or otherwise, and the terms "affiliated", "controlling" and "controlled" have correlative meanings.

"Agreement" means this Amended and Restated Limited Liability Company Agreement of the Company, together with the schedules attached hereto, as amended, restated or supplemented or otherwise modified from time to time.

"Asset Purchase Agreement" means the Asset Purchase Agreement, to be entered into by the Company and HB2 Origination, LLC, as amended, restated or supplemented or otherwise modified from time to time.

"Back-Up Management Agreement" means the Back-Up Management Agreement, to be entered into by the Company, HB2 Origination, LLC, UMB Bank, N.A. and AlixPartners, LLP.

"Back-Up Manager Fee Letter" means the Back-Up Manager Fee Letter, to be entered into by the Company and AlixPartners, LLP.

"Bankruptcy" means, with respect to any Person, (A) if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, or (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (B) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated.  The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

"<u>Basic Documents</u>" means (i) the Indenture, (ii) the Notes, (iii) the Management Services Agreement, (iv) the Asset Purchase Agreement, (v) the Holdings Pledge Agreement, (vi) the Hedge Agreements, (vii) the Holdings Guaranty Agreement, (viii) each Mortgage, (ix) each Precautionary Mortgage, (x) the Operating Agreement, (xi) the Note Purchase Agreement, (xii) the Wellbore Assignment and Bill of Sale, (xiii) the Back-Up Management Agreement, (xiv) the Side Letter, (xv) the Novation Agreement, (xvi) the Back-Up Manager Fee Letter, (xvii) other Basic Documents (as defined in the Indenture), and (xviii) all documents and certificates contemplated by or delivered in connection with any of the foregoing and any amendments to the foregoing.

"<u>Cause</u>" means, with respect to an Independent Manager, (i) acts or omissions by such Independent Manager that constitute willful disregard of, or bad faith or gross negligence with respect to, such Independent Manager's duties under this Agreement, (ii) that such Independent Manager has engaged in or has been charged with, or has been convicted of, fraud or other acts constituting a crime under any law applicable to such Independent Manager, (iii) that such Independent Manager is unable to perform his or her duties as Independent Manager due to death, disability or incapacity, (iv) a change in the fees charged by the Independent Manager or a change in the terms of service of the Independent Manager that is not acceptable to the Company, or (v) that such Independent Manager no longer meets the definition of Independent Manager.

"<u>Certificate of Formation</u>" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on April 7, 2022, as amended or amended and restated from time to time.

"<u>Code</u>" means the Internal Revenue Code of 1986, as it may be amended from time to time, or any successor statute thereto.

"<u>Collateral</u>" shall have the meaning set forth in the Indenture.

"<u>Company</u>" shall have the meaning set forth in the preamble.

"<u>Covered Person</u>" shall have the meaning set forth in <u>Section 14(b)</u>.

"<u>Hedge Agreements</u>" shall have the meaning set forth in the Indenture.

"<u>Hedge Counterparty</u>" shall have the meaning set forth in the Indenture.

"<u>Holdings Pledge Agreement</u>" means the Pledge Agreement, to be entered into by the Member, the Company and the Indenture Trustee, for the benefit of the Secured Parties, as amended, amended and restated, supplemented or otherwise modified from time to time.

"<u>Indenture</u>" means the Indenture, dated on or about the date hereof, by and between the Company, as issuer and UMB Bank, N.A., as indenture trustee, paying agent and as securities intermediary, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Indenture Trustee" means UMB Bank, N.A., a national banking association, not in its individual capacity but solely as Indenture Trustee under the Indenture, or any successor Indenture Trustee under the Indenture.

"Indenture Termination Date" means that date on which the Indenture has been terminated in accordance with its terms and the Notes have been paid in full or are otherwise discharged.

"Independent Manager" means a natural person who (1) for the five-year period prior to his or her appointment as Independent Manager of the Company has not been, and during the continuation of his or her service as Independent Manager of the Company is not: (a) an employee, director, stockholder, member (other than a special member, springing member or similar capacity), manager, partner or officer of the Company, the Member or any of their respective Affiliates (other than his or her service as an Independent Manager or similar capacity of the Company or any Affiliate thereof that is a special purpose entity); (b) a customer or supplier of the Company, the Member or any of their respective Affiliates (other than an Independent Manager provided by a corporate services company that provides independent managers in the ordinary course of its business); or (c) any member of the immediate family of a person described in (a) or (b); (2) has (a) prior experience as an independent manager or independent director for a corporation or limited liability company whose organizational or charter documents required the unanimous consent of all independent managers or independent directors thereof before such corporation or limited liability company could consent to the institution of bankruptcy or insolvency proceedings against it or could file a petition seeking relief under any applicable federal or state law relating to bankruptcy, and (b) at least three years of employment experience with one or more entities that provide, in the ordinary course of their respective businesses, advisory, management or placement services to issuers of securitization or structured finance instruments, agreements or securities; and (3) is an individual employed and provided by a nationally recognized company that provides professional independent directors/managers and other corporate services in the ordinary course of business. For purposes of this paragraph, a "special purpose entity" is an entity, whose organizational documents contain restrictions on its activities and impose requirements intended to preserve such entity's separateness that are substantially similar to the Special Purpose Provisions of this Agreement and the limited liability company agreement of the Member.

"Majority Noteholders" shall have the meaning set forth in the Indenture.

"Management Services Agreement" means the Management Services Agreement, to be entered into by the Manager and the Company, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Manager" means HB2 Origination, LLC, a Delaware limited liability company, in its capacity as manager under the Management Services Agreement, and any successor thereunder.

"Material Action" means to consolidate or merge the Company with or into any Person or sell all or substantially all of the assets of the Company (other than pursuant to the Basic Documents), or to institute proceedings to have the Company be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company or file a voluntary bankruptcy petition or any other petition seeking, or consent to, reorganization or relief

Sch. A-3

with respect to the Company under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or for a substantial part of its property, or make any assignment for the benefit of creditors of the Company, admit in writing the Company's inability to pay its debts generally as they become due, or, take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate the Company.

"Member" means Alpine Summit Funding Holdings LLC, a Delaware limited liability company, as the initial member of the Company, and includes any Person admitted as an additional member of the Company or a substitute member of the Company pursuant to the provisions of this Agreement, each in its capacity as a member of the Company; provided, however, the term "Member" shall not include a Special Member.

"Membership Interest" means a Member's limited liability company interest in the Company.

"Mortgage" shall have the meaning set forth in the Indenture.

"Note Purchase Agreement" means the Note Purchase Agreement, to be entered into by the Company, HB2 Origination, LLC, Alpine Summit Energy Partners, Inc., Ironroc Energy Partners LLC, Alpine Summit Funding Holdings LLC and the Purchasers (as defined therein).

"Noteholders" shall have the meaning set forth in the Indenture.

"Novation Agreement" shall have the meaning set forth in the Indenture.

"Notes" shall have the meaning set forth in the Indenture.

"Officer" has the meaning set forth in Section 7.

"Officer's Certificate" shall have the meaning set forth in the Indenture.

"Operating Agreement" means the Model Form Operating Agreement, to be entered into by the Company and Ironroc Energy Partners, LLC.

"Opinion of Counsel" shall have the meaning set forth in the Indenture.

"Original LLC Agreement" shall have the meaning set forth in the recitals.

"Parties" shall have the meaning set forth in the preamble.

"Partnership Representative" shall have the meaning set forth in Section 24(c).

"Person" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"Precautionary Mortgage" shall have the meaning set forth in the Indenture.

"Recognized Member" means a Person that (1) is a Member and is regarded as a separate entity for federal income tax purposes or (2) with respect to a Member that is a disregarded entity for federal income tax purposes, is the first direct or indirect parent entity of such Person that is regarded as a separate entity for federal income tax purposes.

"Regulations" means the temporary, proposed or final Income Tax Regulations promulgated by the Department of the Treasury.

"Secured Party" shall have the meaning set forth in the Indenture.

"Securities Act" means the Securities Act of 1933, as amended.

"Side Letter" means the Side Letter, to be entered into by the Company, and accepted and agreed to by Kuvare Insurance Services LP.

"Special Member" means, upon such Person's admission to the Company as a member of the Company pursuant to Section 12(b), a Person acting as Independent Manager, in such Person's capacity as a member of the Company.  A Special Member shall only have the rights and duties expressly set forth in this Agreement.

"Special Purpose Provisions" has the meaning set forth in Section 15(b).

"Wellbore Assignment and Bill of Sale" means the Wellbore Assignment and Bill of Sale, to be entered into by the Company and HB2 Origination, LLC.

"Wells" shall have the meaning set forth in the Indenture.

**2.   Rules of Construction**.

Definitions in this Agreement apply equally to both the singular and plural forms of the defined terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation." The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, paragraph or subdivision. The Section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement. All Section, paragraph, clause, Exhibit or Schedule references not attributed to a particular document shall be references to such parts of this Agreement.

**SCHEDULE B**

Member

| Name | Mailing Address | Limited Liability Company Interest |
|------|-----------------|-------------------------------------|
| Alpine Summit Funding Holdings LLC | 3322 West End Avenue, Suite 450, Nashville, TN 37203 | 100% |

**SCHEDULE C**

<u>OFFICERS</u>                                    <u>TITLE(S)</u>

Craig Perry                              President and Chief Executive Officer

Darren Moulds                            Chief Financial Officer

William Wicker                           Chief Investment Officer

Michael McCoy                            Chief Operating Officer

Reagan Brown                             Chief Administrative Officer

Chrystie Holmstrom                       Chief Legal Officer and Secretary